## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AHWAR SULTAN**;<br>2026 Summit St<br>Columbus, OH 43201<br><br>**STUDENTS FOR JUSTICE IN PALESTINE**<br>**at THE OHIO STATE UNIVERSITY**,<br>Ohio State University<br>281 W Lane Ave<br>Columbus, OH 43210<br><br>*Plaintiffs*,<br><br>v.<br><br>**DONALD J. TRUMP,** *in his official capacity*<br>*as President of the United States;*<br>White House<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500<br><br>**MARCO RUBIO,** *in his official capacity as*<br>*Secretary of State of the United States;*<br>U.S. Department of State<br>The Executive Office<br>Office of Legal Advisor, Suite 5.600<br>600 19th Street NW<br>Washington, DC 20522<br><br>**PAMELA BONDI**, *in her official capacity as*<br>*Attorney General of the United States;*<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001<br><br>**KRISTI NOEM**, *in her official capacity as*<br>*Secretary of Homeland Security;*<br>U.S. Department of Homeland Security<br>2707 Martin Luther King Jr. Ave, SE<br>Washington, DC 20528-0485<br><br>**TODD M. LYONS,** *in his official capacity as*<br>*Acting Director of ICE*<br>Office of the Principle Legal Advisor | Civil Action No.: 1:25-cv-01121 |

500 12th Street SW, Mail Stop 5906
Washington, D.C. 20536-5906

*Defendants.*

**PLAINTIFFS' COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

## INTRODUCTION

1.  This action arises from Defendants' unconstitutional retaliation against Plaintiff's
    protected political speech critical of Israeli policies. Defendants' actions have directly
    violated Plaintiff's rights under the First and Fifth Amendments, and the Administrative
    Procedure Act (APA).

2.  Plaintiff Sultan is a full-time international student in lawful F-1 status, enrolled at The
    Ohio State University ("OSU"). He is one of hundreds, if not more, F-1 students
    nationwide whose Student and Exchange Visitor Information System (SEVIS)[i] record
    has been abruptly and unlawfully terminated by U.S. Immigration and Customs
    Enforcement (ICE) last week, effectively stripping them of their ability to remain a
    student in the United States.

3.  Since 2023, along with hundreds of his peers, Plaintiff Sultan has participated in student
    protests, demonstrations and actions related to Israel's military campaign in Gaza and
    the devastating toll it has taken on Palestinian civilians.

4.  On April 25, 2024, hundreds of OSU students and community members engaged in a
    peaceful protest on The Ohio State University South Oval organized by the Students for
    Justice in Palestine at OSU, in part demanding OSU's divestment from the State of
    Israel.

5.  Media reports identified Plaintiff Sultan as one of the individuals arrested on the South
    Oval. Plaintiff Sultan was in attendance and formed a perimeter around praying students
    who were being advanced upon with batons by Ohio State Troopers.

6. Plaintiff Sultan was detained for nearly 12 hours before being released. His charges were dismissed pursuant to predisposition conditions and subsequently expunged. The dismissal was contingent on the completion of 10 hours of community service and the attendance of a workshop on civil discourse which he promptly completed.

7. Upon information and belief, Defendants were aware of Plaintiff's speech and participation in protest activities through media coverage and arrest reports that were widely disseminated, explicitly linking Plaintiff Sultan to protected political speech and Palestinian advocacy.

8. On March 27, 2025, Secretary of State Marco Rubio announced at a press conference that the Department of State had revoked the visas of approximately 300 foreign students.

9. A week later, Plaintiff Sultan was informed by university administration that his SEVIS had been terminated for "otherwise failing to maintain status – individual identified in criminal records check and/or has had their VISA revoked."

10. Critically, revocation of an F-1 visa alone does not constitute grounds for SEVIS termination for students already lawfully admitted, according to ICE's own guidelines.

11. Defendants' actions are part of a larger pattern of government repression of constitutionally protected speech and protest.

12. The government's repression has hyper-focused on international students who speak out in solidarity with Palestinians and who are critical of the Israeli government's ongoing military campaign in Gaza or the pro-Israeli policies of the U.S. government and other U.S. institutions.[1]

---

[1] *See, e.g.*, Bianca Quilantan, Madine Touré, *'They need to see the institutions experiencing pain': The Trump*

13.    Now, officials at the highest echelons of government are attempting to use immigration

enforcement as a bludgeon to suppress speech that they dislike, including Plaintiff

Sultan's speech. To this end, Defendants have adopted a policy ("the Policy") to

retaliate against and punish noncitizens like Plaintiff Sultan for their participation in

protests. Under the Policy, if Defendant Marco Rubio, the Secretary of State, claims

reasonable ground to believe that a noncitizen protester's presence or activities in the

United States would have potentially serious adverse foreign policy consequences for

the United States, or personally determines that their protected views, speech, or

associations would compromise a compelling U.S. foreign policy interest, then such

determinations—according to the government—permit the U.S. Department of

Homeland Security (DHS) to seek to detain and deport the noncitizen protester.

14.    Defendants' actions violate Plaintiff's rights under the First Amendment and Fifth

Amendment of the U.S. Constitution, the Administrative Procedure Act, the

Immigration and Nationality Act, and its own policies. This Court should vacate and set

aside Defendants' Policy and the Rubio Determination, declare Defendants' actions

unlawful, and enjoin Defendants from detaining, transferring, or deporting Plaintiff

Sultan unless Defendants establish that their actions are untainted by impermissible

First Amendment retaliation and discrimination, and are otherwise lawful.

**PARTIES**

---

*administration wants Columbia University to change its admissions and disciplinary rules before research money gets turned back on.*, Politico (Mar. 15, 2025), *available at* https://www.politico.com/news/2025/03/15/colleges-federal-funding-shock-trump-antisemitism-00231160;

Kate Bellows, *Can Trump Force Columbia U. to Expel Student Protesters?*, Chronicle of Higher Education (Mar. 14, 2025), *available at* https://www.chronicle.com/article/can-trump-force-columbia-u-to-expel-student-protesters; Kanishka Singh, Jonathan Allen, *Trump Threatens Funding Cut to Colleges Allowing 'Illegal Protests'*, Reuters (Mar. 4, 2025), *available at* https://www.reuters.com/world/us/trump-says-federal-funding-will-stop-colleges-schools-allowing-illegal-protests-2025-03-04/.

15. Plaintiff Ahwar Sultan ("Plaintiff Sultan") is a citizen of India and currently resides in Columbus, Ohio. He is a second-year graduate student in Comparative Studies at The Ohio State University and has been admitted to the PhD program in History of Art.

16. Plaintiff Students for Justice in Palestine at The Ohio State University ("SJP") is a student-led organization committed to advocating for Palestinian rights, raising awareness about human rights abuses, and promoting political and social discourse regarding Israel-Palestine. SJP members regularly engage in expressive activities protected by the First Amendment, including peaceful protests, educational events, and campus demonstrations.

17. Defendant DONALD J. TRUMP is named in his official capacity as the President of the United States of America. In this capacity, he is responsible for the policies and actions of the executive branch, including the U.S. Department of State and U.S. Department of Homeland Security.

