## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**AHWAR SULTAN**;
2026 Summit St
Columbus, OH 43201

Civil Action No.: 1:25-cv-01121

**STUDENTS FOR JUSTICE IN PALESTINE
at THE OHIO STATE UNIVERSITY**,
Ohio State University
281 W Lane Ave
Columbus, OH 43210

*Plaintiffs*,

v.

**DONALD J. TRUMP,** *in his official capacity
as President of the United States;*
White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

**MARCO RUBIO,** *in his official capacity as
Secretary of State of the United States;*
U.S. Department of State
The Executive Office
Office of Legal Advisor, Suite 5.600
600 19th Street NW
Washington, DC 20522

**PAMELA BONDI**, *in her official capacity as
Attorney General of the United States;*
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**KRISTI NOEM**, *in her official capacity as
Secretary of Homeland Security;*
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485

**TODD M. LYONS,** *in his official capacity as
Acting Director of ICE*
Office of the Principle Legal Advisor
500 12th Street SW, Mail Stop 5906
Washington, D.C. 20536-5906

*Defendants.*

**PLAINTIFFS' AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE
RELIEF**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

PARTIES ............................................................................................................................ 7

JURISDICTION AND VENUE ........................................................................................ 8

LEGAL FRAMEWORK.................................................................................................... 10

BACKGROUND ............................................................................................................... 13

    Defendant Trump Campaigns on Pledge to "Deport" Students for Protest Activity ............... 15

    Defendant Trump Issues Executive Orders.............................................................................. 15

    Executive Order No. 14,161: "Protecting the United States from Terrorists and National
    Security and Public Safety Threats ........................................................................................... 16

    Executive Order No. 14,188: "Additional Measures to Combat Anti-Semitism" ................... 17

    Ideological Deportation Policy ................................................................................................. 20

    Impact of the Executive Orders and the Ideological Deportation Policy ................................. 21

    ICE and the Student Criminal Alien Initiative......................................................................... 29

    Plaintiff Ahwar Sultan............................................................................................................... 30

    Plaintiff Sultan Activism and Political Speech on Campus ...................................................... 32

    Arrest at Peaceful Campus Protest............................................................................................ 32

    Continued Advocacy and Social Justice Engagement .............................................................. 34

    Unlawful Termination and Revocation of Sultan's SEVIS record, F-1 Status, and Visa ......... 36

    Plaintiff Students for Justice in Palestine (SJP)....................................................................... 39

    Executive Orders Impose Chilling Effect on Plaintiffs ........................................................... 41

    History of the Foreign Policy Ground ...................................................................................... 44

    Existing DHS Guidance Concerning First Amendment Activity .............................................. 45

CLAIMS FOR RELIEF ..................................................................................................... 46

    Count 1: Violation of the First Amendment Right to Free Speech ........................................... 46

    Count 2: Violation of the First Amendment Right to Association ............................................ 50

    Count 3: Violation of the First Amendment – Vagueness and Overbreadth ............................ 51

    Count 4: Violation of the Administrative Procedure Act .......................................................... 52

    Count 5: The Ideological-deportation policy violates the Fifth Amendment .......................... 54

    Count 6: Violation of the Due Process Clause......................................................................... 55

Count 7: Violation of the Immigration and Nationality Act, and *Accardi* Doctrine ............. 56

PRAYER FOR RELIEF ............................................................................................................. 57

## INTRODUCTION

1.  This Complaint calls upon this Court to join the growing chorus of federal courts across the country expressed grave concerns about or rejected government's efforts to wield immigration enforcement as a tool of ideological punishment.[1]

2.  Plaintiffs respectfully ask this Court to reaffirm that the First Amendment protects the rights of all persons—citizens and noncitizens alike—to speak, assemble, and advocate without fear of government retaliation. In doing so, this Court will help preserve the constitutional foundation of a free American society and ensure that dissent remains not a deportable offense, but a protected civic virtue.

3.  By targeting noncitizen students like Plaintiff Sultan for arrest, detention, and deportation solely because of their political beliefs and protected speech, Defendants have struck at

---

[1] *See, eg., Mahdawi v. Trump*, No. 2:25-cv-00389, 2025 WL 1009445 (D. Vt. Apr. 22, 2025) (noting extraordinary circumstances and condemning the immigration enforcement against noncitizens, not charged with crimes, who faced arrest and deportation threats for political speech, drawing parallels to abuses during the Red Scare and Palmer Raids); *Mohammed H. v. Trump,* No. 25-1576 (JWB/DTS), slip op. (D. Minn. May 5, 2025) (holding record showed sufficient evidence of viewpoint-based retaliation, emphasizing the arrest of an international student aligned with executive policy targeting individuals supporting Palestinian human rights and criticizing violence in Gaza); *Am. Ass'n of Univ. Professors v. Rubio,* No. 25-10685-WGY, 2025 U.S. Dist. LEXIS 80935 (D. Mass. Apr. 29, 2025) (denying the government's motion to dismiss First Amendment and APA claims challenging the ideological-deportation policy pursuant to executive orders, emphasizing the gravity of allegations that federal agencies actively and intentionally sought to silence political speech based solely on its viewpoint). *Khalil v. Trump*, No. 25-cv-1935, 2025 WL 849803 (S.D.N.Y. Mar. 19, 2025) (holding that expedited judicial review is required for First Amendment claims surrounding the ideological-deportation policies); *Ozturk v. Hyde,* No. 25-1019, 2025 U.S. App. LEXIS 10976 (2d Cir. May 7, 2025) (finding that the only justification the government has provided for an international student's arrest and detention is that she had been involved in associations that may undermine U.S foreign policy and co-authoring an op-ed.); *Suri v. Trump,* No. 1:25-cv-480 (PTG/WBP), 2025 U.S. Dist. LEXIS 86877, at *41-42 (E.D. Va. May 6, 2025) (highlighting ICE's irregular and rapid interstate transfers of international students, which deviate from standard procedures and appear aimed at obstructing legal representation and judicial oversight) (collecting cases).

the heart of the First Amendment and threatened to fundamentally alter the fabric of American democracy.

4.  If allowed to stand, the Ideological Deportation Policy will mark a dangerous precedent in which the federal government wields immigration enforcement as a tool of ideological control, transforming campuses from spaces of inquiry and dissent into zones of surveillance and fear.

5.  This Court must intervene to reaffirm that in a free society—especially one grounded in constitutional principles—political speech is not a deportable offense.

6.  The preservation of expressive freedom, especially in the face of governmental retaliation, is essential to the continued legitimacy of our constitutional order.

7.  This action arises from the government's unconstitutional retaliation against Plaintiffs' protected political speech critical of Israeli policies and support for fundamental human rights for Palestinian people.

8.  Defendants' actions have directly violated Plaintiffs' rights under the First and Fifth Amendments, and the Administrative Procedure Act (APA).

9.  Plaintiff Sultan is a full-time international student in lawful F-1 status, enrolled at The Ohio State University ("OSU").

10. Plaintiff Students for Justice in Palestine at The Ohio State University ("SJP") is a student-led organization committed to advocating for Palestinian rights, raising awareness about human rights abuses, and promoting political and social discourse regarding Israel-Palestine.

11. Since 2023, Plaintiffs, along with hundreds of their peers, participated in student protests, demonstrations and actions related to Israel's military campaign in Gaza and the devastating toll it has taken on Palestinian people.

12. On April 25, 2024, hundreds of OSU students and community members engaged in a peaceful protest on The Ohio State University South Oval organized by the Students for Justice in Palestine at OSU, in part demanding OSU's divestment from the State of Israel.

13. Plaintiff Sultan was identified in media reports as an individual arrested on the South Oval during the protest. He had formed a protective perimeter around students praying, who were being advanced upon by Ohio State Troopers armed with batons. Plaintiff Sultan was detained for nearly 12 hours before being released.

14. Plaintiff Sultan was detained for nearly 12 hours before release. His charges were dismissed subject to predisposition conditions, which required completion of 10 hours of community service and attendance at a civil discourse workshop—both promptly fulfilled. These charges were subsequently expunged.

15. His charges were dismissed pursuant to predisposition conditions and subsequently expunged. The dismissal was contingent on the completion of 10 hours of community service and the attendance of a workshop on civil discourse which he promptly completed.

16. Shortly after assuming office, President Donald J. Trump issued Executive Order No.14,161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats" and Executive Order No.14,188 titled "Additional Measures to Combat Anti-Semitism" on January 29. 2025.

17.    Executive Order 14,161 imposed sweeping restrictions on noncitizens by revoking valid

visas and suspending entry based on vague and unsubstantiated national security claims,

without individualized assessments or procedural protections. It also authorized federal

agencies to coordinate surveillance, visa revocation, and immigration enforcement

actions against individuals based solely political opinions, expressions, and

associations.

18.    The Order authorized federal agencies to coordinate surveillance, visa revocation, and

immigration enforcement actions against individuals based solely on their country of

origin or past political associations, violating due process and equal protection

guarantees under the Constitution.

19.    Executive Order No.14,188 expanded the federal government's definition of anti-

Semitism to include criticism of the State of Israel and authorized immigration

consequences—including visa revocation and removal—for foreign students and

scholars engaged in pro-Palestinian speech or campus activism.

20.    Pursuant to this Order, the Department of Homeland Security and the Department of

State implemented policies that authorized violent and unconscionable immigration

enforcement actions under the pretext of combating anti-Semitism (the "ideological-

deportation policy" or "the policy").

21.    Following the issuance of these executive orders, Defendants and their associated

agencies have sent masked, plain-clothed federal agents to carry out arrests, detentions,

and deportations of noncitizen students and faculty who participate in pro-Palestine

protests and other related expression and association.

22.    Pursuant to these unconstitutional executive orders and their implementing policies,

4

procedures, and practices, U.S. Immigration and Customs Enforcement (ICE) created

the Student Criminal Alien Initiative ("the Initiative").

23. Pursuant to the Initiative, ICE and the Department of State ("State) abruptly and

unlawfully terminated the Student and Exchange Visitor Information System (SEVIS)[i]

record and revoked the student visas of hundreds of F-1 students nationwide,

effectively stripping them of their ability to remain a student in the United States.

24. While Defendant Trump and other administration officials have described pro-

Palestinian campus protests as "pro-Hamas", they have stretched that label beyond the

breaking point to encompass any speech supportive of Palestinian human rights or

critical of Israel and have left no doubt that their new policy entails the arrest, detention,

and deportation of noncitizen students for constitutionally protected speech and

association.