18. Defendant MARCO RUBIO is the Secretary of the United States Department of State and is sued in his official capacity. He is responsible for determinations made pursuant to certain provisions of the immigration laws. Among other things, he has the authority to revoke issued visas pursuant to 8 U.S.C. § 1201(i). Following such a determination, the government may initiate removal proceedings under 8 U.S.C. § 1227(a)(1)(B).

19. Defendant PAMELA BONDI is the Attorney General of the United States and is sued in her official capacity. She is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(g).

20. Defendant KRISTI NOEM is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this

capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a), and routinely transacts business in this District.

21. Defendant TODD M. LYONS is named in his official capacity as the Acting Director of Immigration and Customs Enforcement. As the Acting Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States and routinely transacts business in this District.

## JURISDICTION AND VENUE

22. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 2241; and U.S. Constitution, Article I, § 9, cl. 2 (the Suspension Clause).

23. An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has authority under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, and additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

24. Mr. Sultan does not challenge an underlying order of removal or actions committed to unreviewable agency discretion.

25. Mr. Sultan is challenging Defendants' pattern and practice of targeting individuals associated with protests for Palestinian rights for immigration enforcement in retaliation for their core protected political speech.

26. This includes Defendants' actions targeting Mr. Sultan.

27. No other forum exists to address these claims.

28. Applying any statutory provision to curb jurisdiction in this case therefore would deprive Mr. Sultan of any effective judicial review of his claims and a "serious

constitutional question . . .would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe,* 486 U.S. 592, 603 (1988).

29. Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(A) because Defendant Donald J. Trump, resides in the District, and pursuant to 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to the claim occurred in this District, namely, the formulation and promulgation of the challenged policies, procedures, and practices suspending the visa of Plaintiff.

## LEGAL FRAMEWORK

30. A nonimmigrant visa controls a noncitizen's admission into the United States, not their continued stay.

31. Congress established a statutory basis for student visas under 8 U.S.C. § 1101(a)(15)(F)(i), requiring that a noncitizen engage in a full course of study to maintain nonimmigrant status.

32. Once admitted in F-1 status, a student is granted permission to remain in the United States for the duration of status (D/S) as long as they continue to meet the requirements established by the regulations governing their visa classification in 8 C.F.R. § 214.2(f), such as maintaining a full course of study and avoiding unauthorized employment.

33. The SEVIS is a centralized database maintained by the SEVP within ICE used to manage information on nonimmigrant students and exchange visitors and track their compliance with terms of their status. Under 8 C.F.R. § 214.3(g)(2), Designated School Officials (DSOs) must report through SEVIS to SEVP when a student fails to maintain

status. SEVIS termination is governed by SEVP policy and regulations. Termination must be based on a student's failure to maintain status.

34. DHS regulations distinguish between two separate ways a student may fall out of status: (1) a student who "fails to maintain status," and (2) an agency-initiated "termination of status."

35. The first category, failure to maintain status, involves circumstances where a student voluntarily or inadvertently falls out of compliance with the F-1 visa requirements, for example by failing to maintain a full course of study, engaging in unauthorized employment, or other violations of their status requirements under 8 C.F.R. § 214.2(f). In addition, 8 C.F.R. §§ 214.1(e)–(g) outlines specific circumstances where certain conduct by any nonimmigrant visa holder, such as engaging in unauthorized employment, providing false information to DHS, or being convicted of a crime of violence with a potential sentence of more than a year, "constitutes a failure to maintain status."

36. With the respect to the crime of violence category, 8 C.F.R. § 214.1(g) sets forth that a nonimmigrant's conviction "for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status . . . ." Minor misdemeanor offenses do not meet this threshold for termination based on criminal history.

37. The second category, termination of status by DHS, can occur only under the limited circumstances set forth in 8 C.F.R. § 214.1(d), which only permits DHS to terminate status when: (1) a previously granted waiver under INA § 212(d)(3) or (4) [ 8 U.S.C. § 1182(d)(3) or (4)] is revoked; (2) a private bill to confer lawful permanent residence is

introduced in Congress; or (3) DHS publishes a notification in the Federal Register identifying national security, diplomatic, or public safety reasons for termination. DHS cannot otherwise unilaterally terminate nonimmigrant status.

38.    Accordingly, the revocation of a visa does not constitute failure to maintain status and cannot therefore be a basis for SEVIS termination. If a visa is revoked prior to the student's arrival to the United States, then a student may not enter and the SEVIS record is terminated. However, the SEVIS record may not be terminated as a result of a visa revocation after a student has been admitted into the United States, because the student is permitted to continue the authorized course of study

39.    ICE's own guidance confirms that "[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS record." Rather, if the visa is revoked, the student is permitted to pursue their course of study in school, but upon departure, the SEVIS record is terminated and the student must obtain a new visa from a consulate or embassy abroad before returning to the United States

40.    While a visa revocation *can* be charged as a ground of deportability in removal proceedings, deportability can be contested in such proceedings.

41.    The immigration judge may also even dismiss removal proceedings where a visa is revoked, so long as a student is able to remain in valid status.

42.    Only when a final removal order entered would status be lost.

43.    A student who has not violated their F-1 status, even if their visa is revoked, cannot have a SEVIS record terminated based on INA § 237(a)(1)(C)(i) [8 U.S.C. § 1227(a)(1)(C)(i)] (failure to maintain status), INA § 237(a)(4)(C)(i) [8 U.S.C. § 1227(a)(4)(C)(i)] (foreign policy grounds), or any deportability ground for that matter.

# BACKGROUND

### *Plaintiff Ahwar Sultan*

44. Plaintiff Ahwar Sultan ("Plaintiff Sultan") is a citizen of India and second year graduate student at The Ohio State University ("OSU") in Columbus Ohio.

45. As a graduate student at OSU, Plaintiff Sultan has worked as a Teaching Assistant for an Introduction to Humanities course, is a member of the Comparative Studies Department lecture committee which organizes colloquiums for undergraduate students to showcase their work, and is a member of the South Asia Graduate Studies Association, and was selected as a fellow for the Global Arts and Humanities Society slated to begin funded research this coming Fall.

46. Part of his role as a teaching assistant includes engaging students freely and openly on course-related matters and discussions.

47. On February 28, 2023, Plaintiff Sultan received his acceptance to OSU and was thereafter admitted on March 22, 2023.

48. On April 22, 2023, OSU certified Plaintiff Sultan's Form I-20, *Certificate of Eligibility for Nonimmigrant Student Status*, with the United States Citizenship and Immigration Services ("USCIS"), thereby confirming his admission and registration in SEVIS.

49. Following the issuance and certification of Form, I-20, Plaintiff Sultan became eligible to apply for an F-1 student visa under 8 U.S.C. § 1101(a)(15)(F)(i), which he did on June 22, 2023.

50. On or about July 17, 2023, the U.S. Department of State ("State Department") approved Plaintiff Sultan's student visa application after determining that he was statutorily eligible and posed no threat to national security. This decision reflected the State

Department's conclusion that Plaintiff Sultan satisfied all requirements for admission under the Immigration and Nationality Act ("INA") and that no grounds of inadmissibility applied to him.