25. On April 3, 2025, Plaintiff Sultan was informed by university administration that his

SEVIS had been terminated for "otherwise failing to maintain status – individual

identified in criminal records check and/or has had their VISA revoked."

26. On April 21, 2025, Plaintiff Sultan received an email from the US Consulate Mumbai

informing him that his visa had been revoked pursuant to INA 221(i) and directing him

to depart the United States.

27. Revocation of an F-1 visa alone does not constitute grounds for SEVIS termination for

students already lawfully admitted, according to the government's own guidelines.

28. Defendants' actions are part of a larger policy of violent government repression of

constitutionally protected speech and protest implemented pursuant to executive orders.

29. The policy has created a climate of repression and fear on university campuses.

30.   The government's repression has hyper-focused on international students who speak out in solidarity with Palestinians and who are critical of the Israeli government's ongoing military campaign in Gaza or the pro-Israeli policies of the U.S. government and other U.S. institutions.[2] Now, officials at the highest echelons of government are attempting to use immigration enforcement as a bludgeon to suppress speech that they dislike, including Plaintiff Sultan's speech. To this end, Defendants have adopted this policy to retaliate against and punish noncitizens like Plaintiff Sultan for their participation in protests.

31.   Fearing arrest or deportation for lawful political expression and association, Plaintiff Sultan was compelled into hiding, forced to suspend his studies, dismissed from his teaching assistantship, and irreparably harmed by the termination of his SEVIS record and subsequent visa revocation.

32.   As a direct result of Defendants' Ideological Deportation Policy, Plaintiff SJP experienced severe suppression of its expressive activities, as noncitizen members and affiliates—including Plaintiff Sultan—have been targeted for immigration enforcement solely based on their protected political speech and association. The policy has forced students into silence, deterred participation in SJP's events and leadership, and diverted critical organizational resources toward addressing member safety and legal defense,

---

[2] *See, e.g.*, Bianca Quilantan, Madine Touré, *'They need to see the institutions experiencing pain': The Trump administration wants Columbia University to change its admissions and disciplinary rules before research money gets turned back on.*, Politico (Mar. 15, 2025), *available at* https://www.politico.com/news/2025/03/15/colleges-federal-funding-shock-trump-antisemitism-00231160;  Kate Bellows, *Can Trump Force Columbia U. to Expel Student Protesters?*, Chronicle of Higher Education (Mar. 14, 2025), *available at* https://www.chronicle.com/article/can-trump-force-columbia-u-to-expel-student-protesters; Kanishka Singh, Jonathan Allen, *Trump Threatens Funding Cut to Colleges Allowing 'Illegal Protests'*, Reuters (Mar. 4, 2025), *available at* https://www.reuters.com/world/us/trump-says-federal-funding-will-stop-colleges-schools-allowing-illegal-protests-2025-03-04/.

thereby impeding SJP's core mission of political advocacy and public education on Palestinian human rights in violation of its First Amendment rights.

33. Defendants' actions violate Plaintiffs' rights under the First Amendment and Fifth Amendment of the U.S. Constitution, the Administrative Procedure Act, the Immigration and Nationality Act, and its own policies.

34. This Court should vacate and set aside Defendants' Ideological Deportation Policy, declare Defendants' actions unlawful, and enjoin Defendants from detaining, transferring, or deporting Plaintiff Sultan unless Defendants establish that their actions are untainted by impermissible First Amendment retaliation and discrimination, and are otherwise lawful.

35. Plaintiffs also seek a declaration that Defendants' campaign of violence and coercive threats to arrest, detain, and deport noncitizen students and faculty based on their pro-Palestinian expression and association violates the First Amendment.

## PARTIES

36. Plaintiff Ahwar Sultan ("Plaintiff Sultan") is a citizen of India and currently resides in Columbus, Ohio.

37. He is a second-year graduate student in Comparative Studies at The Ohio State University and has been admitted to the PhD program in History of Art.

38. Plaintiff Students for Justice in Palestine at The Ohio State University ("SJP") is a student-led organization committed to advocating for Palestinian rights, raising awareness about human rights abuses, and promoting political and social discourse regarding Israel-Palestine. SJP members regularly engage in expressive activities

protected by the First Amendment, including peaceful protests, educational events, and campus demonstrations.

39. Defendant Donald J. Trump is named in his official capacity as the President of the United States of America. In this capacity, he is responsible for the policies and actions of the executive branch, including the U.S. Department of State and U.S. Department of Homeland Security.

40. Defendant Marco Rubio is the Secretary of the United States Department of State and is sued in his official capacity. He is responsible for determinations made pursuant to certain provisions of the immigration laws. Among other things, he has the authority to revoke issued visas pursuant to 8 U.S.C. § 1201(i). Following such a determination, the government may initiate removal proceedings under 8 U.S.C. § 1227(a)(1)(B).

41. Defendant Pamela Bondi is the Attorney General of the United States and is sued in her byway official capacity. She is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(g).

42. Defendant Kristi Noem is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section103(a) of the INA, 8 U.S.C. § 1103(a), and routinely transacts business in this District.

43. Defendant Todd M. Lyons is named in his official capacity as the Acting Director of Immigration and Customs Enforcement. As the Acting Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States and routinely transacts business in this District.

## JURISDICTION AND VENUE

44. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 2241; and U.S. Constitution, Article I, § 9, cl. 2 (the Suspension Clause).

45. An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has authority under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, and additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

46. The Plaintiffs do not challenge an underlying order of removal or actions committed to unreviewable agency discretion.

47. The Plaintiffs are challenging Defendants' Executive Orders and implementing policies, procedures, and practices of targeting individuals associated with protests for Palestinian rights for immigration enforcement in retaliation for their core protected political speech.

48. This includes Defendants' actions targeting Mr. Sultan.

49. No other forum exists to address these claims.

50. Applying any statutory provision to curb jurisdiction in this case therefore would deprive the Plaintiffs of any effective judicial review of his claims and a "serious constitutional question . . .would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988)

51. Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(A) because Defendant Donald J. Trump, resides in the District, and pursuant to 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to the claim occurred in this

District, namely, the formulation and promulgation of the challenged policies,

procedures, and practices suspending the visa of Plaintiff.

## LEGAL FRAMEWORK

52. A nonimmigrant visa controls a noncitizen's admission into the United States, not their

continued stay.

53. Congress established a statutory basis for student visas under 8 U.S.C. §

1101(a)(15)(F)(i), requiring that a noncitizen engage in a full course of study to

maintain nonimmigrant status.

54. Once admitted in F-1 status, a student is granted permission to remain in the United

States for the duration of status (D/S) as long as they continue to meet the requirements

established by the regulations governing their visa classification in 8 C.F.R. § 214.2(f),

such as maintaining a full course of study and avoiding unauthorized employment.

55. The SEVIS is a centralized database maintained by the SEVP within ICE used to

manage information on nonimmigrant students and exchange visitors and track their

compliance with terms of their status.

56. Under 8 C.F.R. § 214.3(g)(2), Designated School Officials (DSOs) must report through

SEVIS to SEVP when a student fails to maintain status. SEVIS termination is governed

by SEVP policy and regulations.

57. Termination must be based on a student's failure to maintain status.

58. DHS regulations distinguish between two separate ways a student may fall out of status:

(1) a student who "fails to maintain status," and (2) an agency-initiated "termination of

status."

59. The first category, failure to maintain status, involves circumstances where a student voluntarily or inadvertently falls out of compliance with the F-1 visa requirements, for example by failing to maintain a full course of study, engaging in unauthorized employment, or other violations of their status requirements under 8 C.F.R. § 214.2(f). In addition, 8 C.F.R. §§ 214.1(e)–(g) outlines specific circumstances where certain conduct by any nonimmigrant visa holder, such as engaging in unauthorized employment, providing false information to DHS, or being convicted of a crime of violence with a potential sentence of more than a year, "constitutes a failure to maintain status."

60. With the respect to the crime of violence category, 8 C.F.R. § 214.1(g) sets forth that a nonimmigrant's conviction "for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status."

61. Minor misdemeanor offenses do not meet this threshold for termination based on criminal history.

62. The second category, termination of status by DHS, can occur only under the limited circumstances set forth in 8 C.F.R. § 214.1(d), which only permits DHS to terminate status when: (1) a previously granted waiver under INA § 212(d)(3) or (4) [ 8 U.S.C. § 1182(d)(3) or (4)] is revoked; (2) a private bill to confer lawful permanent residence is introduced in Congress; or (3) DHS publishes a notification in the Federal Register identifying national security, diplomatic, or public safety reasons for termination.

63. DHS cannot unilaterally terminate nonimmigrant status.

64. Accordingly, the revocation of a visa does not constitute failure to maintain status and cannot therefore be a basis for SEVIS termination.

65. If a visa is revoked prior to the student's arrival to the United States, then a student may not enter and the SEVIS record is terminated.

66. However, the SEVIS record may not be terminated as a result of a visa revocation after a student has been admitted into the United States, because the student is permitted to continue the authorized course of study.

67. ICE's own guidance confirms that "[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS record."

68. Rather, if the visa is revoked, the student is permitted to pursue their course of study in school, but upon departure, the SEVIS record is terminated and the student must obtain a new visa from a consulate or embassy abroad before returning to the United States.

69. Under standard practice, a visa may be revoked only if the individual is found to be ineligible under INA § 212(a), INA § 214(b), or is no longer entitled to the visa classification originally granted.

70. The Department of State, permits "prudential revocation" of a visa even when ineligibility has not been definitively established.

71. Prudential revocation may also be initiated when the Department receives derogatory information from another U.S. government agency, including intelligence or law enforcement entities.

72. Such revocation requests are processed through Bureau of Consular Affairs, Visa Office, Support and Assistance Center, Research and Coordination United (CA/VO/SAC/RC) and reviewed via an electronic memorandum sent to a duly

authorized official in the Visa Office, which includes a summary of available

intelligence or background information and any relevant documentation.

73.  If prudential revocation is approved, the individual's name is entered into the CLASS

system, the visa case status is changed to "Revoke", and the revocation is

communicated within the Department and to other federal agencies.

74.  According to 9 FAM 403.11-4(A)(1), the Department is required to notify the

individual of the intent to revoke a visa whenever practicable, so that the visa holder

may have a meaningful opportunity to respond and demonstrate why the visa should not

be revoked.

75.  A retroactive notice that the visa has already been revoked is not sufficient unless

advance notice was not practicable.

76.  Pursuant to the Department of State's own policies, failure to provide this opportunity

may render the revocation procedurally defective.

77.  While a visa revocation *can* be charged as a ground of deportability in removal

proceedings, deportability can be contested in such proceedings.