51. On August 6, 2023, Plaintiff Sultan entered the United States at John F. Kennedy International Airport, where he was inspected and lawfully admitted by U.S. Customs and Border Protection ("CBP"). His admission further confirmed the federal government's prior determination that he met all legal requirements for entry and posed no national security threat.

52. Since entering the United States on an F-1 visa, Plaintiff Sultan has traveled internationally and been lawfully re-admitted upon inspection by Customs and Border Protection on June 22, 2024, August 16, 2024, December 11, 2024, and January 12, 2025.

53. As a graduate student at OSU, Plaintiff Sultan has worked as a Teaching Assistant for an Introduction to Humanities course, is a member of the Comparative Studies Department lecture committee which organizes colloquiums for undergraduate students to showcase their work, is a member of the South Asia Graduate Studies Association, and was selected as a fellow for the Global Arts and Humanities Society slated to begin funded research this coming Fall.

54. In addition to these activities, Plaintiff Sultan has felt moved to join efforts to advocate for Palestinian human rights.

55. On October 9, 2023, Plaintiff Sultan joined a march on OSU campus organized by the Students for Justice in Palestine.

***Plaintiff Sultan Activism and Political Speech on Campus***

56.  He went on to join two marches on October 12, 2023 and October 21, 2023 in downtown Columbus.

57.  On October 25, 2023, Plaintiff Sultan participated in a student walk-out followed by a march.

58.  On October 26, 2023, Plaintiff Sultan attended an on-campus teach-in for Palestine.

59.  On November 20, 2023, Plaintiff Sultan attended a teach-in organized by the Faculty and Staff for Justice in Palestine at OSU.

60.  On February 8, 2024, Plaintiff Sultan attended a demonstration in the Ohio Union.

61.  On March 1, 2024, Plaintiff Sultan attended a vigil honoring Aaron Bushnell.

62.  On April 14, 2024, the South Asia Graduate Study Association, of which Plaintiff Sultan is a member, organized an event titled "Screenprinting for Palestine".

63.  On April 23, 2024, Plaintiff Sultan attended and was photographed at a protest outside an OSU Trustees Board Meeting demanding the university divest from Israel.[2]

64.  Plaintiff Sultan was not arrested or disciplined in relation to any of the above events.

***Arrest at Peaceful Campus Protest***

65.  On April 25, 2024, hundreds of OSU students and community members engaged in a peaceful protest on The Ohio State University South Oval, in part demanding OSU's divestment from Israel.[3]

66.  The protest began around 6 pm, with students sitting in a circle, breaking bread and singing songs. As the evening wore on, The Ohio State University called upon police,

---

[2] The Ohio State University (@corsrev), Instagram (April 23, 2024), *available at* Central Ohio Revolutionary Socialists (CORS) | Columbus Police arrest 2 students at a protest demanding the university divest from Israel outside the Ohio State University Board of... | Instagram

[3] Ariana Smith, Josie Stewart, Christian Harsa, Meghan Beery, and Nora Igelnik, "Inside the Five-Hour Standoff Between Police and Protesters on the South Oval", The Lantern (April 26, 2024), *available at* Inside the five-hour standoff between police and protesters on the South Oval

along with state troopers who advanced on the crowd and began to brutalize protestors who were joined in prayer, arresting over three dozen and piling them into five arrest vehicles.

67. Plaintiff Sultan was standing on the outer perimeter of the prayer circle when he was arrested as he was attempting to protect the Muslim students who were offering the Maghrib (sunset prayer).

68. On April 29, 2024, OSU President Ted Carter provided various media outlets with the names of those arrested, including Plaintiff Sultan, and stated that "Ohio State's campus will not be overtaken".[4]

69. Prior to this incident, Plaintiff Sultan had no disciplinary measures in relation to his academic progress, or arrests with local police.

70. Following his arrest on April 25, 2024, Plaintiff Sultan's charges were dismissed predisposition, and expunged. The dismissal was contingent on the completion of 10 hours of community service and the attendance of a workshop on civil discourse.

71. Plaintiff Sultan completed the necessary diversion requirements on October 25, 2024.

***Continued Advocacy and Social Justice Engagement***

72. Undeterred by the attempt to suppress his speech, Plaintiff Sultan continued to attend actions and meetings in support of Palestinian human rights including but not limited to a Faculty and Staff for Justice in Palestine Meeting on April 29, 2024, and a Picket for Palestine on October 7, 2024.

---

[4] George Shillcock, "'Ohio State's campus will not be overtaken': President Ted Carter defends protestor arrests", WOSU Public Media (April 29, 2024), *available at* 'Ohio State's campus will not be overtaken': President Ted Carter defends protestor arrests | WOSU Public Media

73.  Plaintiff Sultan's speech regarding the obligations that The Ohio State University has under international law, the human rights of the Palestinian people, and university restrictions on speech is all protected by the First Amendment, particularly as it relates to matter of public concern. It is political speech at the core of the protection of the First Amendment.

74.  In addition to the above, Plaintiff Sultan has been an outspoken member of his campus community on a multitude of social justice issues.

75.  On September 3, 2023 he attended an action in protest of the killing of Ta'Kiya Young by an Ohio police officer.[5]

76.  On December 3, 2024 he organized a tabling and screenprinting in memory of the 40th anniversary of Bhopal Gas Tragedy.[6]

77.  On February 23, 2025, Plaintiff Sultan attended a protest against Anduril, who plan to build a $1 billion weapons factory in Columbus, Ohio.[7]

78.  On February 25, 2025, Plaintiff Sultan attended a teach-in and march for trans liberation.

---

[5] Michael Rubinkam and Samantha Hendrickson, "Ta'Kiya Young, killed by police in an Ohio parking lot, is mouned along with her unborn child", AP News (September 7, 2023), *available at* Ta'Kiya Young, killed by police in an Ohio parking lot, is mourned along with her unborn child | AP News

[6] Mark Dummett, "Bhopal Gas Tragedy: 40 years of Injustice", The Diplomat (December 2, 2024), *available at* Bhopal Gas Tragedy: 40 years of Injustice - Amnesty International

[7] Ginny Richardson, Mike Gold Collective of Columbus, "Local residents protest planned weapons plant", Columbus Free Press (February 27, 2025), *available at* Local residents protest planned weapons plant | ColumbusFreePress.com

79. On February 27, 2025, Plaintiff Sultan engaged in and was photographed at a walk-out and protest against cuts to the Diversity Equity and Inclusion offices at The Ohio State University.[8]

80. On February 28, 2025, Plaintiff Sultan attended and engaged in a sit-in at the Center for Social Change and Belonging at The Ohio State University.[9]

81. On March 4, 2025, Plaintiff Sultan attended a faculty and staff protest at The Ohio State University against Senate Bill 1, which seeks to ban diversity, equity, and inclusion initiatives in higher education and prohibit faculty strikes.[10]

82. On March 11, 2025, the Education Department sent letters to 60 colleges and universities under investigation for alleged "relentless antisemitic eruptions". The Trump administration warned this could result in enforcement actions if the probe found that the institution "failed to protect Jewish students on campus".[11]

83. The Ohio State University was one of the 60 colleges that received the aforementioned letter from the Education Department.[12]

---

[8] Samantha Madar, "President Ted Carter announces changes to DEI programs at Ohio State Senate meeting", The Columbus Dispatch (February 28, 2025), *available at* Ohio State University Senate meeting: Changes to DEI programs

[9] Madison Macarthur, Chrissa Loukas, "Ohio State students protest university ending DEI programming", Spectrum News 1 (February 28, 2025), *available at* OSU students protest university ending DEI programming

[10] Samantha Madar, "Ohio State students, faculty and staff protest over Senate Bill 1, The Columbus Dispatch (March 4, 2025), *available at* Protest March 4, 2025, at Ohio State over SB1 and DEI cuts

[11] Ty Roush, "Trump Administration Investigates These 60 Colleges Over Antisemitism Allegations", Forbes (March 11, 2025), *available at* Trump Investigates These 60 Schools For Alleged Antisemitism

[12] Id.