78.  The immigration judge may also even dismiss removal proceedings where a visa is

revoked, so long as a student is able to remain in valid status.

79.  Only when a final removal order entered would the F-1 status be lost.

80.  A student who has not violated their F-1 status, even if their visa is revoked, cannot

have a SEVIS record terminated based on INA § 237(a)(1)(C)(i) [8 U.S.C. §

1227(a)(1)(C)(i)] (failure to maintain status), INA § 237(a)(4)(C)(i) [8 U.S.C. §

1227(a)(4)(C)(i)] (foreign policy grounds), or any deportability ground for that matter.

## **BACKGROUND**

81. Following the Hamas-led attacks on Israel of October 7, 2023, and Israel's subsequent indiscriminate bombing, blockade, and invasion of Gaza, students, faculty, and student organizations organized protests on campuses across the United States.

82. Many of the anti-war, pro-Palestinian protests included calls for a ceasefire and for humanitarian aid to displaced or wounded Palestinians.

83. Others centered on calls for institutional divestment from Israel and many included criticism or condemnation of Israel's campaign in Gaza.

84. On campuses across the nation, pro-Palestinian protests took different forms. They included teach-ins, sit-ins, walk-outs, marches, exhibitions, vigils, and encampments.

85. Notably, on April 17, 2024, student protesters at Columbia University erected a "Gaza Solidarity Encampment" on the university's Morningside campus and more than one hundred solidarity encampments were established at universities across the United States in the weeks thereafter.

86. The students and faculty who participated in the anti-war, pro-Palestinian protests on campus came from diverse backgrounds and held a wide range of political views. Some protesters viewed their participation as an extension of an American protest tradition, encompassing the anti-war and anti-apartheid protests of the 1960s, 70s, and 80s. Some protesters were Palestinians whose family members had been killed in or displaced by the war. Some protesters were Jewish, and many of them joined the protests to express their opposition to what they viewed as the displacement and even genocide of Palestinians in their name. While most of the protesters were likely U.S. citizens, many foreign citizens with visas or green cards joined the protests, and sometimes even led them.

14

87. Despite the diversity of the protesters and the wide range of views they expressed, President Trump repeatedly characterized the protests as "pro-Hamas," "pro-terrorist," "antisemitic," and "anti-American" during his 2024 campaign. He also promised that, if elected, he would deport the noncitizen students and faculty who had participated in the protests.

### Defendant Trump Campaigns on Pledge to "Deport" Students for Protest Activity

88. During the 2024 presidential campaign, Defendant Trump repeatedly vowed to deport non-citizen students who participate in protest activity. On or about October 28, 2023, he told the Republican Jewish Coalition, "All of the resident aliens who joined in the pro-jihadist protest this month, nobody's ever seen anything like it. Come 2025, we will find you and we will deport you."[3]

89. On May 14, 2024, he told reporters, "Any student that protests, I throw them out of the country… As soon as they hear that, they're going to behave." He described campus protests as a "radical revolution" and promised, "we're going to set that movement back 25 or 30 years."[4]

90. At a rally in Wildwood, New Jersey, he declared, "If you come from another country and try to bring Jihadism or anti-Americanism or anti-Semitism to our campuses, we will immediately deport you."[5]

### Defendant Trump Issues Executive Orders

---

[3] Khaleda Rahman, "Donald Trump's Orde to Deport Pro-Palestinian Activists Explained", Newsweek (January 30, 2025), *available at* Donald Trump's Order to Deport Pro-Palestinian Activists Explained - Newsweek

[4] Lexi Lonas Chochran, "Trump threatens to stop funding for any colleges allowing 'illegal protests'", The Hill (March 4, 2025), *available at* Donald Trump threatens to stop funding for colleges allowing 'illegal protests'

[5] Simone Weichselbaum, "Trump's plan to quell protests: 'Deport pro-Hamas radicals'", NBC News (August 13, 2024), *available at* Trump's plan to quell protests: 'Deport pro-Hamas radicals'

91. Defendants and their respective agencies adopted the ideological-deportation policy to implement two executive orders that Defendant Trump issued shortly after taking office.

92. Executive Order No.14,161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats" was issued on January 20, 2025, followed by Executive Order No.14, 188 titled "Additional Measures to Combat Anti-Semitism" on January 29. 2025.

### *Executive Order No. 14,161: "Protecting the United States from Terrorists and National Security and Public Safety Threats*

93. Section 1(a) of Executive Order No. 4,161 states that it is the policy of the federal government "to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 30, 2025).

94. Section 1(b) further states that, in order "[t]o protect Americans . . . the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security." *Id.*

95. Section 2 of Executive Order No. 14,161 implements enhanced vetting of the speech and political opinions of non-citizens. As relevant to Plaintiff:

    a. Section 2(a)(i) requires Defendant Noem, the Attorney General, and the Director of National Intelligence to "promptly . . . identify all resources that may be used to

ensure that all aliens . . . who are already in the United States, are vetted and screened to the maximum degree possible." *Id.*

b. Section 2(a)(ii) mandates the same officials to "ascertain whether [an] individual seeking [an immigration] benefit is . . . not a security or public safety threat." *Id.*

c. Section 2(a)(iv) requires the officials to "vet and screen to the maximum degree possible all aliens who . . . are already inside the United States." *Id.*

96. Section 3 requires the Secretary of State, in coordination with Defendant Noem, the Attorney General and the Director of National Intelligence, to "[r]ecommend *any actions necessary* to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or *replacement of the culture* on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists." (Emphasis added). *Id.* These recommendations were due no later than February 19, 2025, but as of the date of this filing, they have not been made public.

### *Executive Order No. 14,188: "Additional Measures to Combat Anti-Semitism"*

97. Section 1 of Executive Order No. 14,188 includes a preamble attacking "the prior administration" for failing to take steps to "protect American Jews," and declaring that "this failure is unacceptable and ends today." Exec. Order No. 14188, 90 Fed. Reg. 8847 (Feb. 3, 2025).

98. Section 2 states: "It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or

otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.*

99. Section 3 requires Defendants Rubio and Noem, in consultation with the Secretary of Education, to issue a report within 60 days to "identify[] all civil and criminal authorities or actions within the jurisdiction of" each agency to "combat anti-Semitism." *Id*.

100. Section 3(e) authorizes the Attorney General to make "recommendations for familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens." *Id.*

101. The "grounds for inadmissibility under 8 U.S.C. § 1182(a)(3)" are the security and related grounds of inadmissibility, including various terrorism- and foreign policy–related provisions, 8 U.S.C. § 1882(a)(3)(B), (a)(3)(C), which also serve as grounds for deportation, *see* 8 U.S.C. § 1227(a)(4)(B), (C). Under the terrorism-related provisions, noncitizens who have engaged in or incited terrorist activity are inadmissible to the country, *id.* § 1182(a)(3)(B)(i)(I), (III); the same is true of noncitizens who "endorse[] or espouse[] terrorist activity or persuade[] others to endorse or espouse terrorist activity or support a terrorist organization," *id.* § 1182(a)(3)(B)(i)(VII), or who are representatives of "a political, social, or other group that endorses or espouses terrorist activity," *id.* § 1182(a)(3)(B)(i)(IV)(bb) (together, the "endorse or espouse" provisions). The foreign policy provision renders inadmissible any noncitizen "whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the

18

United States." *Id.* § 1182(a)(3)(C)(i). This provision also states, however, that
individuals may not be excluded based on "past, current, or expected beliefs,
statements, or associations [that] would be lawful within the United States" unless "the
Secretary of State personally determines that the [noncitizen]'s admission would
compromise a compelling United States foreign policy interest," *id.* §
1182(a)(3)(C)(iii), and provides timely notice of that determination to Congress, *id.* §
1182(a)(3)(C)(iv).

102. High-ranking officials from the Department of Justice have recently indicated Defendants'
intent to prosecute individuals and subject them to lengthy prison sentences pursuant to
Executive Order No. 14,188. This threat is imminent.

103. Senior Counsel Leo Terrell, Assistant U.S. Attorney for Civil Rights, told Israel's Channel
12 News: 'You see all these disorderly demonstrations supporting Hamas and intimidating
Jews? We will put these people in jail—not for 24 hours, but for years.' He further stated, 'a
lot will happen in the next four to five weeks,' asserting that the threat of jail time would
stop such activities. *Id*.

104. On February 28, 2025, the U.S. Department of Justice's Task Force to Combat Anti-
Semitism announced it would begin "meet[ing] with university leadership, impacted
students and staff, local law enforcement, and community members as it gathers
information" about protest activity and alleged "anti-Semitic" activity on campuses in
preparation for possible prosecution.[6]

---

[6] Press Release, U.S. Dep't of Justice, Federal Task Force to Combat Antisemitism Announces Visits to 10 College
Campuses that Experienced Incidents of Antisemitism (Feb. 28, 2025), https://www.justice.gov/opa/pr/federal-task-
force-combat-antisemitism-announces-visits-10-college-campuses-experienced.

105. After President Trump signed Executive Order 14,188, the White House released a fact

sheet about the order "promis[ing]" to "Deport Hamas Sympathizers and Revoke

Student Visas." The fact sheet included this warning from the President:

> To all the resident aliens who joined in the pro-jihadist protests, we put you on
> notice: come 2025, we will find you, and we will deport you. I will also quickly
> cancel the student visas of all Hamas sympathizers on college campuses, which
> have been infested with radicalism like never before.

### *Ideological Deportation Policy*

106. To implement the two executive orders described above, Defendants and their

respective agencies adopted the ideological-deportation policy challenged here,

announcing that they intend to carry out large-scale arrests, detentions, and deportations

of noncitizen students and faculty who participate in pro-Palestine protests and other

related expression and association.

107. Pursuant to this policy, they arrested over a dozen students, revoked the visas of

hundreds more, encouraged individuals to self-deport or risk indefinite detention,

supplied universities with the names of other students they intend to target under the

policy, and launched new social media surveillance programs aimed at identifying

others.

108. There is no doubt that this Policy entails the arrest, detention, and deportation of

noncitizen students for constitutionally protected speech and association as evidenced

by the comments of Deputy Secretary of Homeland Security of Troy Edgar in a recent

NPR *Morning Edition* interview. When asked about the arrest of Mahmoud Khalil, the

Deputy Secretary responded:

> **Edgar:** This is a person that came in under a visa. And again, the
> secretary of state at any point can take a look and evaluate that visa
> and decide if they want to revoke it.

**Martin:** He's a legal permanent resident. I have to keep insisting on that. He is a legal permanent resident. So what is the standard? Is any criticism of the Israeli government a deportable offense?