84. On March 27, 2025, Secretary of State Marco Rubio announced at a press conference that the Department of State had revoked the visas of approximately 300 foreign students.[13]

85. Various university officials have indicated that the Trump administration is deploying the rarely-used risk-to-foreign policy immigration provision used to detain Mahmoud Khalil[14] to now target students across the country.[15]

86. ICE appears to be manually revoking students' immigration status – an authority typically left to university staff.

### Unlawful Termination of Plaintiff Sultan's SEVIS Status

87. On April 3, 2025 at 4:30 pm Plaintiff Sultan was notified through an email from the Office of International Affairs that his SEVIS record "has been terminated" for "otherwise failing to maintain status – individual identified in criminal records check and/or has had their VISA revoked".

88. The termination notice instructed Plaintiff Sultan to cease all F-1-related and campus employment immediately, effectively removing his ability to study or work.

89. Plaintiff Sultan was informed, only days after Defendant Rubio's press conference, that his SEVIS was terminated but was offered no additional information.

---

[13] Edward Wong, "Rubio Says He Has Revoked 300 or More Visas in Trump's Deportation Push", The New York Times (March 28, 2025), *available at* Rubio Says He Has Revoked 300 or More Visas in Trump's Deportation Push - The New York Times

[14] Philip Marcelo, "What to know about Mahmoud Khalil, the Columbia protester arrested by ICE and facing deportation", AP News (March 11, 2025), *available at* Who is Mahmoud Khalil, the Columbia student activist arrested by ICE? | AP News

[15] Prem Thakker, "SCOOP: ICE Revoking Students' Immigration Statuses Without Their or the University's Knowledge", Zeteo (March 29, 2025), *available at* SCOOP: ICE Revoking Students' Immigration Statuses Without Their or the University's Knowledge

90. In fact, the most recent search of Plaintiffs' I-94 has no indication that there has been a revocation of any kind.

91. This has created a sense of fear and uncertainty as Plaintiff Sultan is now living in fear, unsure of whether he will be detained at any moment by ICE due to his protected speech.

92. On April 8, 2025, OSU President Ted Carter sent a message to the OSU campus community stating in part that "We were not formally notified of these actions by the government, nor have we received any information about why the students' visas were revoked."[16]

93. Defendants' failure to offer notice of the visa revocation extended to the University wherein Plaintiff was enrolled, further limiting his ability and opportunity to respond to the revocation in a way that would protect his due process rights.

94. On April 9, 2025, USCIS announced that it will begin considering aliens' social media activity in determining immigration benefits. "There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here," said DHS Assistant Secretary for Public Affairs Tricia McLaughlin. "Sec. Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-Semitic violence and terrorism – think again. You are not welcome here." [17]

---

[16] "A message from President Carter on international student visas", Ohio State News (April 8, 2025), *available at* A message from President Carter on international student visas

[17] "DHS to Begin Screening Aliens' Social Media Activity for Antisemitism", US. Citizenship and Immigration Services (April 9, 2025), *available at* DHS to Begin Screening Aliens' Social Media Activity for Antisemitism | USCIS

95.   Defendants continue to insist on conflating actions and speech taken in support of
      Palestinian human rights with antisemitism18 and openly proclaim that the First
      Amendment and principles of freedom of speech does not apply to non-citizens.

96.   This consistent conflation extends to both recent Executive Orders and Policy wherein
      advocacy for Palestinians is criminalized.

97.   There is a clear causal connection between the actions and policy objectives of
      Defendants as they relate to Plaintiffs' ability to freely express themselves, assemble,
      and associate.

***Plaintiff Students for Justice in Palestine (SJP)***

98.   Plaintiff Students for Justice in Palestine at The Ohio State University (SJP) is a
      registered student organization at Ohio State University, whose purpose is to educate the
      campus community about human rights issues facing Palestinians, advocate for
      Palestinian self-determination, and promote public discourse on U.S. foreign policy
      regarding Israel-Palestine.

99.   SJP engages in expressive activities protected by the First Amendment, including
      organizing peaceful protests, demonstrations, teach-ins, lectures, and other educational
      events.

100.  Plaintiff Sultan is an active member of SJP who regularly participates in, organizes, and
      publicly advocates for the organization's events and activities. Sultan's advocacy, public
      visibility, and leadership in SJP activities, such as campus demonstrations and protests
      critical of Israeli policies, are central to SJP's mission.

---

18 ⬛HYPERLINK "https://www.jewishvoiceforpeace.org/2023/11/09/antisemitism-dangerous/"On
Antisemitism, Anti-Zionism and Dangerous Conflations - JVP

18

101. Defendants' retaliatory and discriminatory immigration enforcement actions against Plaintiff Sultan directly interfere with and substantially burden SJP's organizational mission, activities, and its members' protected rights of speech and association. Defendants' targeted enforcement creates an environment of fear, intimidation, and self-censorship, undermining SJP's ability to conduct advocacy and education concerning Palestinian human rights effectively.

102. As a direct consequence of Defendants' actions, SJP has been forced to divert significant organizational resources to address concerns related to members' safety, immigration status, and legal defense, instead of furthering its core expressive and educational activities. This diversion of resources constitutes concrete injury sufficient to confer organizational standing.

103. Additionally, the targeting and intimidation of active SJP members such as Plaintiff Sultan have deterred current and prospective members from participating fully and freely in organizational activities and advocacy, leading to decreased member participation and engagement.

104. As a direct result of the recent Executive Orders, the SJP communities' willingness to engage in SJP events and actions has been profoundly affected – turnout has plummeted from hundreds, sometimes thousands, to just a handful of participants.

105. This chilling effect on SJP members' willingness and ability to associate and advocate on controversial matters of public concern represents a tangible injury to SJP's organizational effectiveness and associational interests.

106. SJP thus brings this action both on its own behalf, asserting injury to its organizational mission, expressive activities, and associational rights, and in a representative capacity

on behalf of its members, including Plaintiff Sultan, whose constitutionally protected rights have been and continue to be threatened by Defendants' retaliatory immigration actions. SJP has associational standing because: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect through this litigation are germane to its purpose and mission; and (c) neither the claims asserted nor the relief requested require the participation of individual members in this lawsuit.

107. Consequently, Defendants' conduct in targeting SJP members like Sultan directly infringes on the First Amendment rights of the organization itself, undermines its ability to fulfill its advocacy mission, and significantly disrupts the protected expressive and associational activities that lie at the heart of its organizational purpose.