**Edgar**: Like I said, I think that at this point when he entered into the country on a student visa, at any point we can go through and evaluate what his status is.

**Martin**: Is any criticism of the United States government a deportable offense?

**Edgar**: Like I said, if you go through the process and you're a student and you're
here on a visa and you go through it, at any point . . .

**Martin**: Is any criticism of the government a deportable offense?

**Edgar**: Let me put it this way, Michel, imagine if he came in and filled out the form and said, "I want a student visa." They asked him, "What are you going to do here?" And he says, "I'm going to go and protest." We would have never let him into the
country.

### *Impact of the Executive Orders and the Ideological Deportation Policy*

109. On March 6, 2025, Secretary Rubio stated via social media: "Those who support designated terrorist organizations, including Hamas, threaten national security. The U.S. has zero tolerance for foreign visitors supporting terrorists. Violators—including international students—face visa revocation and deportation."

110. A news report published that same day revealed that the State Department had already launched a new social media surveillance program, called "Catch and Revoke," to identify noncitizen students for deportation pursuant to the new policy of ideological deportation. According to senior State Department officials cited by *Axios*, the program involves "AI-assisted reviews of tens of thousands of student visa holders' social media accounts" to find "evidence of alleged terrorist sympathies expressed after Hamas'

[October 7] attack on Israel." According to the report, "[i]f officials find a social media post from a foreign national that appears to endorse the [October 7] attack on Israel and looks 'pro-Hamas,' . . . that could be grounds for visa revocation."

111. Under the Policy, if Defendant Marco Rubio, the Secretary of State, claims reasonable ground to believe that a noncitizen protester's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States, or personally determines that their protected views, speech, or associations would compromise a compelling U.S. foreign policy interest, then such determinations—according to the government—permit the U.S. Department of Homeland Security (DHS) to seek to detain and deport the noncitizen protester.

112. Two days later, ICE agents began implementing the Ideological Deportation Policy and began with Mahmoud Khalil, a legal permanent resident who was arrested at his residence and has since been detained and transported to a Louisiana ICE facility.

113. Mahmoud Khalil was initially told that he was detained because his student visa had been revoked by the State Department, but when Khalil's lawyer informed agents that Khalil was a green card holder, the agents responded that the State Department had revoked Khalil's green card, too.

114. The deportation notice later filed by the government cites the foreign policy provision and states: "The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States."

115. Khalil has not been charged with any crime, and an administration official stated to *The Free Press* that "[t]he allegation here is not that he was breaking the law." Instead, the

administration has made clear that it arrested Khalil because of his role in organizing protests that the administration characterizes as pro-Hamas.

116. In a post made to X on March 9, 2025, DHS asserted that Khalil had led activities "aligned to" Hamas, and that ICE had arrested Khalil "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State."

117. At a news briefing on March 11, 2025, Press Secretary Karoline Leavitt stated that "Mahmoud Khalil was an individual who was given the privilege of coming to this country to study at one of our nation's finest universities and colleges. And he took advantage of that opportunity, of that privilege by siding with terrorists." She asserted that "pro-Hamas propaganda" fliers had been distributed at a protest that Khalil had led, though she did not provide any evidence that Khalil had produced, distributed, or even known about them.

118. Below includes a non-exhaustive list of similarly impacted students:

119. Mohsen Mahdawi, a Columbia University student and Palestinian human rights advocate was arrested by ICE agents on April 14, 2025, during what he believed was a routine naturalization interview in Vermont.

120. Despite holding a green card and having no criminal charges, he was detained for over two weeks. The Trump administration ordered his deportation under an obscure law, accusing him of threatening U.S. foreign policy due to his advocacy for Palestinian rights.

121. A federal judge later released him on bail, criticizing the administration's actions against legal residents for their political views.

122. Rumeysa Ozturk a Fulbright scholar and PhD student at Tufts University, was detained by ICE agents in Somerville, Massachusetts on March 25, 2025 despite being in the U.S. legally on a student visa.

123. Her arrest was politically motivated due to alleged support for Palestine, was captured on video, and spread widely.

124. The incident occurred shortly after the launch of the LUCE Hotline, a community-driven ICE alert system in Massachusetts.

125. Badar Khan Suri, an Indian national and postdoctoral scholar at Georgetown University, was arrested by ICE in Arlington, Virginia on March 17 and was told his visa was revoked.

126. Homeland Security Assistant Secretary Tricia McLaughlin said Suri was "actively spreading Hamas propaganda and promoting antisemitism on social media," but she offered no further details of his activity.

127. A spokesperson for Georgetown said the school was "not aware" of any criminal activity by Suri and it has not been given a reason for the detention.

128. Yunseo Chung, a 21-year-old Korean American and lawful permanent resident, was arrested during a peaceful sit-in at Columbia University. She was given a desk ticket by the NYPD for "obstruction of governmental administration."

129. Days later, the Department of Homeland Security reported her to Secretary of State Marco Rubio, initiating deportation proceedings under a Cold War-era provision of the Immigration and Nationality Act.

130. A judicial search warrant was executed by federal law enforcement agents at her dormitory. A federal judge later ruled that Chung could not be detained while she

challenges the deportation order, highlighting concerns over the use of immigration laws to suppress political dissent.

131. Momodou Taal, a Gambian graduate student at New York University, chose to leave the United States voluntarily in April 2025 after learning he was under federal surveillance for his involvement in pro-Palestinian activism.

132. Fearing arrest and deportation, Taal's departure underscores the climate of fear among international students who engage in political expression.

133. His case reflects a broader pattern where students feel compelled to self-deport to avoid potential government retaliation.

134. Leqaa Kordia, a 32-year-old Palestinian woman, was arrested by ICE after attending a pro-Palestinian protest near Columbia University.

135. Despite having a pending green card application, she was detained and transferred to Texas.

136. The NYPD shared internal records of her arrest with ICE, violating New York City's sanctuary laws.

137. The arrest was politically motivated and have filed a habeas corpus petition seeking her release.

138. Ranjani Srinivasan, a doctoral student in urban planning at Columbia and an Indian national, had her student visa revoked on March 5.

139. Three federal immigration agents showed up at her apartment looking for her two days later, but she did not open the door.

140. Agents showed up again the following night, just hours before Khalil was arrested, but she was not home because, fearing arrest, she had already fled the United States for Canada.

141. On March 13, 2025, agents returned to her home with a judicial warrant.

142. DHS released a statement characterizing Srinivasan as a terrorist sympathizer and accused her of advocating violence and being "involved in activities supporting Hamas," but the agency has not provided any evidence for its allegations, and Srinivasan disputes them. Srinivasan left the country before ICE could detain her in a move DHS has called "self-deporting."

143. Mohammed Hoque, a 20-year-old Bangladeshi student, was followed by plainclothes ICE agents and arrested as he returned to his off-campus home on March 28, 2025. Officers informed him that his student visa had been revoked, even though neither he nor his university had received prior notice.

144. As Hoque was processed at Fort Snelling, the Department of Homeland Security terminated his SEVIS student record on the spot, effectively stripping him of legal status.

145. Rasha Alawieh, an assistant professor from Brown University's medical school, was deported the weekend of March 15 even after orders were given by a judge to keep her in the country.

146. Alawieh was deported to Lebanon, with Customs and Border Patrol saying the agents who deported her were not aware of the court order at the time.

147. Defendants and other administration officials have made clear that they intend to target other foreign students and faculty for arrest, detention, and deportation under the policy.

148. On March 9, 2025, the Secretary of State shared a news story about Khalil's arrest on X and warned: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." The same day, DHS posted to X: "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."

149. The next day, President Trump posted on Truth Social:

> Following my previously signed Executive Orders, ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again. If you support terrorism, including the slaughtering of innocent men, women, and children, your presence is contrary to our national and foreign policy interests, and you are not welcome here. We expect every one of America's Colleges and Universities to comply. Thank you!

150. The White House Press Secretary Karoline Leavitt reiterated this message at the news briefing she gave on March 11, 2025. When asked how many arrests the administration planned to make, she said that she did not have an estimate, but that DHS "is actively working on it."

151. She stated that DHS had gathered "very good intel" "at the direction of the President's executive order, which made it very clear . . . that engaging . . . in anti-American, anti-Semitic, pro-Hamas protests will not be tolerated."

152. This intelligence was, she said, aimed at "identify[ing] individuals on our nation's colleges and universities, on our college campuses who have engaged in such behavior and activity, and especially illegal activity." She also added that "Columbia University

has been given the names of other individuals who have engaged in pro-Hamas activity, and they are refusing to help DHS identify those individuals on campus." S

153. he concluded: "We expect all America's colleges and universities to comply with this administration's policy."

154. On March 12, 2025, the *New York Times* reported that "[i]nvestigators from a branch of [ICE] that typically focuses on human traffickers and drug smugglers [had] scoured the internet for social media posts and videos that the administration could argue showed sympathy toward Hamas" and "handed over reports on multiple protesters to the State Department."

155. The ideological-deportation policy has created a climate of fear and repression on university campuses across the country and forced many noncitizen students and faculty into silence.

156. Out of fear that pro-Palestinian expression might lead to arrest, detention, and deportation, many noncitizen students and faculty are no longer willing to participate in, or even attend, public political protests.

157. Some have stepped back from leadership roles and participation in groups that engage in advocacy related to Israel and Palestine.

158. Some are abstaining from public writing or scholarship that they would otherwise have pursued.

159. The chill on university campuses flows directly from the policy challenged here, as well as from Defendants' threats to arrest, detain, and deport noncitizen students and faculty based on their lawful expressive and associational activities.

160. Plaintiffs Sultan and Students for Justice in Palestine have been compelled to curtail their exercise of expressive and associational rights in the ways described above.

### ICE and the Student Criminal Alien Initiative

161. Pursuant to the Ideological-Deportation Policy, the government also created the Student Criminal Alien Initiative.

162. On April 1, 2025, Assistant Director Andre Watson of ICE emailed Acting Principal Deputy Assistant Secretary of the Bureau of Consular Affairs Shane Myers, stating that "in furtherance of our Student Criminal Alien Initiative, the attached letterhead memo and spreadsheet containing positive NCIC (National Crime Information Center) hits for…foreign students are respectfully submitted for your review and any action deemed appropriate".

163. The Initiative is nowhere to be found in writing and according to Mr. Watson is just a "name that was given by my staff to this specific effort to scrub records from SEVIS through NCIC to determine if there were positive criminality hits".