### *Defendant Trump Campaigns on Pledge to "Deport" Students for Protest Activity*

108. During the 2024 presidential campaign, Defendant Trump repeatedly vowed to deport non-citizen students who participate in protest activity. On or about October 28, 2023, he told the Republican Jewish Coalition, "All of the resident aliens who joined in the pro-jihadist protest this month, nobody's ever seen anything like it. Come 2025, we will find you and we will deport you."[19]

109. On May 14, 2024, he told reporters, "Any student that protests, I throw them out of the country… As soon as they hear that, they're going to behave." He described campus protests as a "radical revolution" and promised, "we're going to set that movement back 25 or 30 years."[20]

---

[19] Khaleda Rahman, "Donald Trump's Orde to Deport Pro-Palestinian Activists Explained", Newsweek (January 30, 2025), *available at* Donald Trump's Order to Deport Pro-Palestinian Activists Explained - Newsweek

[20] Lexi Lonas Chochran, "Trump threatens to stop funding for any colleges allowing 'illegal protests'", The Hill (March 4, 2025), *available at* Donald Trump threatens to stop funding for colleges allowing 'illegal protests'

110. At a rally in Wildwood, New Jersey, he declared, "If you come from another country and try to bring Jihadism or anti-Americanism or anti-Semitism to our campuses, we will immediately deport you."[21]

***Defendant Trump Issues Executive Orders***

***EO 1: "Protecting the United States from Terrorists and National Security and Public Safety Threats***

111. Section 1(a) of EO 1 states that it is the policy of the federal government "to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 30, 2025).

112. Section 1(b) further states that, in order "[t]o protect Americans . . . the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security." *Id.*

113. Section 2 of EO 1 implements enhanced vetting of the speech and political opinions of non-citizens. As relevant to Plaintiff:

   a. Section 2(a)(i) requires Defendant Noem, the Attorney General, and the Director of National Intelligence to "promptly . . . identify all resources that may be used to ensure that all aliens . . . who are already in the United States, are vetted and screened to the maximum degree possible." *Id.*

---

[21] Simone Weichselbaum, "Trump's plan to quell protests: 'Deport pro-Hamas radicals'", NBC News (August 13, 2024), *available at* Trump's plan to quell protests: 'Deport pro-Hamas radicals'

b.  Section 2(a)(ii) mandates the same officials to "ascertain whether [an] individual seeking [an immigration] benefit is . . . not a security or public safety threat." *Id.*

c.  Section 2(a)(iv) requires the officials to "vet and screen to the maximum degree possible all aliens who . . . are already inside the United States." *Id.*

114.  Section 3 requires the Secretary of State, in coordination with Defendant Noem, the Attorney General and the Director of National Intelligence, to "[r]ecommend *any actions necessary* to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or *replacement of the culture* on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists." (Emphasis added). *Id.* These recommendations were due no later than February 19, 2025, but as of the date of this filing, they have not been made public.

**EO 2: "Additional Measures to Combat Anti-Semitism"**

115.  Section 1 of EO 2 includes a preamble attacking "the prior administration" for failing to take steps to "protect American Jews," and declaring that "this failure is unacceptable and ends today." Exec. Order No. 14188, 90 Fed. Reg. 8847 (Feb. 3, 2025).

116.  Section 2 states: "It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.*

117. Section 3 requires Defendants Rubio and Noem, in consultation with the Secretary of Education, to issue a report within 60 days to "identify[] all civil and criminal authorities or actions within the jurisdiction of" each agency to "combat anti-Semitism." *Id*.

118. Section 3(e) authorizes the Attorney General to make "recommendations for familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens." *Id.*

119. High-ranking officials from the Department of Justice have recently indicated Defendants' intent to prosecute individuals and subject them to lengthy prison sentences pursuant to EO 2. This threat is imminent. At the end of February 2025, Senior Counsel to the Assistant U.S. Attorney for Civil Rights Leo Terrell told Israel's Channel 12 News: "You see all these disorderly demonstrations, supporting Hamas and trying to intimidate Jews? We are going to put these people in jail — not for 24 hours, but for years."[22] He added, "a lot is going to happen in the next four to five weeks" and that once protestors face a threat of jail time, "it will stop. Id.

120. On February 28, 2025, the U.S. Department of Justice's Task Force to Combat Anti-Semitism announced it would begin "meet[ing] with university leadership, impacted students and staff, local law enforcement, and community members as it gathers

---

[22] Jewish News Syndicate, *DOJ Antisemitism Task Force: We'll Put Hamas Supporters in Jail 'for Years'*, NEWSMAX (Feb. 26, 2025, 9:18 AM), https://www.newsmax.com/us/hamas-terrorists-antisemitic/2025/02/26/id/1200545/

information" about protest activity and alleged "anti-Semitic" activity on campuses in preparation for possible prosecution.[23]

***Executive Orders Impose Chilling Effect on Plaintiff and similarly positioned students***

121. Relying on these executive orders, groups and organizations opposed to Palestinian rights protests began publicizing names of individuals they wanted the U.S. government to deport. The groups compiled lists of students who were publicly identifiable as having organized Palestine-related protests, engaged in Palestine-related advocacy, or otherwise appeared to voice opinions supportive of Palestinians, and upon information and belief, submitted these tips to ICE's tip line.[24]

122. For example, Betar USA[25], an extremist group that has openly embraced Islamophobia and indicated a desire to work with the far-right extremist group the Proud Boys, has published lists of individuals, including Columbia students and faculty, urging ICE to deport them under the executive orders. In a statement to a media outlet, Betar stated that it had "already submitted names of hundreds of terror supporters to the Trump Administration."[26] Betar USA's Executive Director has met with prominent lawmakers

---

[23] Press Release, U.S. Dep't of Justice, Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism (Feb. 28, 2025), https://www.justice.gov/opa/pr/federal-task-force-combat-antisemitism-announces-visits-10-college-campuses-experienced.

[24] Natasha Lennard & Akela Lacy, *The Columbia Network Pushing Behind the Scenes to Deport and Arrest Student Protestors*, The Intercept (Feb. 15, 2025), *available at https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/*.

[25] Betar is a self-described "Zionist" movement. *See* https://betarus.org/. The Anti-Defamation League has labeled Betar USA an extremist group.

[26] Nicholas Liu, *A pro-Israel group says it gave the Trump administration a list of students to deport*, Salon.com (Jan. 31, 2025), *available at* https://www.salon.com/2025/01/31/pledged-to-deport-pro-palestine--and-a-pro-israel-group-has-already-made-a-list/.

and claims credit for providing information that led to the arrest of Columbia student,

Mahmoud Khalil, who held lawful permanent resident status.[27]

123. Canary Mission, an organization dedicated to targeting students, student

organizations, and faculty who advocate for Palestinian rights, has similarly proclaimed it

has identified "suspected foreign nationals" at Columbia University that it would like to

see deported. Id.

124. Predictably, this resulted in widespread fear of retaliation for pro-Palestine speech

among noncitizen students. Reporting has shown that the executive orders "already

appear to be chilling political activism."[28]

125. On or before Wednesday March 5, 2025, Defendants adopted the Policy by which they

would retaliate against and punish noncitizens, including Plaintiff Sultan, for their

actual or perceived advocacy for Palestinian rights.