164. The following day, a member of the State Department sent an email to ICE informing them that they ran the data against their systems and sorted students by individuals with valid visas, and those without. They then asked, "how would you like us to prioritize revocations of these visas?"

165. A mere 15 minutes later, a representative of ICE responded "Please terminate all in SEVIS".

166. Plaintiff Sultan's student visa was revoked as part of the Student Criminal Alien Initiative.

167. Moreover, Plaintiff Sultan's SEVIS record was terminated solely based on an alleged revocation of his visa and vague reference to "criminal records check," despite the absence of any qualifying criminal conviction or justified basis under the regulation.

### *Plaintiff Ahwar Sultan*

168. Plaintiff Ahwar Sultan ("Plaintiff Sultan") is a citizen of India and second year graduate student at The Ohio State University ("OSU") in Columbus Ohio.

169. As a graduate student at OSU, Plaintiff Sultan has worked as a Teaching Assistant for an Introduction to Humanities course, is a member of the Comparative Studies Department lecture committee which organizes colloquiums for undergraduate students to showcase their work, and is a member of the South Asia Graduate Studies Association, and was selected as a fellow for the Global Arts and Humanities Society slated to begin funded research this coming Fall.

170. Part of his role as a teaching assistant includes engaging students freely and openly on course-related matters and discussions.

171. On February 28, 2023, Plaintiff Sultan received his acceptance to OSU and was thereafter admitted on March 22, 2023.

172. On April 22, 2023, OSU certified Plaintiff Sultan's Form I-20, *Certificate of Eligibility for Nonimmigrant Student Status*, with the United States Citizenship and Immigration Services ("USCIS"), thereby confirming his admission and registration in SEVIS.

173. Following the issuance and certification of Form, I-20, Plaintiff Sultan became eligible to apply for an F-1 student visa under 8 U.S.C. § 1101(a)(15)(F)(i), which he did on June 22, 2023.

174. On or about July 17, 2023, the U.S. Department of State ("State Department") approved Plaintiff Sultan's student visa application after determining that he was statutorily eligible and posed no threat to national security. This decision reflected the State Department's conclusion that Plaintiff Sultan satisfied all requirements for admission under the Immigration and Nationality Act ("INA") and that no grounds of inadmissibility applied to him.

175. On August 6, 2023, Plaintiff Sultan entered the United States at John F. Kennedy International Airport, where he was inspected and lawfully admitted by U.S. Customs and Border Protection ("CBP").

176. His admission further confirmed the federal government's prior determination that he met all legal requirements for entry and posed no national security threat.

177. Since entering the United States on an F-1 visa, Plaintiff Sultan has traveled internationally and been lawfully re-admitted upon inspection by Customs and Border Protection on June 22, 2024, August 16, 2024, December 11, 2024, and January 12, 2025.

178. As a graduate student at OSU, Plaintiff Sultan has worked as a Teaching Assistant for an Introduction to Humanities course, is a member of the Comparative Studies Department lecture committee which organizes colloquiums for undergraduate students to showcase their work, is a member of the South Asia Graduate Studies Association, and was selected as a fellow for the Global Arts and Humanities Society slated to begin funded research this coming Fall.

179. In addition to these activities, Plaintiff Sultan has felt moved to join efforts to advocate for Palestinian human rights and is critical of Israel's genocide in Gaza.

180. On October 9, 2023, Plaintiff Sultan joined a march on OSU campus organized by the Students for Justice in Palestine.

### *Plaintiff Sultan Activism and Political Speech on Campus*

181.  Plaintiff Sultan joined two marches on October 12, 2023 and October 21, 2023 in downtown Columbus.

182. On October 25, 2023, Plaintiff Sultan participated in a student walk-out followed by a march.

183. On October 26, 2023, Plaintiff Sultan attended an on-campus teach-in for Palestine.

184. On November 20, 2023, Plaintiff Sultan attended a teach-in organized by the Faculty and Staff for Justice in Palestine at OSU.

185. On February 8, 2024, Plaintiff Sultan attended a demonstration in the Ohio Union.

186. On March 1, 2024, Plaintiff Sultan attended a vigil honoring Aaron Bushnell.

187. On April 14, 2024, the South Asia Graduate Study Association, of which Plaintiff Sultan is a member, organized an event titled "Screenprinting for Palestine".

188. On April 23, 2024, Plaintiff Sultan attended and was photographed at a protest outside an OSU Trustees Board Meeting demanding the university divest from Israel.[7]

189. Plaintiff Sultan was not arrested or disciplined in relation to any of the above events.

### *Arrest at Peaceful Campus Protest*

---

[7] The Ohio State University (@corsrev), Instagram (April 23, 2024), *available at* Central Ohio Revolutionary Socialists (CORS) | Columbus Police arrest 2 students at a protest demanding the university divest from Israel outside the Ohio State University Board of... | Instagram

190. On April 25, 2024, hundreds of OSU students and community members engaged in a peaceful protest on The Ohio State University South Oval, in part demanding OSU's divestment from Israel.[8]

191. The protest began around 6 pm, with students sitting in a circle, breaking bread and singing songs.

192. As the evening wore on, The Ohio State University called upon police, along with state troopers who advanced on the crowd and began to brutalize protestors who were joined in prayer, arresting over three dozen and piling them into five arrest vehicles.

193. Plaintiff Sultan stood at the perimeter of a prayer circle during the protest, attempting to shield students engaged in prayer, when he was arrested.

194. On April 29, 2024, OSU President Ted Carter provided various media outlets with the names of those arrested, including Plaintiff Sultan, and stated that "Ohio State's campus will not be overtaken".[9]

195. Prior to this incident, Plaintiff Sultan had no disciplinary measures in relation to his academic progress, or arrests with local police.

196. Following his arrest on April 25, 2024, Plaintiff Sultan's charges were dismissed predisposition, and expunged.

197. The dismissal was contingent on the completion of 10 hours of community service and the attendance of a workshop on civil discourse.

198. Plaintiff Sultan completed the necessary diversion requirements on October 25, 2024.

---

[8] Ariana Smith, Josie Stewart, Christian Harsa, Meghan Beery, and Nora Igelnik, "Inside the Five-Hour Standoff Between Police and Protesters on the South Oval", The Lantern (April 26, 2024), *available at* Inside the five-hour standoff between police and protesters on the South Oval

[9] George Shillcock, "'Ohio State's campus will not be overtaken': President Ted Carter defends protestor arrests", WOSU Public Media (April 29, 2024), *available at* 'Ohio State's campus will not be overtaken': President Ted Carter defends protestor arrests | WOSU Public Media

199. No plea of guilty, no contest, or other admission of guilt was entered in the matter.

### *Continued Advocacy and Social Justice Engagement*

200. Undeterred by the attempt to suppress his speech, Plaintiff Sultan continued to attend actions and meetings in support of Palestinian human rights including but not limited to a Faculty and Staff for Justice in Palestine Meeting on April 29, 2024, and a Picket for Palestine on October 7, 2024.

201. Plaintiff Sultan's speech regarding the obligations that The Ohio State University has under international law, the human rights of the Palestinian people, and university restrictions on speech is all protected by the First Amendment, particularly as it relates to matter of public concern. It is political speech at the core of the protection of the First Amendment.

202. In addition to the above, Plaintiff Sultan has been an outspoken member of his campus community on a multitude of social justice issues.

203. On September 3, 2023 he attended an action in protest of the killing of Ta'Kiya Young by an Ohio police officer.[10]

204. On December 3, 2024 he organized a tabling and screen printing in memory of the 40th anniversary of Bhopal Gas Tragedy.[11]

205. On February 23, 2025, Plaintiff Sultan protested Anduril, who planed to build a $1 billion weapons factory in Columbus, Ohio.[12]

---

[10] Michael Rubinkam and Samantha Hendrickson, "Ta'Kiya Young, killed by police in an Ohio parking lot, is mouned along with her unborn child", AP News (September 7, 2023), *available at* Ta'Kiya Young, killed by police in an Ohio parking lot, is mourned along with her unborn child | AP News

[11] Mark Dummett, "Bhopal Gas Tragedy: 40 years of Injustice", The Diplomat (December 2, 2024), *available at* Bhopal Gas Tragedy: 40 years of Injustice - Amnesty International

206. On February 25, 2025, Plaintiff Sultan attended a teach-in and march for trans liberation.

207. On February 27, 2025, Plaintiff Sultan engaged in and was photographed at a walk-out and protest against cuts to the Diversity Equity and Inclusion offices at The Ohio State University.[13]

208. On February 28, 2025, Plaintiff Sultan attended and engaged in a sit-in at the Center for Social Change and Belonging at The Ohio State University.[14]

209. On March 4, 2025, Plaintiff Sultan attended a faculty and staff protest at The Ohio State University against Senate Bill 1, which seeks to ban diversity, equity, and inclusion initiatives in higher education and prohibit faculty strikes.[15]

210. On March 11, 2025, the Education Department sent letters to 60 colleges and universities under investigation for alleged "relentless antisemitic eruptions". The Trump administration warned this could result in enforcement actions if the probe found that the institution "failed to protect Jewish students on campus".[16]

---

[12] Ginny Richardson, Mike Gold Collective of Columbus, "Local residents protest planned weapons plant", Columbus Free Press (February 27, 2025), *available at* Local residents protest planned weapons plant | ColumbusFreePress.com

[13] Samantha Madar, "President Ted Carter announces changes to DEI programs at Ohio State Senate meeting", The Columbus Dispatch (February 28, 2025), *available at* Ohio State University Senate meeting: Changes to DEI programs

[14] Madison Macarthur, Chrissa Loukas, "Ohio State students protest university ending DEI programming", Spectum News 1 (February 28, 2025), *available at* OSU students protest university ending DEI programming

[15] Samantha Madar, "Ohio State students, faculty and staff protest over Senate Bill 1, The Columbus Dispatch (March 4, 2025), *available at* Protest March 4, 2025, at Ohio State over SB1 and DEI cuts

[16] Ty Roush, "Trump Administration Investigates These 60 Colleges Over Antisemitism Allegations", Forbes (March 11, 2025), *available at* Trump Investigates These 60 Schools For Alleged Antisemitism

211. The Ohio State University was one of the 60 colleges that received the aforementioned letter from the Education Department.[17]

212. On March 27, 2025, Secretary of State Marco Rubio announced at a press conference that the Department of State had revoked the visas of approximately 300 foreign students.[18]

213. Various university officials have indicated that the Trump administration is deploying the rarely-used risk-to-foreign policy immigration provision used to detain Mahmoud Khalil[19] to now target students across the country.[20]

214. ICE has been manually revoking students' immigration status – an authority typically left to university staff.

***Unlawful Termination and Revocation of Sultan's SEVIS record, F-1 Status, and Visa***

On April 3, 2025, at 4:30 PM, Plaintiff Sultan received an email from the Office of International Affairs stating that his SEVIS record was terminated for "otherwise failing to maintain status—individual identified in criminal records check and/or has had their visa revoked."