126. Under the Policy, Defendant Rubio, the Secretary of State, and the Department of

Homeland Security would seek to identify any noncitizen associated with protests

supportive of Palestinian human rights. One way to target individuals would be to

identify any noncitizen who had been arrested during protests associated with

Palestinian rights advocacy on campuses, regardless of whether they had participated in

the protest, their actual activity during any protest, the nature of any of the conduct

charged, or the ultimate outcome or disposition of any of these arrests.

---

[27] Anna Betts, *Pro-Israel group says it has 'deportation list' and has sent 'thousands' of names to Trump officials*, The Guardian (March 14, 2025), *available at* https://www.theguardian.com/us-news/2025/mar/14/israel-betar-deportation-list-trump .

[28] Tovia Smith, *Foreign students say the threat of Trump's executive orders is getting real*, NPR (Mar. 3, 2025), *available at* https://www.npr.org/2025/03/03/nx-s1-5307187/trump-executive-order-visa-pro-palestinian-foreignstudents-protests-hamas-hezbollah-israel.

127. Under the Policy, the Secretary of State would also identify noncitizen students or faculty generally associated with pro-Palestine protests on campuses, or who espoused views supportive of Palestinian human rights.

128. Under the Policy, Defendant Rubio is empowered to determine that a noncitizen's presence or activities in the United States would have potentially serious foreign policy consequences for the United States or to "personally" determine that a noncitizen's protected expressive activity would compromise a compelling U.S. foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protester.

129. On March 6, 2025, the Department of State confirmed the commencement of this Policy to the press.

130. Specifically, on March 6, 2025, the Department of State informed Fox News that it had revoked the student visa of a noncitizen who was "cited for criminal behavior in connection with Hamas-supporting disruptions. This individual was a university student. ICE will proceed with removing this person from the country."[29]

131. The Department of State confirmed it was planning to review internal databases to see whether any visa holders were arrested and had not been subjected to immigration enforcement.[30]

---

[29] Louis Casiano, Bill Melugin, *State Department revokes first visa of foreign student linked to "Hamas-supporting disruptions,"* Fox News (Mar. 6, 2025), *available at* https://www.foxnews.com/politics/state-department-revokes-first-visa-foreign-student-linked-hamas-supporting-disruptions.

[30] Marc Caputo, *Scoop: State Dept. to use AI to revoke visas of foreign students who appear "pro-Hamas,"* Axios (Mar. 6, 2025), *available at* https://www.axios.com/2025/03/06/state-department-ai-revoke-foreign-student-visas-hamas.

132. Additionally, on March 6, 2025, the Department of State announced a program called "Catch and Revoke," an artificial intelligence driven effort to "cancel the visas of foreign nationals who appear to support Hamas or other designated terror groups.

133. Government officials confirmed that they would conduct an AI-assisted review of "tens of thousands of student visa holders' social media accounts," to look for evidence of "alleged terrorist sympathies." The announcement did not clarify how the government would determine someone held "terrorist sympathies."

***History of the Foreign Policy Ground***

134. Under the immigration laws, the Secretary of State has been granted wide latitude to refuse entry or deport noncitizens if he has "reasonable grounds to believe" that their presence or activities "would have potentially serious adverse foreign policy consequences for the United States." See 8 U.S.C. § 1227(a)(4)(C)(i) (referencing 8 U.S.C. § 1182(a)(4)(C)(i)).

135. The statute expressly forbids the Secretary of State from issuing a policy or decision to deny entry or initiate deportation based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary "personally determines" that admitting the individual or allowing them to remain in the United States would compromise a compelling U.S. foreign policy interest, 8 U.S.C. § 1182(a)(3)(C)(iii), and then notifies certain leaders in Congress of the person's identity and the reasons for the determination, 8 U.S.C. § 1182(a)(3)(C)(iv).

136. Legislative history confirms that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. A Senate Committee report

provides that for years "the United States has embarrassed itself by excluding prominent

foreigners from visiting the United States solely because of their political beliefs." The

amendments which resulted in the current version of the law were intended "to take

away the executive branch's authority to deny visas to foreigners solely because of the

foreigner's political beliefs or because of his anticipated speech in the United States."[31]

***Existing DHS Guidance Concerning First Amendment Activity***

137. In 2019, during the first Trump Administration, DHS Acting Secretary Kevin

McAleenan issued guidance to all DHS employees specifically concerning First

Amendment protected activities.[32] Per that memorandum, the prior Trump

Administration directed that "DHS does not profile, target, or discriminate against any

individual for exercising his or her First Amendment rights."

138. In 2021, then-Secretary of Homeland Security Alejandro Mayorkas issued guidance to

ICE providing that "[a] noncitizen's exercise of their First Amendment rights . . .should

never be a factor in deciding to take enforcement action."[33]

139. As of the date of filing, DHS has yet to rescind the Mayorkas 2021 Guidance, or issue

new guidance that addresses consideration of First Amendment rights as a factor in

enforcement actions.

### **CLAIMS FOR RELIEF**

---

[31] S. Rep. No. 100-75 at 11, 100th Cong., 1st Sess. (1987) (reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

[32] See Memorandum from Kevin McAleenan, Sec'y, U.S. Dep't of Homeland Sec., to all DHS Employees (May 17, 2019), available at https://www.dhs.gov/sites/default/files/publications/info_regarding_first_amendment_protected_activities_as1_signed_05.17.2019.pdf.

[33] See Memorandum from Alejandro N. Mayorkas, Sec'y, U.S. Dep't of Homeland Sec., to Tae D. Johnson, Acting Dir., U.S. Immigr. & Customs Enf't 5 (Sept. 30, 2021), available at https://www.ice.gov/doclib/news/guidelinescivilimmigrationlaw.pdf.

**Count 1: Violation of the First Amendment Right to Free Speech**

**(U.S. Constitution, First Amendment)**

*On Behalf of All Plaintiffs*

140. Plaintiff hereby incorporates by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

141. The First Amendment to the U.S. Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I.

142. The Orders have imposed an unconstitutional chilling effect on all Plaintiffs' right to free speech. The First Amendment protects "people" and not citizens alone. U.S. Const. Amend. I. This includes non-citizens living in the U.S. "Freedom of speech and of press is accorded [non-citizens] residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945).

143. The First Amendment protects past and future speech. *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009) ("The first amendment protects speakers from threats of punishment that are designed to discourage future speech."); *Saleh v. City of New York*, No. 06 Civ. 1007(SHS), 2007 WL 4437167, at *3 (S.D.N.Y Dec. 17, 2007) (noting that First Amendment retaliation claims can be brought "alleging punishment for past speech and those complaining of suppression of future speech"). The First Amendment protects "[t]he rights to complain to public officials and to seek administrative and judicial relief." *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir.1994). The First Amendment applies to actions taken against people in custody, *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004), and those threatened with deportation, *Ragbir v. Homan*, 923 F.3d 53, 66 (2d Cir. 2019) (internal citations omitted*), cert. granted, remanded, and vacated sub nom.on other grounds*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020).