215. The termination notice instructed Plaintiff Sultan to cease all F-1-related and campus employment immediately, effectively removing his ability to study or work.

---

[17] *Id.*

[18] Edward Wong, "Rubio Says He Has Revoked 300 or More Visas in Trump's Deportation Push", The New York Times (March 28, 2025), *available at* Rubio Says He Has Revoked 300 or More Visas in Trump's Deportation Push - The New York Times

[19] Philip Marcelo, "What to know about Mahmoud Khalil, the Columbia protester arrested by ICE and facing deportation", AP News (March 11, 2025), *available at* Who is Mahmoud Khalil, the Columbia student activist arrested by ICE? | AP News

[20] Prem Thakker, "SCOOP: ICE Revoking Students' Immigration Statuses Without Their or the University's Knowledge", Zeteo (March 29, 2025), *available at* SCOOP: ICE Revoking Students' Immigration Statuses Without Their or the University's Knowledge

216. Plaintiff Sultan was informed, only days after Defendant Rubio's press conference, that his SEVIS was terminated but was offered no additional information.

217. This has created a sense of fear and uncertainty as Plaintiff Sultan is now living in fear, unsure of whether he will be detained at any moment by ICE due to his protected speech.

218. On April 21, 2025 at 1:37 am, Plaintiff Sultan received an email from the U.S. Consulate General Mumbai informing him that his F-1 visa was revoked in accordance with Section 221(i) of the INA.

219. The email went on to state that remaining in the United States without a lawful immigration status can result in fines, detention and/or deportation and directed him to self-deport.

220. The e-mail provided no factual basis for the revocation of the visa.

221. The email provided no factual basis for the visa revocation.

222. Prior to filing of this suit, Plaintiff Sultan received no notice of the revocation.

223. Plaintiff Sultan faces immediate and irreparable harm from Defendants' arbitrary termination of his SEVIS status that resulted in his visa revocation, including the abrupt cessation of his academic pursuits, loss of employment authorization, and imminent threat of detention or deportation.

224. This harm is as a direct result of the Executive Orders and the resulting Ideological Deportation Policy in which Plaintiff Sultan was identified as having been vocal in his support for Palestine, and had his SEVIS terminated which resulted in the revocation of his student visa.

225. On April 8, 2025, OSU President Ted Carter sent a message to the OSU campus community stating in part that "We were not formally notified of these actions by the government, nor have we received any information about why the students' visas were revoked."[21]

226. Defendants' failure to offer notice of the intent to revoke and of the visa revocation extended to the University wherein Plaintiff was enrolled, further limiting his ability and opportunity to respond to the revocation in a way that would protect his due process rights.

227. On April 9, 2025, USCIS announced that it will begin considering aliens' social media activity in determining immigration benefits. "There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here," said DHS Assistant Secretary for Public Affairs Tricia McLaughlin. "Sec. Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-Semitic violence and terrorism – think again. You are not welcome here." [22]

228. Defendants continue to insist on conflating actions and speech taken in support of Palestinian human rights with antisemitism and openly proclaim that the First Amendment and principles of freedom of speech does not apply to non-citizens. [23]

---

[21] "A message from President Carter on international student visas", Ohio State News (April 8, 2025), *available at* A message from President Carter on international student visas

[22] "DHS to Begin Screening Aliens' Social Media Activity for Antisemitism", US. Citizenship and Immigration Services (April 9, 2025), *available at* DHS to Begin Screening Aliens' Social Media Activity for Antisemitism | USCIS

23 Jewish Voice for Peace, On Antisemitism, Anti-Zionism and Dangerous Conflations (Nov. 9, 2023), https://www.jewishvoiceforpeace.org/2023/11/09/antisemitism-dangerous/.

229. This consistent conflation extends to both recent Executive Orders and the resulting Ideological Deportation Policy wherein advocacy for Palestinians and criticism of Israel is criminalized.

230. There is a clear causal connection between the actions and policy objectives of Defendants as they relate to Plaintiffs' ability to freely express themselves, assemble, and associate.

### *Plaintiff Students for Justice in Palestine (SJP)*

231. Plaintiff Students for Justice in Palestine at The Ohio State University (SJP) is a registered student organization at Ohio State University, whose purpose is to educate the campus community about human rights issues facing Palestinians, advocate for Palestinian self-determination, and promote public discourse on U.S. foreign policy regarding Israel-Palestine.

232. SJP engages in expressive activities protected by the First Amendment, including organizing peaceful protests, demonstrations, teach-ins, lectures, and other educational events.

233. Plaintiff Sultan is an active member of SJP who regularly participates in, organizes, and publicly advocates for the organization's events and activities.

234. Plaintiff Sultan's advocacy, public visibility, and leadership in SJP activities, such as campus demonstrations and protests critical of Israeli policies towards Palestinian people, are central to SJP's mission.

235. Defendants' retaliatory and discriminatory immigration enforcement actions against Plaintiff Sultan directly interfere with and substantially burden SJP's organizational mission, activities, and its members' protected rights of speech and association.

236. Defendants' targeted enforcement creates an environment of fear, intimidation, and self-censorship, undermining SJP's ability to conduct advocacy and education concerning Palestinian human rights effectively.

237. As a direct consequence of Defendants' actions, SJP has been forced to divert significant organizational resources to address concerns related to members' safety, immigration status, and legal defense, instead of furthering its core expressive and educational activities.

238. This diversion of resources constitutes concrete injury sufficient to confer organizational standing.

239. Additionally, the targeting and intimidation of active SJP members such as Plaintiff Sultan have deterred current and prospective members from participating fully and freely in organizational activities and advocacy, leading to decreased member participation and engagement.

240. As a direct result of the recent Executive Orders and Ideological Deportation Policy, the SJP communities' willingness to engage in SJP events and actions has been profoundly affected – turnout has plummeted from hundreds, sometimes thousands, to just a handful of participants.

241. This chilling effect on SJP members' willingness and ability to associate and advocate on controversial matters of public concern represents a tangible injury to SJP's organizational effectiveness and associational interests.

242. SJP thus brings this action both on its own behalf, asserting injury to its organizational mission, expressive activities, and associational rights, and in a representative capacity on behalf of its members, including Plaintiff Sultan, whose constitutionally protected

rights have been and continue to be threatened by Defendants' retaliatory immigration actions.

243. SJP has associational standing because: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect through this litigation are germane to its purpose and mission; and (c) neither the claims asserted nor the relief requested require the participation of individual members in this lawsuit.

244. Consequently, Defendants' conduct in targeting SJP members like Sultan directly infringes on the First Amendment rights of the organization itself, undermines its ability to fulfill its advocacy mission, and significantly disrupts the protected expressive and associational activities that lie at the heart of its organizational purpose.

### *Executive Orders Impose Chilling Effect on Plaintiffs*

245. Relying on these executive orders, groups and organizations opposed to Palestinian rights protests began publicizing names of individuals they wanted the U.S. government to deport.

246. Private groups compiled lists of students who were publicly identifiable as having organized Palestine-related protests, engaged in Palestine-related advocacy, or otherwise appeared to voice opinions supportive of Palestinians, and upon information and belief, submitted these tips to ICE's tip line.[24]

247. For example, Betar USA[25], an extremist group that has openly embraced Islamophobia and indicated a desire to work with the far-right extremist group the Proud Boys, has

---

[24] Natasha Lennard & Akela Lacy, *The Columbia Network Pushing Behind the Scenes to Deport and Arrest Student Protestors*, The Intercept (Feb. 15, 2025), *available at https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/*.

[25] Betar is a self-described "Zionist" movement. *See* https://betarus.org/. The Anti-Defamation League has labeled Betar USA an extremist group.

published lists of individuals, including Columbia students and faculty, urging ICE to deport them under the executive orders.

248. In a statement to a media outlet, Betar stated that it had "already submitted names of hundreds of terror supporters to the Trump Administration."[26] Betar USA's Executive Director has met with prominent lawmakers and claims credit for providing information that led to the arrest of Columbia student, Mahmoud Khalil, who held lawful permanent resident status.[27]

249. Canary Mission, an organization dedicated to targeting students, student organizations, and faculty who advocate for Palestinian rights, has similarly proclaimed it has identified "suspected foreign nationals" at Columbia University that it would like to see deported. *Id*.

250. Predictably, this resulted in widespread fear of retaliation for pro-Palestine speech among noncitizen students. Reporting has shown that the executive orders "already appear to be chilling political activism."[28]

251. On or before Wednesday March 6, 2025, Defendants adopted the Policy by which they would retaliate against and punish noncitizens, including Plaintiff Sultan, for their actual or perceived advocacy for Palestinian rights.

---

[26] Nicholas Liu, *A pro-Israel group says it gave the Trump administration a list of students to deport*, Salon.com (Jan. 31, 2025), *available at* https://www.salon.com/2025/01/31/pledged-to-deport-pro-palestine--and-a-pro-israel-group-has-already-made-a-list/.

[27] Anna Betts, *Pro-Israel group says it has 'deportation list' and has sent 'thousands' of names to Trump officials*, The Guardian (March 14, 2025), *available at* https://www.theguardian.com/us-news/2025/mar/14/israel-betar-deportation-list-trump .

[28] Tovia Smith, *Foreign students say the threat of Trump's executive orders is getting real*, NPR (Mar. 3, 2025), *available at* https://www.npr.org/2025/03/03/nx-s1-5307187/trump-executive-order-visa-pro-palestinian-foreignstudents-protests-hamas-hezbollah-israel.

252. Under the Policy, Defendant Rubio, the Secretary of State, and the Department of Homeland Security would seek to identify any noncitizen associated with protests supportive of Palestinian human rights.

253. One way to target individuals would be to identify any noncitizen who had been arrested during protests associated with Palestinian rights advocacy on campuses, regardless of whether they had participated in the protest, their actual activity during any protest, the nature of any of the conduct charged, or the ultimate outcome or disposition of any of these arrests.

254. Under the Policy, the Secretary of State would also identify noncitizen students or faculty generally associated with pro-Palestine protests on campuses, or who espoused views supportive of Palestinian human rights.