29

144. Courts have recognized that retaliation against noncitizens exercising protected speech violates constitutional protections. *See Ragbir v. Homan*, 923 F.3d 53, 66 (2d Cir. 2019).

145. It is well-settled that the First Amendment protects against retaliation even where the government "mistakenly *thought* that the [individual] had engaged in protected speech" because "the government's reason . . . is what counts[.]" *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016). This rule applies where the government's factual mistake pertains to participation in protest activity, *Hughes v. City of New York*, 680 F. App'x 8, 9–10 (2d Cir. 2017) (applying *Heffernan* to protected association claim arising from protest); *see also Zehner v. Jordan-Elbridge Bd. of Educ.*, 666 F. App'x 29, 30 (2d Cir. 2016) (applying *Heffernan* to associational activity), and even where that individual did not actually engage in protected conduct. *See McNichol v. Falco*, No. 16-cv-2119, 2020 WL 5802492, at *11 (S.D.N.Y. Sept. 28, 2020) ("[A] perceived protected activity, in the absence of an actual protected activity, can nevertheless give rise to an actionable First Amendment [] claim."); *Burgess v. Banasike*, 636 F. Supp. 3d 351, 359 (W.D.N.Y. 2022) ("[A] plaintiff need not actually engage in protected conduct[.]").

146. Speech on matters of public concern is entitled to the highest level of protection under the First Amendment. *See, e.g., Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("[S]peech critical of the exercise of the State's power lies at the very center of the First Amendment."). Moreover, government action that targets private speech based on the viewpoint taken by the speaker is an egregious form of content discrimination and presumptively unconstitutional. *See Matal v. Tam*, 582 U.S. 218, 234 (2017).

147. "To state a First Amendment retaliation claim, a plaintiff must show that: '(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [the plaintiff's] exercise of that right; and (3) the defendant's actions caused [the plaintiff] some injury.'" *Ragbir*, 923 F.3d at 66 (internal citations omitted).

148. In addition, "the Constitution prevents governmental actors from forbidding, or penalizing, speech that is protected under the first amendment . . . . Threatening penalties for future speech goes by the name 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Fairley*, 578 F.3d at 525. To establish a claim of an unconstitutional "prior restraint" on future testimony, a plaintiff must show (1) that defendants presented "threats of punishment that are designed to discourage" the future testimony, (2) "that [plaintiff's] potential testimony . . .caused the . . .threats," and (3) that the defendants actions caused some injury. *Id.*

149. Plaintiff Sultan's speech is protected by the First Amendment.

150. Plaintiff Sultan's past speech pertains to matters of prominent public concern, including the ongoing Israeli military campaign in Gaza, U.S. government support therefor, U.S. academic institutions' financial investments associated with Israel, and campus responses to advocacy for the rights of Palestinians.

151. Defendants are aware of Plaintiff Sultan's speech and viewpoints. Defendants are aware that Plaintiff Sultan was arrested at a protest on the South Oval at OSU. The arrests were covered in the press, and Plaintiff Sultan was fingerprinted after the arrest, which would have alerted ICE to the arrest.

152. Defendants' actions come months after this protest and arrest.

31

153. There is a substantial causal connection between Plaintiff Sultan's protected speech and Defendants' adverse actions and threats.

154. Defendants have taken adverse actions against Plaintiff Sultan that are motivated by his past and future exercise, and perceived exercise, of First Amendment-protected speech, and have taken action to silence and discourage Plaintiff Sultan from speaking out in the future.

155. By threatening deportation of non-citizens and criminal prosecution of U.S. citizen who protest Israel and Israeli actions in Palestine, the language of executive orders combined with Defendant Trump and high-ranking officials in the Department of Justice have had an immediate chilling effect on the speech and activity of Plaintiffs, who despite a past pattern and practice of attending protests and criticizing the U.S. government and government of Israel have significantly limited such activity in the weeks following the promulgation of the Orders for fear of being arrested, prosecuted, jailed, or deported.

156. Plaintiff engaged in protected political speech by participating in peaceful protests critical of Israeli government policy. Defendants retaliated by revoking Plaintiff's visa and terminating his SEVIS record.

**Count 2: Violation of the First Amendment Right to Association**

**(U.S. Constitution, First Amendment)**

*On Behalf of All Plaintiffs*

157. Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

158. All plaintiffs have a First Amendment right to associate with individuals who possess views that are critical of the U.S. government, its institutions, policies, American "culture," or whose views are critical of the Israeli government. "When it comes to the

freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'" *Ams. For Prosperity Found. V. Bonta*, 594 U.S. 595, 609 (2021) (Quoting *NAACP v. Button*, 371 U. S. 415, 433 (1963)).

159. By barring non-citizens from criticizing the U.S. government, its institutions, its policies, American culture, and the government of Israel, the orders have chilled Plaintiffs and their professor-colleagues and fellow students from interacting, meeting, holding discussions or publicly associating with one another. This implicates each Plaintiff's associational rights, regardless of alienage. Because EO 1 announced that Defendants are surveilling all non-citizens in the U.S. to monitor their political views, Plaintiff Sultan possesses a reasonable fear that associating with local activists may constitute an "anti-American" act in itself, thereby subjecting him to possible negative immigration consequences. And because EO2's criminal prosecution provision applies to citizens as well as non-citizens, all Plaintiffs fear that Defendants might interpret their association with one another as proof of activity that falls under the ambit of that order. This has produced an unconstitutional chilling effect on all Plaintiffs' right to freely and publicly associate with one another.

**Count 3: Violation of the First Amendment – Vagueness and Overbreadth**

**(U.S. Constitution, First Amendment)**

*On Behalf of All Plaintiffs*

160. Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

161. Both executive orders are unconstitutionally vague and overbroad. The sweeping and confusing language of the orders creates substantial uncertainty as to the type of speech that is barred. This uncertainty has chilled a broad range of protected speech on the part of Plaintiffs, which renders each order unconstitutionally vague for overbreadth.

162. "Where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 391 (1972) (quotations and citations omitted). A restriction on speech is unconstitutionally vague if "a substantial number of sweep." *Ams. For Prosperity Found. V. Bonta*, 594 U.S. at 615; *United States v. Hansen*, 599 U. S. 762, 770 (2023) (speech restriction is void for vagueness if it "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep").

163. This test is met here. The language of the orders encompasses all speech critical of the government, its institutions, American culture, and the government of Israel. Its scope is unprecedented in the context of First Amendment restrictions. The vast majority of the orders' applications sweep-up clearly protected speech. In fact, the orders criminalize no type of activity or speech that isn't already barred by either the inadmissibility and deportability statutes (8 U.S.C. §§1182 and 1227, respectively) or the criminal "material support for terrorism" statute (18 U.S.C. §2339B). The ban on expressing a "hostile

attitude" toward American "culture" is of particular concern as EO1 does not define the elements of American "culture" that are to be insulated from criticism.

164. The broad and sweeping character of the Orders will lead reasonable individuals to self-censor speech that is plainly protected for fear of transgressing the vague boundaries enumerated therein. The Orders are overbroad and vague in violation of the First Amendment.