255. Under the Policy, if Defendant Marco Rubio, the Secretary of State, claims reasonable ground to believe that a noncitizen protester's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States, or personally determines that their protected views, speech, or associations would compromise a compelling U.S. foreign policy interest, then such determinations—according to the government—permit the U.S. Department of Homeland Security (DHS) to seek to detain and deport the noncitizen protester.

256. Under the Policy, Defendant Rubio is empowered to determine that a noncitizen's presence or activities in the United States would have potentially serious foreign policy consequences for the United States or to "personally" determine that a noncitizen's protected expressive activity would compromise a compelling U.S. foreign policy

interest. These determinations would then permit the Department of Homeland Security

to seek to detain and deport the protester.

257. On March 6, 2025, the Department of State confirmed the commencement of this Policy

to the press.

258. That day, the Department of State informed Fox News that it had revoked the student

visa of a noncitizen who was "cited for criminal behavior in connection with Hamas-

supporting disruptions. This individual was a university student. ICE will proceed with

removing this person from the country."[29]

259. The Department of State confirmed it was planning to review internal databases to see

whether any visa holders were arrested and had not been subjected to immigration

enforcement.[30]

260. Additionally, on March 6, 2025, the Department of State announced a program called

"Catch and Revoke," an artificial intelligence driven effort to "cancel the visas of

foreign nationals who appear to support Hamas or other designated terror groups.

261. Government officials confirmed that they would conduct an AI-assisted review of "tens

of thousands of student visa holders' social media accounts," to look for evidence of

"alleged terrorist sympathies." The announcement did not clarify how the government

would determine someone held "terrorist sympathies."

### *History of the Foreign Policy Ground*

---

[29] Louis Casiano, Bill Melugin, *State Department revokes first visa of foreign student linked to "Hamas-supporting disruptions,"* Fox News (Mar. 6, 2025), *available at* https://www.foxnews.com/politics/state-department-revokes-first-visa-foreign-student-linked-hamas-supporting-disruptions.

[30] Marc Caputo, *Scoop: State Dept. to use AI to revoke visas of foreign students who appear "pro-Hamas,"* Axios (Mar. 6, 2025), *available at* https://www.axios.com/2025/03/06/state-department-ai-revoke-foreign-student-visas-hamas.

262. Under the immigration laws, the Secretary of State has been granted latitude to refuse entry or deport noncitizens if he has "reasonable grounds to believe" that their presence or activities "would have potentially serious adverse foreign policy consequences for the United States." See 8 U.S.C. § 1227(a)(4)(C)(i) (referencing 8 U.S.C. § 1182(a)(4)(C)(i)).

263. The statute expressly forbids the Secretary of State from issuing a policy or decision to deny entry or initiate deportation based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary "personally determines" that admitting the individual or allowing them to remain in the United States would compromise a compelling U.S. foreign policy interest, 8 U.S.C. § 1182(a)(3)(C)(iii), and then notifies certain leaders in Congress of the person's identity and the reasons for the determination, 8 U.S.C. § 1182(a)(3)(C)(iv).

264. Legislative history confirms that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs.

265. A Senate Committee report provides that for years "the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs."

266. The amendments which resulted in the current version of the law were intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States."[31]

***Existing DHS Guidance Concerning First Amendment Activity***

---

[31] S. Rep. No. 100-75 at 11, 100th Cong., 1st Sess. (1987) (reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

267. In 2019, during the first Trump Administration, DHS Acting Secretary Kevin McAleenan issued guidance to all DHS employees specifically concerning First Amendment protected activities.[32]

268. Per that memorandum, the prior Trump Administration directed that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights."

269. In 2021, then-Secretary of Homeland Security Alejandro Mayorkas issued guidance to ICE providing that "[a] noncitizen's exercise of their First Amendment rights . . .should never be a factor in deciding to take enforcement action."[33]

270. As of the date of filing, DHS has yet to rescind the Mayorkas 2021 Guidance, or issue new guidance that addresses consideration of First Amendment rights as a factor in enforcement actions.

## CLAIMS FOR RELIEF

### Count 1: Violation of the First Amendment Right to Free Speech

### (U.S. Constitution, First Amendment)

*On Behalf of All Plaintiffs*

271. Plaintiff hereby incorporates by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

---

[32] *See* Memorandum from Kevin McAleenan, Sec'y, U.S. Dep't of Homeland Sec., to all DHS Employees (May 17, 2019), available at https://www.dhs.gov/sites/default/files/publications/info_regarding_first_amendment_protected_activities_as1_signed_05.17.2019.pdf.

[33] *See* Memorandum from Alejandro N. Mayorkas, Sec'y, U.S. Dep't of Homeland Sec., to Tae D. Johnson, Acting Dir., U.S. Immigr. & Customs Enf't 5 (Sept. 30, 2021), available at https://www.ice.gov/doclib/news/guidelinescivilimmigrationlaw.pdf.

272. The First Amendment to the U.S. Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I.

273. The Orders have imposed an unconstitutional chilling effect on all Plaintiffs' right to free speech. The First Amendment protects "people" and not citizens alone. U.S. Const. Amend. I. This includes non-citizens living in the U.S. "Freedom of speech and of press is accorded [non-citizens] residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945).

274. The First Amendment protects past and future speech. *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009); *Saleh v. City of New York*, No. 06 Civ. 1007 (SHS), 2007 WL 4437167, at *3 (S.D.N.Y. Dec. 17, 2007); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994); *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004); *Ragbir v. Homan*, 923 F.3d 53, 66 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020).

275. Courts have recognized that retaliation against noncitizens exercising protected speech violates constitutional protections. *See Ragbir v. Homan*, 923 F.3d 53, 66 (2d Cir. 2019).

276. It is well-settled that the First Amendment protects against retaliation even where the government "mistakenly *thought* that the [individual] had engaged in protected speech" because "the government's reason . . . is what counts[.]" *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016). This rule applies where the government's factual mistake pertains to participation in protest activity, *Hughes v. City of New York*, 680 F. App'x 8, 9–10 (2d Cir. 2017) (applying *Heffernan* to protected association claim arising from protest); *see also Zehner v. Jordan-Elbridge Bd. of Educ.*, 666 F. App'x 29, 30 (2d Cir. 2016) (applying *Heffernan* to associational activity), and even where that individual did

not actually engage in protected conduct. *See McNichol v. Falco*, No. 16-cv-2119, 2020 WL 5802492, at *11 (S.D.N.Y. Sept. 28, 2020) ("[A] perceived protected activity, in the absence of an actual protected activity, can nevertheless give rise to an actionable First Amendment [] claim."); *Burgess v. Banasike*, 636 F. Supp. 3d 351, 359 (W.D.N.Y. 2022) ("[A] plaintiff need not actually engage in protected conduct[.]").

277. Speech on matters of public concern is entitled to the highest level of protection under the First Amendment. *See, e.g., Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("[S]peech critical of the exercise of the State's power lies at the very center of the First Amendment.").

278. Moreover, government action that targets private speech based on the viewpoint taken by the speaker is an egregious form of content discrimination and presumptively unconstitutional. *See Matal v. Tam*, 582 U.S. 218, 234 (2017).

279. "To state a First Amendment retaliation claim, a plaintiff must show that: '(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [the plaintiff's] exercise of that right; and (3) the defendant's actions caused [the plaintiff] some injury.'" *Ragbir*, 923 F.3d at 66 (internal citations omitted).

280. In addition, "the Constitution prevents governmental actors from forbidding, or penalizing, speech that is protected under the first amendment . . . . Threatening penalties for future speech goes by the name 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Fairley*, 578 F.3d at 525.

281. To establish a claim of an unconstitutional "prior restraint" on future testimony, a plaintiff must show (1) that defendants presented "threats of punishment that are

designed to discourage" the future testimony, (2) "that [plaintiff's] potential testimony . . .caused the . . .threats," and (3) that the defendants actions caused some injury. *Id.*

282. Plaintiffs' speech and activities are protected by the First Amendment.

283. Plaintiffs' past speech pertains to matters of prominent public concern, including the ongoing Israeli military campaign and genocide in Gaza, U.S. government support therefore, U.S. academic institutions' financial investments associated with Israel, and campus responses to advocacy for the rights of Palestinians.

284. Defendants are aware of Plaintiff Sultan's speech and viewpoints. Defendants are aware that Plaintiff Sultan was arrested at a protest on the South Oval at OSU. The arrests were covered in the press, and Plaintiff Sultan was fingerprinted after the arrest, which would have alerted ICE to the arrest.

285. Defendants' actions come months after this protest and arrest.

286. There is a substantial causal connection between Plaintiff Sultan's protected speech and Defendants' adverse actions and threats.

287. Defendants have taken adverse actions against Plaintiff Sultan that are motivated by his past and future exercise, and perceived exercise, of First Amendment-protected speech, and have taken action to silence and discourage Plaintiff Sultan from speaking out in the future.

288. By threatening deportation of non-citizens and criminal prosecution of U.S. citizen who protest Israel and Israeli actions in Palestine, the language of executive orders combined with Defendant Trump and high-ranking officials in the Department of Justice have had an immediate chilling effect on the speech and activity of Plaintiffs, who despite a past pattern and practice of attending protests and criticizing the U.S. government and government of

49

Israel have significantly limited such activity in the weeks following the promulgation of the Orders for fear of being arrested, prosecuted, jailed, or deported.

289. Plaintiffs engaged in protected political speech by participating in peaceful protests critical of Israeli government policy.

290. Defendants retaliated by revoking Plaintiff Sultan's visa, terminative his F-1 status, and terminating his SEVIS record.

**Count 2: Violation of the First Amendment Right to Association**

**(U.S. Constitution, First Amendment)**

*On Behalf of All Plaintiffs*

291. Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

292. All plaintiffs have a First Amendment right to associate with individuals who possess views that are critical of the U.S. government, its institutions, policies, American "culture," or whose views are critical of the Israeli government.

293. "When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'" *Ams. for Prosperity Found. v. Bonta,* 141 S. Ct. 2373, 2389 (2021) (quoting *NAACP v. Button*, 371 U. S. 415, 433 (1963)).

294. By barring non-citizens from criticizing the U.S. government, its institutions, its policies, American culture, and the government of Israel, the orders have chilled Plaintiffs and their professor-colleagues and fellow students from interacting, meeting, holding discussions or publicly associating with one another.

295. This implicates each Plaintiff's associational rights, regardless of alienage.

296. Because EXECUTIVE ORDER NO.14,161 announced that Defendants are surveilling all non-citizens in the U.S. to monitor their political views, Plaintiffs possess a reasonable fear that associating with local activists may constitute an "anti-American" act in itself, thereby subjecting him to possible negative immigration consequences. And because EO2's criminal prosecution provision applies to citizens as well as non-citizens, all Plaintiffs fear that Defendants might interpret their association with one another as proof of activity that falls under the ambit of that order. This has produced an unconstitutional chilling effect on all Plaintiffs' right to freely and publicly associate with one another.