## Count 4: Violation of the Administrative Procedure Act

## (Arbitrary and Capricious Agency Action; Failure to Provide Notice and Opportunity to Respond) (5 U.S.C. § 706)

*On Behalf of Plaintiff Sultan*

165. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

166. Under the Administrative Procedure Act ("APA"), agency action must not be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Agency actions must also comply with procedural requirements, including fair notice and the opportunity to respond. 5 U.S.C. § 706(2)(D).

167. Defendants acted arbitrarily and capriciously by failing to provide Plaintiff notice and an opportunity to respond to alleged visa revocation or SEVIS termination, in violation of both 5 U.S.C. § 706(2)(D) and DHS's own regulations at 8 C.F.R. § 214.3(g)(2).

168. Defendants acted arbitrarily and capriciously in violation of 5 U.S.C. § 706(2)(A) by failing to provide notice and opportunity to respond as required by 8 C.F.R. § 214.3(g)(2).

169. Plaintiff Sultan was a lawful F-1 nonimmigrant student visa holder, in full compliance with all immigration regulations, including maintaining a full course of study and SEVIS registration.

170. Without prior notice, explanation, or an opportunity to respond, the U.S. Department of State revoked Plaintiff's F-1 visa. Plaintiff was not informed of the reason for revocation, nor was any process afforded to contest the revocation or correct any purported deficiencies.

171. Defendants have no statutory or regulatory authority to terminate Plaintiff's SEVIS record or status based simply on revocation of a visa. Additionally, nothing in Plaintiff's criminal history or other history provides a basis for termination.

172. According to the U.S. Department of State's own guidelines, including the Foreign Affairs Manual (9 FAM 403.11), consular officers are instructed—*when practicable*— to notify a visa holder of the intent to revoke and to allow the individual to respond prior to revocation. Defendants failed to make any such effort or determination regarding practicability.

173. Defendants' revocation of Plaintiff's visa without any individualized consideration, notice, or opportunity to respond constitutes arbitrary and capricious action, in violation of the APA, and fails to meet minimal standards of due process and fair administrative practice.

174. Defendants' actions have deprived Plaintiff of lawful immigration status, educational opportunities, and due process protections to which Plaintiff is entitled under federal law.

175. Plaintiff has suffered and continues to suffer irreparable harm as a direct result of the visa revocation and the unlawful denial of procedural protections.

### Count 5: Violation of the Due Process Clause

### (U.S. Constitution, Fifth Amendment)

*On Behalf of Plaintiff Sultan*

176. Plaintiffs incorporates the preceding paragraphs as if fully set forth herein.

177. The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

178. Procedural due process requires that the government be constrained before it acts in a way that deprives individuals of property interests protected under the Due Process Clause of the Fifth Amendment.

179. Once a student is lawfully admitted to the United States in F-1 status and complies with the regulatory requirements of that status, the continued registration of that student in SEVIS is governed by specific and mandatory regulations.

180. Because these regulations impose mandatory constraints on agency action and because SEVIS registration is necessary for a student to remain enrolled as an international student, Plaintiff has a constitutionally protected property interest in their SEVIS registration. *See ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059 (9th Cir. 2015)(recognizing protected property interest in participating in exchange visitor program); *Brown v. Holder*, 763 F.3d 1141, 1148 (9th Cir. 2014) (recognizing protected property interest in nondiscretionary application for naturalization).

181. "Plaintiff has a constitutionally protected property interest in his continued enrollment, F-1 status, and SEVIS registration, consistent with established precedents recognizing protected interests of nonimmigrant students. *See ASSE Int'l, Inc.*, 803 F.3d at 1070.

182. Defendants terminated Plaintiff's SEVIS record without prior notice or opportunity to contest, violating procedural due process.

183. Defendants terminated Plaintiff's SEVIS record based on improper grounds without prior notice and without providing Plaintiff an opportunity to respond. The failure to provide notice of the facts that formed the basis for the SEVIS termination is a violation of due process under the Fifth Amendment

**Count 6: Violation of the Immigration and Nationality Act, and Accardi Doctrine**

**(8 U.S.C. §§ 1227, 1182)**

*On Behalf of Plaintiff Sultan*

184. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

185. The government has adopted a policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction, 5 U.S.C. § 706(2)(A)-(B), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

186. In addition, the Secretary of State's determination that Plaintiffs' "presence or activities" would carry "potentially serious adverse foreign policy consequences for the United States" is arbitrary and capricious, an abuse of discretion, contrary to

constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. §
706(2)(A), (B), (C).

187. The Secretary of State's personal determination that Plaintiffs' protected past, current,
or expected speech, beliefs, statements, or associations may form a basis to deport him
because his presence "would compromise a compelling United States foreign policy
interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional
right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B),
(C).

188. Under *Accardi v. Shaughnessy*, 347 U.S. 260 (1954), Defendants were obligated to
comply strictly with their published policies governing SEVIS termination and visa
revocation.

189. Defendants violated the *Accardi* doctrine by failing to follow ICE's own regulations,
specifically 8 C.F.R. § 214.1(d), governing circumstances for lawful termination of
SEVIS records.

190. Defendants violated their own procedures by initiating termination without proper
statutory or regulatory grounds, rendering their actions unlawful.

## **PRAYER FOR RELIEF**

A.  Plaintiff seeks a preliminary and permanent injunction restraining Defendants from
further adverse immigration actions taken in retaliation for Plaintiff's protected First
Amendment activities.

B.  Declare Defendants' Policy and Executive Orders unconstitutional under the First
Amendment as impermissible viewpoint discrimination and retaliation.

C.  Order Defendants to immediately reinstate Plaintiff Sultan's SEVIS record and F-1 status, including the removal of any derogatory information resulting from the unlawful termination.

D.  Order Defendants to expunge all immigration enforcement records created or maintained regarding Plaintiff as a result of the retaliatory actions taken.

E.  Issue a permanent injunction barring Defendants from surveilling, detaining, or deporting Plaintiff based solely or primarily on constitutionally protected speech activities.

F.  Order Defendants to implement procedural safeguards ensuring that nonimmigrant students receive adequate notice and an opportunity to respond prior to visa revocation or SEVIS termination.

G.  Require Defendants to report periodically to the Court to ensure ongoing compliance with the ordered relief.

H.  Order Defendants to issue a public clarification acknowledging the unlawful nature of their actions, explicitly stating that participation in lawful political speech shall not serve as a basis for immigration enforcement or retaliation.

I.  Order Defendants to implement procedural safeguards ensuring nonimmigrant students receive notice and opportunity to respond prior to visa revocation or SEVIS termination.

J.  Award Plaintiff reasonable attorneys' fees, litigation costs, and any other relief as the Court deems just and proper pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and other applicable statutes.

Dated: April 15, 2025                    Respectfully Submitted,

                                        */s/ Jana Al-Akhras*
                                        Jana Al-Akhras, Esq. (OH: 0096726)
                                        Phone: (929) 988-0912
                                        Email: ja@urenaesq.com

Rafael Urena, Esq. (NY: 5164058)
Phone: (703) 989-4424
Email: ru@urenaesq.com

**URENA & ASSOCIATES**
42 West St. Suite 136
Brooklyn, NY 11222
info@urenaesq.com / (888) 817-8599
*Counsel for Plaintiffs*