**Count 3: Violation of the First Amendment – Vagueness and Overbreadth**

**(U.S. Constitution, First Amendment)**

*On Behalf of All Plaintiffs*

297. Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

298. Both executive orders are unconstitutionally vague and overbroad. The sweeping and confusing language of the orders creates substantial uncertainty as to the type of speech that is barred.

299. This uncertainty has chilled a broad range of protected speech on the part of Plaintiffs, which renders each order unconstitutionally vague for overbreadth.

300. "Where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the

forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (quotations and citations omitted).

301. A restriction on speech is unconstitutionally vague if "a substantial number of sweep." *Ams. For Prosperity Found. V. Bonta*, 594 U.S. at 615; *United States v. Hansen*, 599 U.S. 762, 770 (2023) (speech restriction is void for vagueness if it "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep").

302. This test is met here. The language of the orders encompasses all speech critical of the government, its institutions, American culture, and the government of Israel.

303. Its scope is unprecedented in the context of First Amendment restrictions. The vast majority of the orders' applications sweep-up clearly protected speech. In fact, the orders criminalize no type of activity or speech that isn't already barred by either the inadmissibility and deportability statutes (8 U.S.C. §§1182 and 1227, respectively) or the criminal "material support for terrorism" statute (18 U.S.C. §2339B).

304. The ban on expressing a "hostile attitude" toward American "culture" is of particular concern as EO1 does not define the elements of American "culture" that are to be insulated from criticism.

305. The broad and sweeping character of the Orders will lead reasonable individuals to self-censor speech that is plainly protected for fear of transgressing the vague boundaries enumerated therein.

306. The Orders are overbroad and vague in violation of the First Amendment.

**Count 4: Violation of the Administrative Procedure Act**

**(Arbitrary and Capricious Agency Action; Failure to Provide Notice and Opportunity to Respond) (5 U.S.C. § 706)**

*On Behalf of Plaintiff Sultan*

307. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

308. Under the Administrative Procedure Act ("APA"), agency action must not be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Agency actions must also comply with procedural requirements, including fair notice and the opportunity to respond. 5 U.S.C. § 706(2)(D).

309. Defendants acted arbitrarily and capriciously by failing to provide Plaintiff notice and an opportunity to respond to alleged visa revocation or SEVIS termination, in violation of both 5 U.S.C. § 706(2)(D) and the Defendants' own policies and regulations at 8 C.F.R. § 214.3(g)(2).

310. Defendants acted arbitrarily and capriciously in violation of 5 U.S.C. § 706(2)(A) by failing to provide notice and opportunity to respond as required by 8 C.F.R. § 214.3(g)(2).

311. Plaintiff Sultan was a lawful F-1 nonimmigrant student visa holder, in full compliance with all immigration regulations, including maintaining a full course of study and SEVIS registration.

312. Without prior notice, explanation, or an opportunity to respond, the U.S. Department of State revoked Plaintiff's F-1 visa.

313. Plaintiff was not informed of the reason for revocation, nor was any process afforded to contest the revocation or correct any purported deficiencies.

314. Defendants lack statutory or regulatory authority to terminate Plaintiff's SEVIS record based solely on visa revocation.

315. Additionally, nothing in Plaintiff's criminal history or other history provides a basis for termination or revocation of visa.

316. According to the U.S. Department of State's own guidelines, including the Foreign Affairs Manual (9 FAM 403.11), consular officers are instructed—*when practicable*—to notify a visa holder of the intent to revoke and to allow the individual to respond prior to revocation. Defendants failed to make any such effort or determination regarding practicability.

317. Defendants' revocation of Plaintiff's visa without any individualized consideration, notice, or opportunity to respond constitutes arbitrary and capricious action, in violation of the APA, and fails to meet minimal standards of due process and fair administrative practice.

318. Defendants' actions have deprived Plaintiff of lawful immigration status, educational opportunities, and due process protections to which Plaintiff is entitled under federal law.

319. Plaintiff has suffered and continues to suffer irreparable harm as a direct result of the visa revocation and the unlawful denial of procedural protections.

### Count 5: The Ideological-deportation policy violates the Fifth Amendment

### (U.S. Constitution, Fifth Amendment)

*On Behalf of Plaintiff Sultan*

320. The ideological-deportation policy violates the Fifth Amendment because it invites arbitrary and discriminatory enforcement.

321. To the extent Defendants rely on the security and related grounds of inadmissibility, including the endorse and espouse and foreign policy provisions, as the basis for

carrying out the policy, those provisions violate the Fifth Amendment as applied

because they invite arbitrary and discriminatory enforcement; and because they fail to

give noncitizen students and faculty fair warning as to what speech and association the

government believes to be grounds for arrest, detention, and deportation.

### Count 6: Violation of the Due Process Clause

### (U.S. Constitution, Fifth Amendment)

*On Behalf of Plaintiff Sultan*

322. Plaintiffs incorporates the preceding paragraphs as if fully set forth herein.

323. The Constitution establishes due process rights for "all 'persons' within the United

States, including [noncitizens], whether their presence here is lawful, unlawful,

temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting

*Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

324. Procedural due process requires that the government be constrained before it acts in a

way that deprives individuals of property interests protected under the Due Process

Clause of the Fifth Amendment.

325. Once a student is lawfully admitted to the United States in F-1 status and complies with

the regulatory requirements of that status, the continued registration of that student in

SEVIS is governed by specific and mandatory regulations.

326. Because these regulations impose mandatory constraints on agency action and because

SEVIS registration is necessary for a student to remain enrolled as an international

student, Plaintiff has a constitutionally protected property interest in their SEVIS

registration. *See ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059 (9th Cir. 2015) (recognizing

protected property interest in participating in exchange visitor program); *Brown v.*

55

*Holder*, 763 F.3d 1141, 1148 (9th Cir. 2014) (recognizing protected property interest in nondiscretionary application for naturalization).

327. "Plaintiff has a constitutionally protected property interest in his continued enrollment, F-1 status, and SEVIS registration, consistent with established precedents recognizing protected interests of nonimmigrant students. *See ASSE Int'l, Inc.*, 803 F.3d at 1070.

328. Defendants terminated Plaintiff's SEVIS record without prior notice or opportunity to contest, violating procedural due process.

329. Defendants terminated Plaintiff's SEVIS record based on improper grounds without prior notice and without providing Plaintiff an opportunity to respond. The failure to provide notice of the facts that formed the basis for the SEVIS termination is a violation of due process under the Fifth Amendment

**Count 7: Violation of the Immigration and Nationality Act, and *Accardi* Doctrine**

**(8 U.S.C. §§ 1227, 1182)**

*On Behalf of Plaintiff Sultan*

330. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

331. The government has adopted a policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights.

332. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction, 5 U.S.C. § 706(2)(A)-(B), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

333. In addition, the Secretary of State's determination that Plaintiffs' "presence or activities" would carry "potentially serious adverse foreign policy consequences for the

United States" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C).

334. The Secretary of State's personal determination that Plaintiffs' protected past, current, or expected speech, beliefs, statements, or associations may form a basis to deport him because his presence "would compromise a compelling United States foreign policy interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C).

335. Under *Accardi v. Shaughnessy*, 347 U.S. 260 (1954), Defendants were obligated to comply strictly with their published policies governing SEVIS termination and visa revocation.

336. Defendants violated the *Accardi* doctrine by failing to follow ICE's own regulations, specifically 8 C.F.R. § 214.1(d), governing circumstances for lawful termination of SEVIS records.

337. Defendants violated their own procedures by initiating termination without proper statutory or regulatory grounds, rendering their actions unlawful.

338. Defendants violated the *Accardi* doctrine by failing to provide a notice of intent to revoke visa to Plaintiff Sultan.

## **PRAYER FOR RELIEF**

A. Plaintiff seeks a preliminary and permanent injunction restraining Defendants from further adverse immigration actions taken in retaliation for Plaintiff's protected First Amendment activities.

B.  Declare Defendants' Ideological Deportation Policy and Executive Orders
    unconstitutional under the First and Fifth Amendment as impermissible viewpoint
    discrimination and retaliation.

C.  Enjoin Defendants from implementing or enforcing the Ideological Deportation Policy,
    including, without limitation, through investigation, surveillance, arrest, detention,
    deportation, or any other adverse action.

D.  Declare the Defendants' threats to arrest, detain, and deport noncitizen students, and
    faculty based on their political viewpoints violates the First Amendment, and enjoin
    Defendants from continuing to make those threats.

E.  Order Defendants to immediately reinstate Plaintiff Sultan's SEVIS record and F-1 status,
    including the removal of any derogatory information resulting from the unlawful
    termination.

F.  Order Defendants to expunge all immigration enforcement records created or maintained
    regarding Plaintiff as a result of the retaliatory actions taken.

G.  Issue a permanent injunction barring Defendants from surveilling, detaining, or deporting
    Plaintiff based solely or primarily on constitutionally protected speech activities.

H.  Order Defendants to implement procedural safeguards ensuring that nonimmigrant
    students receive adequate notice and an opportunity to respond prior to visa revocation or
    SEVIS termination.

I.  Require Defendants to report periodically to the Court to ensure ongoing compliance with
    the ordered relief.

J.  Order Defendants to issue a public clarification acknowledging the unlawful nature of their actions, explicitly stating that participation in lawful political speech shall not serve as a basis for immigration enforcement or retaliation.

K.  Order Defendants to implement procedural safeguards ensuring nonimmigrant students receive notice and opportunity to respond prior to visa revocation or SEVIS termination.

L.  Award Plaintiff reasonable attorneys' fees, litigation costs, and any other relief as the Court deems just and proper pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and other applicable statutes.

Dated: May 9, 2025May 9, 2025                    Respectfully Submitted,

                                                */s/ Jana Al-Akhras*
                                                Jana Al-Akhras, Esq. (OH: 0096726)
                                                Phone: (929) 988-0912
                                                Email: ja@urenaesq.com

                                                Rafael Urena, Esq. (NY: 5164058)
                                                Phone: (703) 989-4424
                                                Email: ru@urenaesq.com

                                                **URENA & ASSOCIATES**
                                                42 West St. Suite 136
                                                Brooklyn, NY 11222
                                                info@urenaesq.com / (888) 817-8599
                                                *Counsel for Plaintiffs*