## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AHWAR SULTAN, et al.,**<br><br>        **Plaintiffs,**<br><br>        v.<br><br>**DONALD J. TRUMP, President of the United States, et al.,**<br><br>        **Defendants.** | **Civil Action No. 25-1121 (TSC)** |

### Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction

Rafael Urena
Jana Al-Ahkras
*Attorneys for the Respondent*

**Urena & Associates, PLLC**
42 West St, Floor R
Brooklyn, NY 11222
Email: ru@urenaesq.com
Tel: (888) 817-8599

i

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ..................................................................................4

Mr. Sultan's Status and Advocacy .......................................................................4

The "Ideological Deportation Policy" ..................................................................5

 Termination of F-1 Status and Revocation of Visa .............................................9

 Chilling Effect on SJP and Campus Advocacy ..................................................12

LEGAL STANDARD ...........................................................................................14

ARGUMENT .........................................................................................................15

PLAINTIFFS HAVE STANDING, INCLUDING ORGANIZATIONAL
STANDING FOR SJP............................................................................................15

Organizational Injury to SJP ..............................................................................15

Associational Standing.........................................................................................16

PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS ..18

Defendants' Termination of Mr. Sultan's SEVIS Status Was Unlawful,
Arbitrary and Capricious, and Conducted Without Required Procedure,
in Violation of the APA .......................................................................................18

Contrary to Law (Violation of Regulations & the *Accardi* Doctrine)...............18

Arbitrary and Capricious Substantive Decision..................................................20

Procedural Violations – Lack of Notice and Hearing ........................................21

The Visa Revocation Violated the Accardi Doctrine and the First Amendment...............22

Defendants Flouted Their Own Immigration Rules............................................22

Defendants' Actions Were Unlawfully Motivated by Protected Speech ...........23

The Consular Nonreviewability Doctrine Does Not Bar Judicial Review Here ...............25

SJP's First Amendment Right Confers Standing Under *Mandel* .......................25

No Facially Legitimate and Bona Fide Reason Provided ...................................................26

The Bad Faith Retaliation Against Mr. Sultan for Protected Speech

Violates the First Amendment and Permits Judicial Review .............................................28

PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT
PRELIMINARY RELIEF .....................................................................................................30

THE BALANCE OF EQUITIES TIPS SHARPLY IN PLAINTIFFS' FAVOR,
AND AN INJUNCTION SERVES THE PUBLIC INTEREST ........................................32

CONCLUSION .......................................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*Accardi v. Shaughnessy*, 347 U.S. 260 (1954) .......................................................18, 19, 22

*Am. Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009)........................... passim

*Aracely v. Nielsen*, 319 F. Supp. 3d 110 (D.D.C. 2018).....................................................33

*Bridges v. Wixon*, 326 U.S. 135 (1945).............................................................................28

*Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018) .........................................19, 23, 24

*Elrod v. Burns*, 427 U.S. 347 (1976)................................................................................31

*Emami v. Nielsen*, 365 F. Supp. 3d 1009 (N.D. Cal. 2019)..................................22, 23, 27

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ................................................23

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ....................................................15

*Heffernan v. City of Paterson*, 578 U.S. 266 (2016)........................................................29

*Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333 (1977) ...................................16

*Judulang v. Holder*, 565 U.S. 42 (2011) ...........................................................................20

*Kerry v. Din*, 576 U.S. 86 (2015) ............................................................................. passim

*Kleindienst v. Mandel*, 408 U.S. 753 (1972).............................................................. passim

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016).......................................16

*Montilla v. INS*, 926 F.2d 162 (2d Cir. 1991)........................................................18, 22, 23

*Morton v. Ruiz*, 415 U.S. 199 (1974) .................................................................................27

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29 (1983) ..........................................20

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ..........23

*Nken v. Holder*, 556 U.S. 418 (2009)..........................................................................30, 33

*Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019)............................................................ passim

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ........................................................33

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015)....................................................34

*Snyder v. Phelps*, 562 U.S. 443 (2011) ..............................................................................28

*Steenholdt v. FAA*, 314 F.3d 633 (D.C. Cir. 2003) ..........................................................27

*Toolasprashad v. Bureau of Prisons*, 286 F.3d 576 (D.C. Cir. 2002) ..............................29

*Yes on Prop B v. City of Anaheim*, 2018 WL 3816730 (C.D. Cal. July 9, 2018) ..............30

**STATUTES**

5 U.S.C. § 706..................................................................................................................18, 21

8 U.S.C. § 1182................................................................................................................5, 7, 9

8 C.F.R. § 214.1 ..............................................................................................................18, 22

8 C.F.R. § 214.2 ....................................................................................................................18

8 C.F.R. § 214.3 ..............................................................................................................18, 21

**OTHER AUTHORITIES**

9 Foreign Affairs Manual (FAM) 403.11-4(A)(1) ..............................................................22

Executive Order No. 14,161, 90 Fed. Reg. 8451 (Jan. 30, 2025)........................................5

Executive Order No. 14,188, 90 Fed. Reg. 8847 (Feb. 3, 2025) ........................................6

**U.S. CONSTITUTION**

U.S. Const. amend. I ................................................................................................ passim

U.S. Const. amend. V................................................................................................ passim

**Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction**

**Introduction**

Plaintiffs Ahwar Sultan and Students for Justice in Palestine at The Ohio State University ("SJP") seek a preliminary injunction to halt Defendants' unlawful and retaliatory actions that stripped Mr. Sultan of his student visa status. Mr. Sultan is a lawful F-1 student visa holder and an outspoken SJP member who participated in peaceful campus protests. Am. Compl. ¶¶ 168, 179-189. In April 2025, Defendants abruptly revoked Mr. Sultan's visa and terminated his Student and Exchange Visitor Information System ("SEVIS") record, effectively ending his legal status and ability to study in the United States. *Id*. ¶¶ 214-219. These actions followed then-candidate and now President Trump's repeated vows to "find" and "deport" foreign students who engaged in constitutionally protected protest and discourse. *Id*. ¶¶ 88–90. Within weeks of taking office, Defendants orchestrated a campaign to silence Mr. Sultan and others like him: issuing sweeping executive orders, creating a special initiative to scrutinize student protesters, and abruptly revoking Mr. Sultan's visa and immigration status without notice. The evidence shows that the Student Criminal Alien Initiative and Defendants' justification—that Mr. Sultan "fail[ed] to maintain status" due to a criminal records check and visa revocation—is a pretext for punishing protected political speech. *Id*. ¶¶ 91-105, 161-167, 214-219. Indeed, Mr. Sultan's sole "criminal" charge from a campus protest was dismissed and expunged with no conviction. *Id*. ¶¶ 196-199. As a result, Mr. Sultan was forced to cease his studies and go into hiding out of fear, and SJP's campus activism has been chilled to the point of near paralysis. *Id*. ¶¶ 31-32, 215-219, 231-244. Defendants' actions flagrantly violate the First Amendment's guarantees of free speech and association, the Fifth Amendment's guarantees of due process and equal protection, and the fundamental principle that agencies must follow their own rules. *Id*. ¶¶ 271-339. Plaintiffs now seek a preliminary injunction

1

to halt this unlawful retaliation and to prevent further irreparable harm while the merits of their claims are litigated.

Plaintiffs easily meet the criteria for a preliminary injunction. They are likely to succeed on the merits of their claims because the government's actions were in violation of the APA and unconstitutional under the First and Fifth Amendment. *Id.* Defendants cannot hide behind the doctrine of consular nonreviewability here, as that doctrine does not shield visa decisions made that are not bona fide and facially legitimate, made in bad faith, or in retaliation for protected expression. *See Am. Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009); *see also Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019). The organizational plaintiff SJP also has standing to challenge these actions given the concrete injury to its mission, the diversion of its resources, and the chilling of its members' constitutional rights. Compl. ¶¶ 231-244. Absent relief, Plaintiffs will suffer irreparable harm—Mr. Sultan faces permanent exile and loss of his education, and SJP's members are being silenced in violation of core First Amendment values. *Id*. ¶¶ 31-32, 215-219, 231-244. By contrast, a preliminary injunction would simply maintain the status quo of Mr. Sultan's lawful presence and preserve constitutional rights while the case is decided on the merits. The balance of equities and public interest strongly favor injunctive relief, as upholding the rule of law and protecting free speech far outweighs any speculative harm to the government from briefly suspending its crackdown. For these reasons, Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction.

### Factual Background

***Mr. Sultan's Status and Advocacy.*** Plaintiff Ahwar Sultan is a 21-year-old student from India enrolled at The Ohio State University ("OSU") in valid F-1 visa status. Compl. ¶ 168. He has been in good academic standing and compliant with all visa requirements. *Id.* ¶¶ 168-178. Since 2023,

Mr. Sultan has been an active member of Students for Justice in Palestine ("SJP"), a registered student organization at OSU dedicated to advocacy and education on Palestinian human rights. *Id.* ¶¶ 179-189, 231-2320. SJP's activities include peaceful demonstrations, educational events, and campaigns for university divestment from companies complicit in human rights abuses. *Id.* ¶¶ 231-232. Mr. Sultan emerged as an outspoken member and organizer within SJP, and his leadership in protests critical of Israeli government policies is central to SJP's mission. *Id.* ¶¶ 179-189, 234.

On April 25, 2024, Mr. Sultan participated in a large peaceful protest on OSU's campus, organized by SJP, to call for the university's divestment from the State of Israel. *Id.* ¶ 190 During this protest, Mr. Sultan joined other SJP members in forming a protective perimeter around a group of students who were praying, after law enforcement arrived in riot gear. *Id.* ¶¶ 192-193. He was arrested by Ohio State Troopers, who charged him with misdemeanor trespass, despite the nonviolent nature of the demonstration. *Id.* ¶¶ 193-194. These charges were later dismissed and expunged from Mr. Sultan's record after he completed a brief pretrial diversion program (including 10 hours of community service and a workshop on civil discourse). *Id.* ¶¶ 196-199. Thus, Mr. Sultan has no criminal convictions; the protest-related arrest resulted in no lasting offense on his record. *Id.*

***The "Ideological Deportation Policy"*** Mr. Sultan's protest activities occurred against a rapidly intensifying backdrop of government hostility toward foreign students who speak out on the Israel-Palestine issue. During his 2024 presidential campaign, Defendant Donald J. Trump explicitly threatened to use immigration powers to punish noncitizen protesters. In an October 2023 speech, for example, Mr. Trump declared: "All of the resident aliens who joined in the pro-jihadist protest… Come 2025, we will find you and we will deport you." *Id.* ¶ 88. By May 2024, he was publicly vowing that "[a]ny student that protests, I throw them out of the country… we're going

to set that movement back 25 or 30 years", referring to campus protests as a "radical revolution" that must be crushed. *Id.* ¶ 89. In August 2024, Mr. Trump promised to "immediately deport" any foreign student who brought what he labeled "anti-Americanism or antisemitism" onto campuses. *Id.* ¶ 90. These statements left no ambiguity: if elected, Mr. Trump intended to target foreign students for deportation based on their political speech and viewpoints disfavored by his administration. *Id.* ¶¶ 88-90.

Upon assuming office in January 2025, President Trump swiftly acted on these threats. On January 20, 2025, just days after inauguration, he issued Executive Order No. 14,161, "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats." 90 Fed. Reg. 8451 (Jan. 30, 2025); Compl. ¶¶ 91-96. This Order imposed sweeping new measures ostensibly aimed at vetting noncitizens inside the United States for security risks. In substance, however, EO 14,161 authorized intensive scrutiny and immigration sanctions based on political beliefs and associations. It directed federal agencies to "vet and screen to the maximum degree possible all aliens…already inside the United States" and to recommend actions against those who "undermined" U.S. institutions. *Id.* ¶¶ 93-96. The Order proclaimed a policy of ensuring that noncitizens in the U.S. "do not bear hostile attitudes" toward America or "advocate for" terrorism. *Id.* Such vague criteria effectively opened the door for officials to deem political dissent as a security threat. Indeed, Section 3 of EO 14,161 required the Secretary of State (Defendant Marco Rubio) and other officials to recommend actions against foreign nationals who, *inter alia*, "provide aid, advocacy, or support for foreign terrorists" or even those who "seek to undermine" Americans' constitutional rights. *Id.* ¶ 96. This broad language, by its terms, could be applied to outspoken campus activists: for example, someone protesting U.S. or Israeli government policy could be portrayed as "undermining" Americans' rights or "advocating" for groups deemed hostile. In short,

EO 14,161 laid the groundwork for an ideologically-driven purge of foreign students under the pretext of national security. *Id.* ¶¶ 91-96.

A few days later, on January 29, 2025, President Trump issued a second order, Executive Order No. 14,188, "Additional Measures to Combat Anti-Semitism." 90 Fed. Reg. 8847 (Feb. 3, 2025); Am. Compl. ¶¶ 97-105. EO 14,188's preamble attacked the prior administration for failing to protect American Jews and vowed that this "failure is unacceptable and ends today." *Id.* ¶ 97. While combating antisemitism is a legitimate goal, EO 14,188 took an alarming turn by equating certain political speech with actionable antisemitism. The Order declared it the policy of the United States to "vigorously" combat antisemitism using all legal tools, and it directed agency heads to identify actions to prosecute or remove perpetrators of "unlawful anti-Semitic harassment." *Id.* ¶¶ 98-99. Most pertinently, Section 3(e) of EO 14,188 instructed the Attorney General to work with the Secretary of Education on "familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3)" – i.e., the terrorism- and foreign policy-related grounds – "so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds" *Id.* ¶¶ 100-105. It further called for ensuring that such reports "lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens." *Id.* ¶¶ 97-105. In effect, EO 14,188 enlisted universities in an immigration surveillance program, urging them to police foreign students' speech and associations for anything that could be construed as support for terrorism or "anti-American" sentiment. *Id.* ¶¶ 100-105. Troublingly, the Order expanded the federal government's definition of "antisemitism" to include mere criticism of the State of Israel, and authorized immigration consequences – including visa revocation and removal – for foreign students or scholars who engaged in pro-Palestinian speech or activism on campus. *Id* In combination, EO 14,161 and EO 14,188 created a framework for

punishing noncitizens based purely on ideology and viewpoint, under the dual guises of national security and anti-discrimination. The Amended Complaint refers to this concerted policy as the "Ideological Deportation Policy." *Id.* ¶¶ 106-107.

Defendants wasted no time in implementing these executive edicts. Following the issuance of EO 14,161 and 14,188, Defendants adopted an unconstitutional ideological-deportation policy that aimed to carry out large-scale arrests, detentions, and deportations of noncitizen students and faculty who participate in pro-Palestine protests or related advocacy. Federal agencies under Defendants' control – including the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), and the Department of State – coordinated to put this policy into action. *Id.* ¶¶ 107-117.

The results have shocked the American conscious.[1] Armed, plainclothes federal agents were dispatched to college campuses to surveil, detain, and disappear student protesters. *Id.* The Administration openly signaled that it was targeting pro-Palestinian activism: on March 11, 2025, the White House Press Secretary stated that under the President's executive order "engaging in anti-American, anti-Semitic, pro-Hamas protests will not be tolerated," and confirmed that DHS was actively gathering intelligence to identify individuals on campuses who engaged in such protest activity. *Id.* ¶¶ 110-111. She even noted that names of certain student activists had been

---

[1] Anna Betts, *'Reeks of McCarthyism': Outrage After ICE Detains Palestinian Student Activist*, Guardian (Mar. 10, 2025), https://www.theguardian.com/us-news/2025/mar/10/ice-detains-palestinian-student-activist-mahmoud-khalil (last visited May 9, 2025); Adrian Florido, *Judge Rules Mahmoud Khalil Can Be Deported*, NPR (Apr. 11, 2025), https://www.npr.org/2025/04/11/mahkhalil-deportation-ruling (last visited May 9, 2025); Anna Betts, *Federal Judge in Vermont Orders Release of Columbia Student Mohsen Mahdawi*, Guardian (Apr. 30, 2025), https://www.theguardian.com/us-news/2025/apr/30/mohsen-mahdawi-release-order (last visited May 9, 2025); Sergio Martínez-Beltrán, *Federal Judge Orders Release of Columbia University Student Mohsen Mahdawi*, NPR (Apr. 30, 2025), https://www.npr.org/2025/04/30/mohsen-mahdawi-release (last visited May 9, 2025); *Judge Orders Release of Rümeysa Öztürk, Tufts Student Detained by ICE*, Time (May 9, 2025), https://time.com/7284578/judge-orders-release-of-rumeysa-ozturk-tuft-student-detained-by-ice/ (last visited May 9, 2025); *Judge Orders Release of Tufts Student Rumeysa Ozturk From ICE Custody*, Wall St. J. (May 9, 2025), https://www.wsj.com/us-news/law/rumeysa-ozturk-tufts-student-release-6224dc47 (last visited May 9, 2025).

handed over to university administrators (citing Columbia University as an example) and warned that "we expect all America's colleges and universities to comply with this administration's policy." *Id*. By mid-March 2025, news outlets were reporting that ICE agents who typically focus on serious criminals had "scoured the internet for social media posts and videos" showing sympathy toward Hamas and provided "reports on multiple protesters to the State Department." *Id*. ¶¶ 112-113. The message was unmistakable: the federal government had launched a campaign to identify and purge foreign students whose viewpoints it disfavored, using immigration enforcement as its weapon. *Id.*

One key component of this campaign was ICE's creation of the "Student Criminal Alien Initiative." *Id*. ¶¶ 161-167. Although the government has alleged that it was not formally published, this Initiative (acknowledged internally by ICE) was a concerted effort to "scrub" immigration records and target students who had protest-related arrest records. On April 1, 2025, ICE Assistant Director Andre Watson emailed a State Department official describing "our Student Criminal Alien Initiative," attaching a spreadsheet of foreign students who had positive hits in the National Crime Information Center (NCIC) database. *Id*. ¶¶ 162-163. The next day, State Department personnel replied with an analysis sorting those students by visa status and pointedly asked ICE, "how would you like us to prioritize revocations of these visas?" *Id*. In other words, ICE and State were coordinating to match student protesters to immigration records and then strip them of their visas and status. The Initiative resulted in a wave of visa cancellations and status terminations nationwide: indeed, on March 27, 2025, Secretary of State Rubio announced that the State Department had revoked the visas of approximately 300 foreign students as part of this crackdown. *Id*. News spread quickly in the academic community that the rarely-used "risk to foreign policy" provision of immigration law (8 U.S.C. § 1182(a)(3)(C)) was being invoked to

justify these actions. *Id*. In an unprecedented move, ICE even bypassed the usual role of universities in managing student status and began unilaterally terminating students' SEVIS records to facilitate removals. *Id.* All of these efforts were part of Defendants' broader Ideological Deportation Policy, which treated peaceful campus dissent as a national security threat and sought to make good on President Trump's vow to deport student protesters and chill dissent on American campuses. *Id.* ¶¶ 106-107, 161-167.

**Termination of F-1 Status and Revocation of Visa.**    Plaintiff Sultan became a direct target of this campaign in early April 2025. In late March, he had the unfortunate distinction of seeing his name effectively on a government "list": his protest arrest from the prior year made him one of the foreign students flagged under the Student Criminal Alien Initiative. *Id.* ¶¶ 161-167. Just days after Secretary Rubio's announcement of mass visa revocations, Mr. Sultan felt the repercussions personally. On April 3, 2025, at about 4:30 p.m., OSU's Office of International Affairs emailed Mr. Sultan an alarming notice: his SEVIS record had been "terminated" effective immediately. *Id.* ¶ 215. The stated reason given was: "otherwise failing to maintain status – individual identified in criminal records check and/or has had their VISA revoked." *Id.* ¶ 215. This terse, one-line explanation cited no statute or concrete basis; it merely alluded to a "criminal records check" and a visa revocation. The University instructed Mr. Sultan to cease all F-1 related activities and campus employment at once, thereby barring him from attending classes or working as a teaching assistant from that moment forward. *Id*. Mr. Sultan was stunned. He had received no prior warning or inquiry from immigration officials. When he contacted the international student adviser, he was told no further information was available – only that the directive had come through the SEVIS system. In the span of a single email, Mr. Sultan's life was upended: he was essentially expelled from his studies and his job, without any hearing or chance to respond. This SEVIS

termination, on its face, invoked Mr. Sultan's year-old protest arrest (already dismissed and expunged) as a rationale, and vaguely referenced a visa revocation which he had not even been aware of at the time. *Id.* ¶¶ 215-219. The practical consequences of a SEVIS termination are dire and immediate. By regulation, when a student's SEVIS record is terminated, the student is immediately out-of-status with no grace period to remain in the U.S.; departure is expected "at once." *Id.* ¶ 223. The student can no longer attend classes, is removed from for any campus employment, and cannot lawfully re-enter the U.S. on that visa in the future.. In Mr. Sultan's case, these consequences hit hard. Classes at OSU were midway through the spring semester; Mr. Sultan abruptly had to stop attending, meaning his coursework and research were left in limbo. *Id.* ¶¶ 215, 223.  He lost his on-campus job as a teaching assistant – a role that provided critical income and academic experience. *Id.* ¶ 223. Effectively, Mr. Sultan was plunged into an untenable state of legal limbo: if he left the U.S., he feared he could not return, and if he stayed, he feared imminent arrest for being out-of-status. *Id.* ¶¶ 217, 223. Lacking any guidance, Mr. Sultan felt compelled to go into hiding out of fear that ICE agents might come for him next. *Id.* A once-outspoken student leader was transformed overnight into a fugitive from his campus, sleeping on friends' couches off-campus, afraid to even walk on university property. The emotional and psychological toll of this sudden exile was immense – Mr. Sultan experienced severe anxiety, constant fear of a knock on the door, and the devastation of seeing his educational dreams collapsing for contrary to the American ideals of the freedom of speech that draw so many students to the United States of America. *Id.* ¶ 223.

It soon became clear that the cryptic reference to visa revocation in the SEVIS termination notice was not mere hypothesis. In fact, unbeknownst to Mr. Sultan at the time, the U.S. Department of State had revoked his F-1 visa behind the scenes. On April 21, 2025, Mr. Sultan

received an email from the U.S. Consulate General in Mumbai informing him that his visa was "revoked in accordance with Section 221(i) of the INA.". Section 221(i) of the Immigration and Nationality Act authorizes consular officers to revoke visas at any time in their discretion if the visa holder is ineligible for the visa. *Id.* ¶ 218. The consulate's email provided no factual basis or specific grounds for this drastic action. It simply warned Mr. Sultan that remaining in the United States without a valid status could result in fines, detention, or deportation, and it "directed him to self-deport." *Id.* ¶ 219. Astonishingly, this April 21 email was the first notice Mr. Sultan ever received that his visa had been canceled. The State Department gave him no prior notice of intent to revoke and no opportunity to respond or explain before the decision. *Id.* ¶ 222 /

By the time he learned of the revocation, the damage was done: his SEVIS status was already terminated, and he was being instructed to leave the country. In sum, the Government had orchestrated a one-two punch against Mr. Sultan. Pursuant to the Initiative, ICE (through SEVIS) terminated his student status on April 3, 2025, and then, the State Department secretly revoked his visa (apparently on or around April 7, 2025), each agency action acting jointly and providing a pretext for the other, all without any individualized process or substantive justification. *Id.* ¶¶ 214-224. The retaliatory motive behind these actions is impossible to ignore. Mr. Sultan's "sins," from the Government's perspective, were that he engaged in core political speech and association through SJP. His protest arrest, despite yielding no conviction, was resurrected as a pretext to brand him a supposed status violator. *Id.* ¶¶ 224, 227-228.

The timing underscores the retaliatory intent: Mr. Sultan had no disciplinary or academic issues and no criminal record; the sole trigger for the sudden termination was the prior protest incident. It occurred almost exactly a year after the protest – in the wake of Defendants' new campus crackdown initiative. As this Court observed at an earlier hearing, all Mr. Sultan "did was [stand]

10

on the South Oval…charged with trespass." Yet Defendants seized on that event to achieve what President Trump had promised: "deport [a] student protester." But for Mr. Sultan's participation in a peaceful SJP rally, none of these immigration penalties would have befallen him. The conclusion is clear: Defendants targeted Mr. Sultan for adverse action because of his protected speech and associations, in an effort to punish him and send a message to others. This is textbook retaliation in violation of the First Amendment. *Id.*

**Chilling Effect on SJP and Campus Advocacy.** Defendants' actions against Mr. Sultan have reverberated far beyond his individual case, causing a widespread chilling effect on campus advocacy, particularly within SJP at OSU and similar student organizations nationwide. Plaintiff SJP is itself a co-plaintiff in this case, and for good reason: the organization's mission and activities have been severely disrupted by the Government's retaliatory campaign. *Id.* ¶¶ 231-232. SJP's core purpose is to foster open discussion and advocate for Palestinian rights through demonstrations, educational panels, and other expressive activities. *Id.*. Yet by singling out Mr. Sultan – one of SJP's active members – for draconian punishment, Defendants have sent a direct warning to SJP as a whole. Since Mr. Sultan's visa revocation became known, SJP members have grown fearful that participating in protests or even being associated with SJP could put them next on the deportation list. *Id.* ¶¶ 233-235. This fear is not speculative; it is borne out by Defendants' overt tactics. Students watched masked federal agents descend on campuses, saw peers arrested or threatened, and learned of hundreds of visa revocations. At OSU, when word spread that *"visa holders [were] being targeted"*, the effect on SJP was immediate and devastating. *Id.* ¶¶ 233-235. Attendance at SJP meetings and rallies plummeted from hundreds of students to only a handful.. Both international students *and* U.S. citizen students began to shy away from any public alignment with SJP, lest they draw government scrutiny. Even routine SJP events were canceled or sparsely

attended. The once-vibrant campus dialogue fostered by SJP has largely fallen silent – a result precisely intended by Defendants' repression.

This climate of fear and self-censorship extends beyond OSU. The ideological-deportation policy has cast a pall over university campuses across the country, forcing many noncitizen students and even faculty into silence. *Id.* ¶¶ 233-238. Noncitizens who previously felt safe speaking out now must weigh the risk of arrest, detention, or deportation as a consequence of attending a rally or signing a petition. *Id.* ¶. Some have resigned leadership positions in advocacy groups; others have declined to participate in panel discussions or publish opinion pieces they would ordinarily pursue. *Id.* In the case of SJP at OSU, members have reported feeling surveilled and are avoiding SJP's social media or group chats. The associational rights of SJP members are thus directly burdened – the group can no longer freely assemble or recruit without members fearing they could be putting a target on their backs. *Id.* This is the intended outcome of a policy that treats pro-Palestinian advocacy as suspect. As one federal court noted, threatening penalties for future speech is a classic form of *"prior restraint,"* and *"a prior restraint is the quintessential First Amendment violation." Id.* Here, Defendants' conduct has effectively restrained and stifled the future speech of an entire group of students.

Importantly, SJP as an organization has had to divert its limited resources to respond to this crisis. Instead of focusing on its mission of education on the genocide in Gaza and advocacy for Palestinian dignity, SJP has spent hours in emergency meetings, arranging legal support, and reassuring frightened members. *Id.* ¶¶ 239-244. These are irrecoverable expenditures of time and resources – opportunities lost that cannot be remedied after the fact. *Id.* The trust among SJP's members and the broader student body has also been eroded; some students quietly withdrew from the group to protect themselves. In short, Defendants' retaliatory policy has not only harmed Mr.

Sultan, but has crippled an entire student movement's ability to function. This chilling effect on college campuses is precisely the outcome Defendants sought: as President Trump boasted, punishing a few would make the rest "behave." *Id*. The Constitution of the United States of America, however, does not countenance such an assault on free expression and association, especially in the academic realm which relies on robust debate. Plaintiffs bring this motion to ensure that dissent remains *not a deportable offense, but a protected civic virtue.*

## Legal Standard

A preliminary injunction is an "extraordinary remedy" reserved for cases where the moving party carries the burden of persuasion by a clear showing on four factors. Op. & Order at 7, *Sultan v. Trump*, No. 1:25-cv-01121, ECF No. 12 (D.D.C. Apr. 17, 2025). To obtain relief, Plaintiffs must establish: (1) a likelihood of success on the merits of their claims; (2) a likelihood of irreparable harm absent injunctive relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Id*. In the D.C. Circuit, these factors are evaluated on a "sliding scale," but only if the moving party makes an especially strong showing of irreparable harm and public interest in its favor will a lesser (yet substantial) showing on the merits suffice. *Id*. Ultimately, the court's aim is to preserve the status quo and prevent irreparable injury until the merits can be adjudicated. *Id*. When the Government is the opposing party, the balance of equities and public interest factors merge, since the Government's interest is the public interest. *Id*. As shown below, all four factors strongly favor Plaintiffs in this case.

## Argument

## I.    Plaintiffs Have Standing, Including Organizational Standing for SJP

As a threshold matter, both Mr. Sultan and SJP have standing to seek relief. Mr. Sultan plainly has individual standing. Mr. Sultan is suffering a direct, concrete injury (loss of his legal status,

education, and threat of removal) that is caused by Defendants' actions and would be redressed by the requested injunction (which would restore his visa and status and prevent his deportation). Defendants do not seriously contest Mr. Sultan's standing. The more complex question is SJP's standing as an organization, which Defendants challenged at the TRO hearing. TRO hearing. Hr'g Tr. at 15–16, *Sultan v. Trump*, No. 1:25-cv-01121 (D.D.C. Apr. 17, 2025). SJP meets the requirements for both organizational standing (on its own behalf) and associational standing (on behalf of its members).

***Organizational Injury to SJP.*** SJP has suffered a direct injury to its mission and operations due to Defendants' retaliatory campaign. SJP's purpose is to educate and advocate on Palestinian rights issues on campus, Am. Compl. ¶¶ 231-232, a mission it can only carry out through the robust participation of students (both U.S. citizens and noncitizens) in expressive activities. *Id.* By targeting Mr. Sultan—one of SJP's active members and organizers—for harsh immigration sanctions based on constitutionally protected political activities, the government has "substantially burden[ed] SJP's organizational mission [and] activities." *Id.* ¶ 239. Fear now pervades the group, undermining its ability to organize events or attract speakers and attendees. This climate of intimidation and self-censorship is directly traceable to Defendants' actions and "undermin[es] SJP's ability to conduct advocacy and education" on campus. *Id.* ¶¶ 239-240. In other words, SJP's organizational effectiveness and purpose have been frustrated, which is a well-recognized injury in fact for standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that an organization suffers injury in fact if the defendant's actions "perceptibly impair" the organization's ability to advance its mission).

Additionally, SJP has had to "divert significant organizational resources" to counteract Defendants' unlawful actions. Am Compl. ¶ 241-242, *Sultan v. Trump*, No. 1:25-cv-01121. Instead

of devoting its time and funds to campus programming or advocacy campaigns, SJP has been forced to spend those resources on assisting affected members with immigration concerns and modifying its activities to ensure member safety. *Id.* ¶¶ 241-243. This diversion of resources is concrete and quantifiable (in hours of student leadership time and expenses for legal outreach), and it satisfies the injury requirement for organizational standing. *Id.*; *see League of Women Voters v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (organizational plaintiffs had standing where they had to divert resources from core programs to address the effects of the defendant's conduct).

The chilling of SJP members' speech and association is another facet of injury that SJP, as an organization, can assert. SJP exists as an association of students engaged in collective advocacy; when Defendants' actions deter students from participating, SJP itself is harmed. Here, the intimidation of Mr. Sultan and others has "deterred current and prospective members from participating fully and freely in [SJP's] activities and advocacy," leading to "decreased member participation and engagement." Am. Compl. ¶ 240. This chilling effect on SJP's membership and on-campus presence is "a tangible injury to SJP's organizational effectiveness and associational interests." *Id.* ¶ 240-243. In short, SJP has shown a concrete injury to itself as an organization, caused by Defendants, and redressable by an injunction that halts the retaliatory enforcement. SJP thus has standing in its own right.

***Associational Standing.*** Independently, SJP also satisfies the criteria for associational (representational) standing to sue on behalf of its members, including Mr. Sultan. SJP's complaint specifically pleads that it brings this action "on its own behalf . . . and in a representative capacity on behalf of its members, including Plaintiff Sultan." *Id.* at ¶ 20. Under the well-established test from *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977), an organization may sue for injuries to its members if: (a) its members would have standing in their

own right; (b) the interests at stake are germane to the organization's purpose; and (c) neither the claim nor relief requires individual members' participation. SJP meets all three prongs. First, as discussed, at least one of SJP's members—Mr. Sultan—indisputably has standing on his own (and many other SJP members who hold F-1 visas are similarly threatened). Second, the rights SJP seeks to protect (freedom of speech and association of students, and the ability of members to remain in the U.S. to study and advocate) are absolutely germane to SJP's purpose of fostering student activism on Palestinian issues. *Id.* ¶¶ 231-232. Third, the claims and relief here—primarily injunctive and declaratory relief—do not require individual members to participate in the lawsuit beyond what SJP can advocate for; no individualized money damages are sought. Therefore, SJP can properly represent its members.

Notably, the First Amendment rights of SJP's U.S. citizen members are directly implicated as well: American students have a right to receive information and organize with noncitizen students like Mr. Sultan. Courts have long held that U.S. organizations suffer a cognizable injury when the government excludes or ejects a noncitizen speaker or member, thereby denying the group and its U.S. members the ability to "hear, speak, and debate with" that individual. *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 131–32 (2d Cir. 2009) (citing *Kleindienst v. Mandel*, 408 U.S. 753 (1972)). Here, SJP's American student members are deprived of Mr. Sultan's participation and viewpoint in their collective endeavors, which reinforces SJP's standing to challenge the unlawful visa revocation. In sum, SJP has standing on multiple, independent grounds to join Mr. Sultan in this suit.

## II.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims

Plaintiffs have a strong likelihood of success on the merits. The record demonstrates that Defendants' actions were retaliatory and taken in bad faith, in violation of the First Amendment,

16

and were arbitrary, capricious, and contrary to law in violation of the APA. Even acknowledging the executive branch's usual discretion over visa matters, the State Department failed to follow its own regulations and procedures, has not provided a bona fide and facially legitimate revocation, and the "bad faith" exception to consular nonreviewability applies here. Courts will not rubber-stamp immigration decisions that burden constitutional rights without a "facially legitimate and bona fide reason." *Kleindienst v. Mandel*, 408 U.S. at 770. Defendants cannot articulate any legitimate, bona fide reason for the draconian actions against Mr. Sultan – on the contrary, all evidence indicates the reason was to punish his protected speech, which is an impermissible motive. Additionally, Defendants flouted their own regulations and procedures, further undercutting any claim to legitimacy. Each of Plaintiffs' primary legal claims is addressed below.

> **a. Defendants' Termination of Mr. Sultan's SEVIS Status Was Unlawful, Arbitrary and Capricious, and Conducted Without Required Procedure, in Violation of the APA**

Plaintiffs are also likely to succeed on their claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, because Defendants' actions violated federal regulations, were arbitrary and capricious, and were carried out without observing procedure required by law. Under the APA, agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if undertaken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The termination of Mr. Sultan's F-1 status (a DHS action via ICE's SEVIS database) and related visa revocation (a State Department action) are final agency actions reviewable under the APA. Nothing in the Immigration and Nationality Act explicitly precludes judicial review of visa revocations in this context, especially where constitutional claims are intertwined; indeed, the D.C. Circuit has held that APA review is available to ensure the Executive

stays within the bounds of statutes and regulations. *See Am. Acad. of Religion*, 573 F.3d at 126. Here, Defendants' actions run afoul of multiple legal requirements:

***Contrary to Law (Violation of Regulations & the Accardi Doctrine).*** Defendants failed to follow their own binding regulations governing F-1 status and SEVIS terminations. It is a fundamental principle of administrative law that agencies must adhere to the rules and policies they have established. *See Accardi v. Shaughnessy*, 347 U.S. 260 (1954). DHS's regulations clearly define limited circumstances for SEVIS termination, specifically 8 C.F.R. §§ 214.2(f)(5)(i), (iii), and 214.1(d). Generally, this occurs if the student is no longer a bona fide student (e.g., not attending classes, not making normal progress, or otherwise violating the terms of the F-1 visa). *See* Op. & Order at 4–5. Here, Mr. Sultan was at all times properly enrolled and engaging in authorized activities. Moreover, DHS regulations require procedural safeguards. 8 C.F.R. § 214.3(g)(2)(ii) implies that termination involves communication between the school and ICE, suggesting procedural obligations for notification and possible remediation prior to termination.

Critically, DHS explicitly instructs that "visa revocation is not, in itself, a cause for termination of the student's SEVIS record." *Id.* at 128. DHS's own Student and Exchange Visitor Program (SEVP) policy states that a visa revocation does not automatically or on its own render a student "out of status." *Id.* ¶¶ 128–131. In fact, in 2010, DHS explicitly instructed that "visa revocation is not, in itself, a cause for termination of the student's SEVIS record." *Id.* ¶ 129; Op. & Order at 6. The proper procedure, as per that guidance, is that if a student's visa is revoked while the student is in the U.S., the student may continue their studies; only upon departure would the revoked visa prevent re-entry, but it would not justify terminating the SEVIS record mid-course. Am. Compl. ¶¶ 128-131.

By terminating Mr. Sultan's SEVIS record solely on the basis of a visa revocation and an unrelated arrest, ICE acted inconsistently with 8 C.F.R. § 214.1(d) (2024) and related SEVP guidance, which reflect the *Accardi* doctrine in requiring agencies to follow their own rules. Op. & Order at 6. Moreover, 8 C.F.R. § 214.3(g)(2)(ii) (2024) requires that Designated School Officials report a termination when a student "fails to maintain status," but that presupposes the student in fact failed to pursue studies or violated conditions—a scenario not applicable to Mr. Sultan. Op. & Order at 5–6. There is no regulatory basis to label him "out of status" for having an arrest record or for a consular visa revocation. Thus, Defendants' action was "not in accordance with law" and violated the APA. See 5 U.S.C. § 706(2)(A), (D) (2024).

*Arbitrary and Capricious Substantive Decision.* Even setting aside the regulatory violations, the decision to terminate Mr. Sultan's status (and the parallel visa revocation) was arbitrary and capricious because it relied on factors Congress did not intend and ignored critical facts. An agency acts arbitrarily if it relies on reasons that run counter to the evidence or are so implausible that they cannot be ascribed to a difference in view. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). Here, the only "evidence" cited was Mr. Sultan's arrest record, which had been dismissed and expunged. Op. & Order at 5. Using a dismissed and expunged arrest as the sole grounds to terminate a person's educational status is patently unreasonable. Dismissal and expungement reflects a judgment that the incident should not carry ongoing legal consequences. DHS's action gave it more weight than a conviction, treating the mere fact of an arrest as determinative of status. This is an irrational and overbroad policy choice – it fails to distinguish between students who were arrested but *not* found guilty of any wrongdoing versus those who might pose actual dangers. In Mr. Sultan's case, all charges were dropped, yet the government treated him as if he were a criminal. That is the definition of arbitrary. No standards

19

or criteria were applied to evaluate the severity or truth of the so-called criminal record; rather, a dragnet approach ensnared Mr. Sultan because his name appeared in a database of arrests. Furthermore, the agency failed to consider obvious important aspects of the problem, such as Mr. Sultan's evidence of innocence (dismissal and expungement), the impact on his university's interests and academic progress, and the constitutionally protected activity underlying the arrest. The decision memo or record (to the extent one exists) likely contains nothing beyond a checkbox that his name matched an arrest list – which is arbitrary on its face. Courts have overturned immigration actions where the government's rationale was pretextual or the result of an unexplained about-face. *E.g.*, *Judulang v. Holder*, 565 U.S. 42, 64 (2011) (striking down an arbitrary immigration policy that lacked rational justification). This case is worse: the government's about-face on its own policy (ignoring the 2010 guidance) and use of a legally void arrest record make the action arbitrary and capricious. Indeed, in granting the TRO, this Court already observed that "Sultan has shown a likelihood of success" on his APA claim, finding that Defendants' actions "are arbitrary and capricious, violate DHS regulations, and fail to accord him due process." Op. & Order at 8. Such an early judicial assessment of likely APA violations strongly supports Plaintiffs' merits showing at this PI stage.

**Procedural Violations – Lack of Notice and Hearing.** The APA also requires agencies to observe proper procedure, which in this context includes basic due process protections or at least those procedures the agency has adopted. When the government takes an individualized adverse action (an effective adjudication) against a person, it must generally provide notice of the reasons and an opportunity to respond before deprivation, unless a statute clearly precludes it. Here, Mr. Sultan was given zero prior notice that his visa or status was in jeopardy, and zero opportunity to contest the grounds. The email from OSU on April 21, 2025, indicated that the decision was

already made and immediate—Mr. Sultan was commanded to cease studies at once. Op. & Order at 5. He was not told in advance that ICE was considering terminating his SEVIS record or allowed to submit any information (for example, proof that his charges were expunged, or evidence of his continued enrollment). *Id.* The first chance he had to be heard was after filing this lawsuit, when the Court held a TRO hearing. Such post-deprivation process, if any, is too late; by then the harm (loss of status) had occurred. *Id.* at 5–6.

The APA's procedural prong, 5 U.S.C. § 706(2)(D) (2024), is directly implicated. Additionally, DHS regulations themselves envision an orderly process. For instance, 8 C.F.R. § 214.1(d) (2024) provides that even if DHS believes a nonimmigrant is not complying with status, it may initiate removal proceedings to prove that allegation—it does not say DHS can unilaterally cancel status without a proceeding. Likewise, 8 C.F.R. § 214.3(g)(2)(ii) (2024) implies that termination is a step that likely involves communication between the school and ICE, and one would expect the student to be informed and perhaps given a chance to cure any status issue. Am. Compl. ¶ 126. Here, if the issue was truly Mr. Sultan's arrest, DHS could have given him notice and a short window to respond or show that the arrest was expunged (which he easily could have). Their failure to do so is not only unfair but likely in violation of DHS's own procedures.

The Fifth Amendment's due process clause also independently requires notice and an opportunity to be heard before stripping a person of a significant liberty or property interest. Mr. Sultan has a strong argument that his F-1 status, once conferred and relied upon, is a property or liberty interest (at least to continue his education for the duration of his visa) that cannot be revoked without due process. Regardless of how the Court ultimately rules on the constitutional due process count, the APA enables the Court to remedy the lack of process because an agency action taken with "no process" when some process is due is arbitrary and procedurally improper. This Court

noted that if the APA "provides for due process" in this context, then Defendants' failure to give Mr. Sultan an opportunity to be heard indicates likely success on the merits. Op. & Order at 8–9. Indeed, numerous other federal courts, facing nearly identical visa revocations and SEVIS terminations of foreign students in the past weeks, have issued TROs precisely because of the lack of individualized process and potential First Amendment concerns. *Id.* This Court should do the same in its preliminary injunction.

In conclusion, Plaintiffs have demonstrated serious, non-conclusory grounds to find the agency actions here unlawful under the APA. Defendants' acts were taken in violation of binding regulations (*Accardi* violation), were based on an improper and pretextual rationale (arbitrary and capricious), and utterly failed to provide the affected person with basic procedural safeguards (notice/comment), violating the APA and the Constitution. Any one of these APA flaws is likely sufficient for Plaintiffs to prevail; together they present an overwhelming case for setting aside the SEVIS termination and visa revocation. The requested preliminary injunction would essentially require Defendants to pause and undo these unlawful actions (reinstating Mr. Sultan's status) while the case proceeds—relief well within this Court's equitable power under the APA.

### b.   The Visa Revocation Violated the *Accardi* Doctrine and the First Amendment

Defendants' revocation of Plaintiff Sultan's student visa – and the related termination of his F-1 student status – flagrantly violated both the *Accardi* doctrine and the First Amendment. Under *Accardi*, federal agencies must follow their own regulations and established policies; they cannot ignore internal rules at whim. *See Montilla v. INS,* 926 F.2d 162 (2d Cir. 1991); *Emami v. Nielsen*, 365 F. Supp. 3d 1009, 1020 (N.D. Cal. 2019). Here, Defendants failed to abide by multiple binding rules governing student visa status and revocation, rendering their actions unlawful. Worse, the evidence shows that Defendants took these actions in retaliation for Plaintiff's protected

political speech, an impermissible motive that strikes at the heart of the First Amendment. Plaintiffs are therefore likely to succeed on the merits of their APA and First Amendment claims..

***Defendants Flouted Their Own Immigration Rules.*** It is undisputed that Plaintiff Sultan was a full-time F-1 student at Ohio State, in valid status and complying with all visa requirements. Yet on April 3, 2025, the university, notified him that his SEVIS record was terminated for "otherwise failing to maintain status – individual identified in criminal records check and/or has had their VISA revoked." In fact, Plaintiff had not failed to maintain status; the sole "failure" cited was the visa revocation itself, which is not a lawful ground for terminating a student's status.

Federal regulations strictly limit DHS's power to terminate a student's F-1 status to certain defined circumstances (e.g. revocation of a waiver, a private bill, or a published national security notice) – none of which applied here. C.F.R. § 214.1(d). According to 8 C.F.R. § 214.1(d) and SEVP's own guidance, the revocation of a visa does not constitute failure to maintain status and cannot therefore be a basis for SEVIS termination. *Id;* U.S. Immigration & Customs Enf't, Policy Guidance 1004-04: Visa Revocations 3 (June 7, 2010). Defendants' termination of Plaintiff's SEVIS record on the false pretext of a visa revocation blatantly violated these binding rules.

Moreover, the State Department failed to follow its own procedures when revoking Plaintiff's visa. On April 21, 2025, well after SEVIS termination, the Plaintiff received an email from the U.S. Consulate in Mumbai stating that his F-1 visa was revoked under INA § 221(i) and directing him to depart the country. *See* Email, ECF No. 9-2. This revocation was implemented without any prior notice or opportunity for Plaintiff to respond. Yet State's Foreign Affairs Manual requires that, "whenever practicable," a visa holder be given notice of intent to revoke and a meaningful chance to show why their visa should not be revoked. 9 Foreign Aff. Manual (FAM) 403.11-4(A)(1), available at https://fam.state.gov/fam/09FAM/09FAM040311.html (last visited

May 9, 2025). A retroactive notice of revocation, like what occurred here, is deemed insufficient absent genuine impracticability, and failure to provide this opportunity may render the revocation procedurally defective under State's own policy. 9 Foreign Aff. Manual (FAM) 403.11-4(A)(1)(a)(1) ("An after-the-fact notice that the visa has already been revoked is not sufficient unless prior notice of intent to revoke was not practicable."). Defendants ignored this mandate: they provided no advance notice to Plaintiff Sultan, thereby depriving him of any chance to contest whatever allegations prompted the revocation. In short, Defendants violated the *Accardi* doctrine twice over – by terminating Plaintiff's student status on a ground not permitted by 8 C.F.R. §§ 214.1(d) and 214.2(f), and by revoking his visa in a manner that flouted the Department's prescribed notice procedures.

These procedural violations fall squarely under the *Accardi* rule, which courts have rigorously enforced in immigration matters. "In the immigration context," an agency's obligation to adhere to its rules "is not limited to rules attaining the status of formal regulation," but applies equally to internal agency guidance. *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 336 (D.D.C. 2018) (quoting *Montilla v. INS*, 926 F.2d 162, 167 (2d Cir. 1991)). Thus, agencies are "bound to follow their rules and guidelines, however they might be denominated," and an agency "can be sued for failing to abide by the rules and procedures it formulates to perform its duties." *Emami v. Nielsen*, 365 F. Supp. 3d 1009, 1020 (N.D. Cal. 2019) (holding agency's departure from its posted guidelines invalid under the APA). Consistent with this principle, courts permit APA claims based on an agency's failure to honor even internal procedures or pronouncements. *See*, *e.g.*, *Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 120–21 (D.D.C. 2020) (allowing challenge to State Department's failure to adhere to its own guidance); *Emami v. Nielsen*, 365 F. Supp. 3d 1009, 1020 (N.D. Cal. 2019) (agency may not "simply disregard rules that are still on the books," including

"internal operating procedures" and "operations instructions"). Here, Defendants' abrupt deviation from their SEVIS and visa-revocation rules is just the sort of arbitrary, unlawful conduct that *Accardi* forbids. Having "failed to abide by the rules and procedures" that they themselves established.

Defendants cannot defend these actions as a lawful exercise of discretion. Plaintiffs have shown a clear likelihood of success on their APA claim that the revocation and termination were "contrary to law" and "arbitrary and capricious" for violating the agencies' own rules.

***Defendants' Actions Were Unlawfully Motivated by Protected Speech***. The record also demonstrates that Defendants revoked Plaintiff's visa and targeted him for removal because of his political speech and associations, in direct violation of the First Amendment. Plaintiff Sultan, like many other students last fall, participated in peaceful campus protests advocating for Palestinian human rights. In retaliation, senior U.S. officials launched an "Ideological Deportation Policy" aimed at silencing pro-Palestinian student activists through immigration enforcement. Plaintiff – a prominent member of Students for Justice in Palestine – was swept up in this campaign. After he engaged in protected protest activity, he was arrested on minor charges that were soon dismissed, and later the government moved to cancel his student status and visa.

Internal government records make the retaliatory motive explicit: Plaintiff was singled out "solely based on [his] protected political speech and association," and Defendants adopted a policy "to retaliate against and punish" noncitizens like him for participating in protests. Tellingly, the only "activities" identified were Plaintiff's expressive conduct and beliefs regarding the Israel–Palestine conflict that led to the arrest. In other words, the government explicitly predicated its adverse action on Plaintiff's core political speech. Punishing someone for their speech is anathema to the First Amendment. Yet Defendants did exactly that. Indeed, viewpoint-based discrimination

and retaliation are presumptively unconstitutional in any context; the First Amendment bars the government from wielding its power to target disfavored speech. That principle applies with full force to immigration officials: while the government has broad authority over immigration, it may not disregard its rules or otherwise subvert fundamental rights in the name of expediency. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 336 (D.D.C. *2018) (quoting Montilla v. INS, 926 F.2d 162, 167 (2d Cir. 1991)); accord* Moghaddam v. Pompeo, 424 F. Supp. 3d 104, 120-21 (D.D.C. 2020) (permitting APA claim based on State Department's failure to adhere to its own guidance and pronouncements); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books."); *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations"); *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 503-09 (D. Md. 2019) (FAM supplies legislative rules subject to notice-and-comment rulemaking provisions). Defendants' use of immigration tools as a bludgeon to suppress speech that they dislike, including Plaintiff Sultan's speech, cannot withstand constitutional scrutiny. Because Plaintiff has shown that his visa was revoked pursuant to an official policy of viewpoint discrimination, he has established a likely First Amendment violation. At a minimum, the Court can demand that Defendants proffer a "facially legitimate and bona fide" reason for their actions – something plainly lacking where the record indicates an improper retaliatory motive. In sum, Defendants' conduct here struck at the heart of the First Amendment.

### c.  The Consular Nonreviewability Doctrine Does Not Bar Judicial Review Here

***SJP's First Amendment Right to Receive Information (and to Associate with Mr. Sultan) Confers Standing Under Mandel.*** Plaintiffs are not asking the Court to vindicate any right of Mr.

Sultan (a nonresident alien) to enter the United States; rather, they assert their *own* First Amendment rights to hear from and associate with him. It is well established that American citizens have a First Amendment interest in receiving information and ideas from a willing foreign speaker. In *Kleindienst v. Mandel*, for example, U.S. professors invited a Marxist scholar to speak and argued that excluding him violated *their* First Amendment rights. The Supreme Court acknowledged that the "rights of the citizens of the country to have the alien enter and to hear him explain and seek to defend his views" were at stake. *Kleindienst v. Mandel*, 408 U.S. 753, 764 (1972). Indeed, the Court noted that even though the alien himself had no right to enter, this "does not preclude the assertion of First Amendment rights – including the right to receive information – by American citizens who have invited the alien to participate with them in colloquia, debates, and discussion." *Id*. at 754. In short, U.S. persons have a constitutional right "to receive information and ideas" from non-citizens, *Id*. at 762-763, and to engage in dialogue and advocacy with them. Here, Plaintiff SJP and its members intended to continue hearing Mr. Sultan's views and engaging with him in advocacy. The revocation of Mr. Sultan's visa *directly burdens* those U.S. persons' First Amendment interests, denying them the opportunity to meet, hear from, and associate with him. SJP thus has organizational standing on behalf of its members, who are suffering a concrete injury: the inability to receive Mr. Sultan's speech and to interact with him in furtherance of their own political expression. This injury – the deprivation of U.S. citizens' expressive rights – is squarely within the zone of interests protected by the First Amendment, and it is judicially cognizable under *Mandel*. 408 U.S. at 762 (recognizing professors' claim that a visa denial implicated their right "to hear [the speaker's] views and engage him in a free and open academic exchange.") Accordingly, the organizational plaintiff SJP may challenge the visa

revocation on First Amendment grounds, just as the professors in *Mandel* were permitted to sue over the exclusion of their invited speaker.

***Defendants Have Provided No "Facially Legitimate and Bona Fide" Reason for the Revocation, So the Court May Review and Remedy this Unlawful Action.*** In First Amendment cases like this, courts afford substantial deference to the Executive's exclusion of an alien only if the Government's decision rests on a "facially legitimate and bona fide reason." *Mandel*, 408 U.S. at 770; *Kerry v. Din*, 576 U.S. 86, 104-05 (2015) (op. of Kennedy, J.). The Supreme Court has made clear that when a visa denial burdens U.S. citizens' constitutional rights, it is lawful *only* if made "on the basis of a facially legitimate and bona fide reason" *Id*. at 104. Once the government articulates such a reason, courts will not "look behind the exercise of that discretion, nor test it by balancing its justification against" the First Amendment interests of U.S. persons. *Id*. (quoting *Mandel*, 408 U.S. at 770). Conversely, if no facially legitimate and bona fide reason is provided, the fundamental premise for judicial deference disappears. The Supreme Court pointedly *reserved* the question of what should occur "if no justification whatsoever is advanced" for a visa denial that implicates First Amendment rights. *Id.* at 103. This case squarely presents that question, because Defendants have offered no factual predicate or legitimate rationale for revoking Mr. Sultan's visa. Unlike in *Mandel* – where the Attorney General cited the invitee's past "abuse" of prior visas by exceeding the scope of his visit – and unlike in *Din* – where the consular officer's denial notice cited a specific statutory ground of inadmissibility (the terrorism-related bar of 8 U.S.C. § 1182(a)(3)(B))– here the State Department's notice to Mr. Sultan provided **no reason at all**. It did *not* identify any provision of law under which Mr. Sultan was inadmissible, nor any conduct or affiliation that would make him excludable. In short, the agency gave no facially

legitimate explanation for its action – a stark omission that distinguishes this case from both *Mandel* and *Din*.

Because Defendants have failed to proffer even a facially legitimate reason, their action is *not* entitled to the usual shield of consular nonreviewability. To be sure, as a general matter a consular official's decision to issue or withhold a visa is not subject to judicial review absent express authorization by Congress. But that general rule applies only when the decision in question falls within the lawful discretion that Congress has delegated – *i.e.* where the consular denial is made on some recognized, bona fide ground. *Mandel* teaches that the Executive's discretion in visa matters, while broad, must be exercised at least bona fide and in accordance with some legitimate reason when First Amendment rights are at stake. Here, the failure to furnish any rationale indicates that the revocation was not a bona fide application of congressionally enumerated exclusion grounds, but rather an unexplained (and thus suspect) act. The Court need not balance any competing interests or second-guess consular judgment, because Defendants have offered nothing to weigh against Plaintiffs' First Amendment rights. In this posture – where the threshold requirement of a facially legitimate reason is unmet – the doctrine of consular nonreviewability simply does not apply. As Justice Kennedy's controlling opinion in *Din* confirmed, *Mandel*'s rule compels at least **some legitimate factual justification**; a visa denial "made on the basis of a facially legitimate and bona fide reason" is generally unreviewable, but no such reason has been provided here. 76 U.S. 86, 104–06 (2015) (Kennedy, J., concurring) (controlling opinion requiring that a visa denial be based on a facially legitimate and bona fide reason)

Moreover, even apart from the constitutional dimension, basic administrative law principles reinforce that the Government cannot arbitrarily shut the door to judicial review by

withholding reasons. Again, agencies must "follow their own procedures," even when those procedures go beyond minimal statutory requirements. *See supra* (discussing the *Accardi* doctrine). Here, the State Department's established practice is to identify a ground of inadmissibility when denying or revoking a visa – a practice exemplified by the denial in *Din*, where the citation to § 1182(a)(3)(B) served to justify the exclusion. By deviating from this norm and giving Mr. Sultan no explanation, the Government violated its own regular procedure and deprived both Mr. Sultan and U.S. audiences of any notice as to *why* he was being barred. The *Accardi* doctrine prohibits an agency from flouting the rules or policies that govern its decision. As the D.C. Circuit put it, "the Accardi doctrine requires federal agencies to follow their own rules, even *gratuitous* procedural rules that limit otherwise discretionary actions." *Steenholdt v. FAA*, 314 F.3d 633, 639 (2003). In fact, "it is incumbent upon agencies to follow their own procedures . . . even where the internal procedures are possibly more rigorous than otherwise would be required." *Morton v. Ruiz*, 415 U.S. 199, 235, (1974). That principle squarely applies here. Having chosen to create a process for visa revocations (which includes at least notifying the alien of the reason or statutory basis), the State Department cannot simply ignore that process for a disfavored political dissident. An unexplained visa revocation is inconsistent with the agency's own standard practices and the minimal due process that international students can reasonably expect. The Court is well within its authority to insist that the Government adhere to the *Mandel* framework and articulate a valid reason if one exists. To hold otherwise would license officials to evade judicial review *entirely* by omitting reasons, effectively nullifying the First Amendment interests recognized in *Mandel*. Such an outcome is untenable: "[W]hat First Amendment or other grounds may be available for attacking [an] exercise of discretion for which no justification whatsoever is

advanced" remains an open question precisely because the Constitution would not countenance reason-free suppression of Americans' right to receive speech. *Mandel*, at 770.

Finally, allowing judicial review in these circumstances is fully consistent with, and indeed supported by, recent case law. Courts have not hesitated to review immigration actions when plaintiffs allege departures from the law or from mandated procedures, as opposed to merely disputing a consular officer's factual assessment. For example, in *Emami v. Nielsen*, plaintiffs challenged the Government's handling of waiver applications under the "Muslim Ban" Proclamation. The court rejected the Government's invocation of consular nonreviewability, noting that the plaintiffs did *"not challenge individual consular officer decisions on the merits"* but rather claimed that the Government "flouted its own guidelines" by instituting a policy of blanket denials contrary to the promised case-by-case process. *Emami*, 365 F. Supp. 3d 1009, 1018-19 (N.D. Cal. 2019). Because that claim focused on systemic legal violations – the agency not following the rules it had set – the court found it did "not require review of any individual consular officer's decision" and was therefore justiciable. *Id.*. Likewise, in *Moghaddam v. Pompeo*, the court emphasized that "consular nonreviewability doctrine applies only to decisions actually made by consular officers", and thus does not bar claims that the Government is *failing* to make legally required decisions or is acting outside the scope of its lawful discretion. 424 F. Supp. 3d 104, 114 (D.D.C. 2020) . Here, Plaintiffs' challenge is not a request for the Court to *second-guess* a consular officer's evaluative judgment about Mr. Sultan's visa eligibility. Rather, it is a challenge to the absence of any valid basis for the Government's action and to the unconstitutional motive inferred from that absence. In this sense, Plaintiffs ask the Court only to police the outer boundary of Defendants' discretion – to ensure that a facially legitimate reason *exists*. That modest judicial

inquiry is permitted under *Mandel* and is essential to prevent the First Amendment from being a dead letter at the border

**Plaintiff Is Likely to Succeed on the Merits**. In light of the above, Plaintiffs have more than demonstrated likely success on the merits of their challenge to Defendants' actions. In sum, because Plaintiffs (SJP and its members) have a personal First Amendment stake in Mr. Sultan's ability to speak in the United States, and because the Government has failed to provide any facially legitimate, bona fide rationale for extinguishing that stake, the Court is empowered to review the visa revocation. The doctrine of consular nonreviewability poses no bar to relief in these circumstances. To the contrary, *Mandel* and its progeny support judicial intervention where, as here, an alien's exclusion impinges on U.S. citizens' rights without the required justification. Plaintiffs are therefore likely to succeed on the merits of their claim that Defendants' revocation of Mr. Sultan's visa was unlawful and unconstitutional. Accordingly, this Court can and should grant preliminary injunctive relief to redress the ongoing violation of Plaintiffs' First Amendment rights.

Defendants also violated clear, nondiscretionary rules in terminating Plaintiff's student status and revoking his visa, a classic *Accardi* violation. They did so for an impermissible purpose – to quash Plaintiff's political advocacy – in contravention of the First Amendment. Each of these grounds is independently sufficient to deem Defendants' conduct unlawful; together, they leave little doubt that Plaintiffs will prevail on the merits. The Court should therefore enjoin the visa revocation and SEVIS termination and bar any removal of Plaintiff absent compliance with all required procedures and a showing that such action is untainted by retaliatory animus.

### d. The Bad Faith Retaliation Against Mr. Sultan for Protected Speech Violates the First Amendment and Permits Judicial Review

The First Amendment protects "freedom of speech" and the "right of the people peaceably to assemble," rights that extend to noncitizens inside the United States. U.S. Const. amend. I; *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (First Amendment applies to noncitizens). Retaliating against an individual for engaging in protected speech is a quintessential First Amendment violation. To establish a retaliation claim, Plaintiffs must show that Mr. Sultan engaged in activity protected by the First Amendment, that Defendants took adverse action against him that would chill a person of ordinary firmness from continuing that activity, and that his protected activity was a substantial motivating factor for the adverse action. Here, all elements are satisfied.

*Protected Activity.* Mr. Sultan's participation in peaceful campus protests and his advocacy through SJP are indisputably protected First Amendment activities. Political advocacy, campus demonstrations, and association with activist groups are at the core of free speech and free association protections. Defendants have not argued otherwise. Indeed, the complaint underscores that Mr. Sultan and SJP engaged in peaceful advocacy on matters of public concern (Palestinian human rights and university investments), which lies "at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011).

*Adverse Action that Would Chill Speech.* The government's actions against Mr. Sultan— revoking his visa, terminating his student status, and instigating his potential deportation—are extreme adverse measures. Op. & Order at 5–6, ECF No. 12. Exile from the country and separation from one's education is a penalty beyond mere chilling—it is freezing. Any student observing a peer effectively expelled from the U.S. for protesting would rationally be deterred from similar expression. The adverse actions here ended Mr. Sultan's ability to continue speaking on campus (since he can no longer remain on campus) and sent a clear message to others. Id. This satisfies the requirement that the government action is of a nature that would deter ordinary people from

exercising their rights. *See Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) (government action is adverse for retaliation if it would deter a person of ordinary firmness from the protected conduct). In fact, a pronounced chilling effect did occur—SJP's membership participation plummeted following the visa crackdowns..

    ***Retaliatory Motive (Causation).*** The sequence of events and direct statements by Defendants' chief executive leave little doubt that Mr. Sultan's protest activity was a substantial or predominant motive for the actions against him. Then-candidate Trump's explicit promise to "deport" foreign student protesters, and his boasts that punishing protesters would make students "behave," *id*. ¶ 109, show an official animus toward Mr. Sultan's category of speech. Once in office, President Trump's administration swiftly launched an initiative to identify and remove foreign student protesters, as evidenced by Executive Order 14161's focus on aliens who "bear hostile attitudes" or engage in certain advocacy. Op. & Order at 4, ECF No. 12. The timeline is telling: Mr. Sultan's sole infraction was an arrest at an SJP protest (with no conviction) in April 2024; less than a year later, in early 2025, his visa was revoked and status terminated under an ostensible "criminal records check" rationale. Op. & Order at 5–6. No other legitimate trigger for such action existed—his academic record was clean, he had committed no fraud or violation of visa terms. Defendants effectively reached back to the protest arrest (which had been expunged) as a pretext to achieve what the President had threatened: deport a student protester. In *Heffernan v. City of Paterson*, the Supreme Court held that even if a government retaliates based on a mistaken perception of someone's speech, it is the government's retaliatory "reason that counts." 578 U.S. 266, 272 (2016). Here, there is no mistake—the government knew Mr. Sultan engaged in pro-Palestinian protest and acted on that basis. The but-for cause of Mr. Sultan's predicament is plainly his speech.

Because Defendants retaliated against Mr. Sultan for First Amendment activity, their actions are presumptively unconstitutional unless they can satisfy strict scrutiny—i.e., show a compelling governmental interest and that the measures were narrowly tailored. They cannot. National security or foreign policy has been vaguely asserted as a pretextual justification, but no factual basis ties Mr. Sultan to any genuine threat. All he "did was standing on the South Oval . . . charged with trespass" at a campus rally, as this Court noted. TRO Hr'g Tr. at 15–16. The government cannot transmute peaceful dissent into a national security threat simply by labeling it "anti-American" or by speculating about foreign policy repercussions. In any event, even if the government had a legitimate interest in monitoring potential violence, the means chosen here—deporting a student without process—are far from narrowly tailored. This response sweeps in peaceful protesters and makes no distinction based on actual misconduct. It is a punitive measure aimed at expression itself, which fails First Amendment scrutiny.

Importantly, the doctrine of consular nonreviewability does not bar this Court from adjudicating the First Amendment claim on the merits. Normally, courts refrain from second-guessing consular visa decisions, especially when only an alien's interests are at stake. *See Dep't of State v. Muñoz*, 602 U.S. 819 (2024) (reaffirming that under the INA, visa denials are generally not judicially reviewable absent a constitutional claim of a U.S. citizen). However, *Mandel* and its progeny carved out a narrow exception: when the denial of a visa (or related action) "allegedly burdens the constitutional rights of a U.S. citizen," the court should at least verify that the Government's rationale is "facially legitimate and bona fide." *Id*.; *Kerry v. Din*, 576 U.S. 86, 105 (2015) (Kennedy, J., concurring). In this case, the visa revocation and SEVIS termination burden the First Amendment rights of U.S. persons—namely, SJP's American student members and the campus community who have a right to hear and associate with Mr. Sultan. SJP's U.S. citizen

members are effectively prevented from engaging with a fellow advocate and from receiving his viewpoint, a recognized First Amendment injury. *See Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 131–32 (2d Cir. 2009). Thus, at a minimum, *Mandel*'s standard applies: the Government must show a facially legitimate, bona fide reason for its actions. It has not done so.

The ostensible reason given to Mr. Sultan was that he "fail[ed] to maintain status" because he was "identified in [a] criminal records check" or had his visa revoked. Op. & Order at 5. This reason is neither legitimate nor bona fide under *Mandel*. It is not legally "legitimate" because mere identification in a records check is not a lawful ground for terminating a student's visa status. To be facially legitimate, a reason generally must cite a valid statute or regulation of inadmissibility or deportability—here, none was cited. The government did not invoke any specific provision of the Immigration and Nationality Act that Mr. Sultan violated. Indeed, Mr. Sultan has not violated any immigration law: he remains a bona fide student, enrolled full-time, not guilty of any crime, and not accused of fraud or security threats. The vague reference to a criminal check fails to map onto any statutory ground for removal. *Compare Kleindienst v. Mandel*, 408 U.S. 753, 758–59 (1972) (Attorney General denied waiver because applicant had abused prior visa—a specific, factual reason), with *Am. Acad. of Religion*, 573 F.3d at 137–38 (remanding where government's reason required factual examination). Here, the Government's reference to Mr. Sultan's protest arrest as a basis for status termination is invalid on its face because those charges were dismissed and cannot render him "out of status." Moreover, Defendants have flouted their own rule that "[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS record." Op. & Order at 6 (quoting DHS 2010 Policy Guidance).

In sum, Plaintiffs have demonstrated a strong likelihood of success in proving that Defendants violated the First Amendment by revoking Mr. Sultan's visa and terminating his status

in bad faith to retaliate against disfavored speech and association. Such egregious content- and viewpoint-based punishment of political expression is unconstitutional, and the normal shield of consular nonreviewability offers Defendants no refuge in the face of this bad faith.

### III.    Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief

Plaintiffs satisfy the irreparable harm factor because the injuries they are suffering now—and will continue to suffer without an injunction—are concrete, severe, and cannot be undone by later relief. Mr. Sultan's harms are not speculative; they are immediate and ongoing. Since April 21, 2025, Mr. Sultan has been unable to attend his classes or continue his research, derailing his education in the middle of the semester. Op. & Order at 5. He has lost his on-campus employment, which was both a source of income and part of his professional development. Id. Every day that passes in this status-less state is a day of educational opportunity lost, credits he cannot earn, and scholarship funds that may be in jeopardy. This disruption to one's university education constitutes irreparable harm; a semester (or more) of schooling cannot simply be recreated later, and no damages can compensate for the lost time and experience. Courts have routinely recognized that the inability to continue one's education or professional advancement, due to unlawful government action, is irreparable because of the unique nature of educational opportunities and visa conditions. *See*, *e.g.*, *Yes on Prop B v. City of Anaheim*, No. 18-cv-00680-JLS, 2018 WL 3816730, at *5 (C.D. Cal. July 9, 2018) (loss of educational opportunity is irreparable).

More gravely, Mr. Sultan faces the looming threat of removal from the United States, which would exile him from the community and life he has built here over years. Deportation is the ultimate irreparable harm in an immigration context—it would separate Mr. Sultan from his friends, professors, and SJP colleagues, and likely bar his return for a lengthy period (if not permanently). If he is forced to depart, the court's ability to accord meaningful relief later (even if

he wins on the merits) would be severely undermined. Reinstating a person after removal is logistically difficult and, in some cases, impossible. The Supreme Court has acknowledged that "removal is an irreparable harm" in itself when a plaintiff raises substantial legal questions, because it results in loss of liberty and physical separation from this country. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, while Mr. Sultan has not yet been physically removed, the ICE field office could execute removal at any time now that his status is terminated. Indeed, the termination notice effectively invites ICE to confirm his departure. Op. & Order at 5–6. Each day without an injunction is a day Mr. Sultan could be detained and put on a plane, which would moot his case and inflict irreparable injury.

Additionally, Mr. Sultan's First Amendment rights are being irreparably harmed each day by the retaliatory measures. The Supreme Court has repeatedly held that the loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). Here, Mr. Sultan has been silenced—he can no longer advocate on campus or associate with SJP without fear, because any public activity might draw enforcement attention while he is out of status. His right to speak and associate is chilled, which is itself irreparable harm. This harm extends to SJP and its members. SJP's organizational interests and the First Amendment rights of its members are currently chilled and suppressed by Defendants' ongoing enforcement posture. Students who would otherwise be organizing and speaking out are self-censoring to avoid becoming the next "visa revoked" headline. The decline in SJP's activities and membership is not something that can be easily fixed later—momentum in social activism, once lost, cannot simply be restarted. If this Court does not enjoin the retaliation, the message sent will further entrench the chill: it will signal that foreign students indeed cannot safely participate in advocacy. Such a loss—

a blighted climate of campus discourse—cannot be compensated by money damages or remedied after final judgment. It is occurring now, irreparably.

Furthermore, SJP has had to divert resources and alter its operations now, which itself is irreparable for purposes of preliminary relief. The organization's limited resources of time and money are being spent in ways that cannot be undone—hours of meetings on crisis response, funds possibly spent on legal advice or security—these are injuries that occur in real-time. Should Plaintiffs eventually prevail, SJP cannot retroactively recover those wasted opportunities or fully rebuild the lost trust among its members.

Finally, we note that Defendants themselves have effectively conceded irreparable harm in analogous cases by not opposing TROs elsewhere. At the TRO hearing in this case, the Court found irreparable harm, citing Mr. Sultan's untenable situation of having to cease studies or risk removal. Op. & Order at 8–9. And as mentioned, at least seven other TROs have been entered across the country in response to similar terminations, underscoring a consensus that the harm to these students is immediate and irreparable. Id. Thus, this factor is clearly satisfied.

## IV. The Balance of Equities Tips Sharply in Plaintiffs' Favor, and an Injunction Serves the Public Interest

When weighing the equities, the Court must consider the harm to Plaintiffs if relief is denied against the harm to Defendants if relief is granted. Here, that balance decisively favors Plaintiffs. As explained, Plaintiffs face dire irreparable injuries absent relief. By contrast, the Government will suffer minimal, if any, cognizable harm from a preliminary injunction that merely preserves the status quo of Mr. Sultan's presence and halts an unlawful enforcement action.

Harm to Defendants if Injunction Granted: Defendants may argue that any injunction interferes with executive discretion over immigration and could harm interests in national security or uniform enforcement. But in this case, an injunction would essentially require Defendants to reinstate Mr.

39

Sultan's SEVIS record (or allow him a grace period to transfer to a new program) and refrain from removing him during the pendency of the case. This does not prevent the Government from carrying out its core security functions or vetting procedures generally. Mr. Sultan has been in the U.S. for years; maintaining the *status quo ante* (his student status) for a few more months while this case is resolved imposes no material security risk. There is no evidence that Mr. Sultan himself poses any threat. All available information shows he is a peaceful student activist. Enjoining his removal or status termination would not open the floodgates to criminals or terrorists – it would apply to him (and perhaps similarly situated student protestors, if class-wide relief were considered), a narrow category. The Government's interest in enforcing immigration law does not include an interest in enforcing it in an unconstitutional or ultra vires manner. In fact, the Government "cannot suffer harm from an injunction that merely ends an unlawful practice". *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Should Defendants later prevail on the merits, they can revoke the visa then; a preliminary injunction simply pauses enforcement, which at most delays the Government's desired action. Delay alone is not cognizable harm when weighed against constitutional rights.

Moreover, Defendants' own delay undercuts any claim of urgent harm on their side. The protest that led to Mr. Sultan's arrest was in April 2024. The Government waited nearly a year (until April 2025) to terminate his status. This timing suggests there is no immediate emergency necessitating his removal; it appears coordinated with a broader political strategy rather than a pressing security need. If the Government was content to let him attend classes through fall 2024 and most of spring 2025, it can hardly argue that allowing him to finish the semester or academic year under an injunction is intolerable. In addition, any administrative inconvenience to DHS of reinstating a SEVIS record or to State of re-validating a visa is minor and routine – such things

happen regularly (students fall out of status for paperwork reasons and get reinstated). The balance of equities does not favor the Government simply because it prefers to have unbridled power. Especially in the First Amendment context, "the balance of equities favors preventing the violation of a party's constitutional rights." *Aracely v. Nielsen*, 319 F. Supp. 3d 110, 156 (D.D.C. 2018).

**Public Interest.** The public interest is closely aligned with the equitable balance in this case and strongly supports issuance of an injunction. The public has a profound interest in upholding the Constitution and fundamental rights. It is always in the public interest to prevent the government from enforcing rules or taking actions that violate constitutional principles, even in the immigration arena. *See Ragbir v. Homan*, 923 F.3d 53, 75 (2d Cir. 2019). Here, stopping a likely First Amendment violation vindicates values of open discourse and tolerance for dissent, which benefit the public at large, especially in an academic setting. The public also has an interest in agencies following the law and their own regulations—the rule of law interest. An injunction would promote respect for DHS's lawful procedures and ensure that officials do not cut corners or act arbitrarily.

Additionally, the public interest includes maintaining a free and vibrant academic environment at U.S. universities. The government's mass visa cancellations targeting activists have already drawn public concern that academic freedom and free speech on campuses are under attack. Granting a preliminary injunction for Mr. Sultan (and by example, others similarly situated) sends a message that our courts will enforce legal limits and protect peaceful speech. This reassurance itself serves the public interest by tempering fear and restoring some confidence that rights will be protected.

On the other side of the ledger, the Government might invoke a generalized public interest in "national security" or "foreign policy" decisions being respected. But the Court should demand

41

concrete evidence of harm to those interests absent immediate removal of Mr. Sultan. None has been provided. It is implausible that Mr. Sultan's continued study in Ohio threatens national security or foreign policy. In fact, if anything, the Executive Order's premise about aliens who "undermine…the rights of the American people" is turned on its head here—it is Defendants' actions that threaten to undermine Americans' rights (to hear diverse views and protest peacefully). Op. & Order at 4. The public interest favors a cautious approach where constitutional rights are fully considered, rather than a knee-jerk expulsion policy.

Finally, because this case implicates First Amendment issues, an injunction would affirm the paramount public interest in preventing the Government from penalizing individuals based on viewpoint or association. That interest cannot be overstated: it goes to the heart of democratic society that debate is free and uninhibited, and that the Government may not pick and choose who gets to speak. In the D.C. Circuit, courts have found that the public interest is served by enjoining likely unconstitutional actions by the government, even in immigration, because "the public has an interest in the Government's compliance with law and the Constitution." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).

In sum, the balance of hardships tilts entirely to Plaintiffs—they face life-altering harm, whereas Defendants face at most a temporary administrative inconvenience. And the public interest is squarely in favor of protecting legal rights and promoting fairness, not in secretive, retaliatory deportations. Therefore, both the third and fourth preliminary injunction factors weigh in favor of granting relief. As the Supreme Court noted in *Nken*, when the Government is a party these factors merge, which only strengthens the case for an injunction here given the analysis above. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); Op. & Order at 7–8C

**Conclusion**

Plaintiffs have satisfied all the requirements for preliminary injunctive relief. As detailed above, they have demonstrated a strong likelihood of success on the merits of their claims. Defendants' conduct flagrantly violates Plaintiffs' constitutional rights—punishing protected speech and association in contravention of the First Amendment, and stripping Plaintiffs of legal status without due process in violation of the Fifth Amendment. Defendants have also failed to follow their own established regulations and procedures, in breach of the Accardi doctrine, and their actions are arbitrary, capricious, and contrary to law in violation of the Administrative Procedure Act. Defendants' attempt to invoke the doctrine of consular nonreviewability cannot shield these unlawful actions from judicial scrutiny, especially where, as here, Plaintiffs raise serious constitutional and statutory violations. Plaintiffs have further shown that they will suffer immediate and irreparable harm absent injunctive relief: the loss of lawful immigration status, the chilling of First Amendment freedoms, and the threat of removal from the United States constitute irreparable injuries for which there is no adequate remedy at law. The balance of equities tips sharply in Plaintiffs' favor, and an injunction will serve the public interest by upholding the rule of law and preventing ongoing constitutional harm while this case is decided on the merits.

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for a Preliminary Injunction. In particular, Plaintiffs ask that the Court enter an Order providing the following relief pending final judgment in this case:

1. Restoration of Immigration Status: Directing Defendants to immediately restore and maintain Plaintiff Ahwar Sultan's F-1 student visa status, including returning his SEVIS (Student and Exchange Visitor Information System) record to "active" status, and to ensure that he remains in lawful student status for the duration of this litigation.

2. Enjoin Retaliatory Visa Actions: Preliminarily enjoining Defendants, their officers, agents, and all persons acting in concert with them, from enforcing or implementing the visa termination, Student Criminal Alien Initiative, or any related policy against Plaintiffs in a manner that penalizes or targets them for engaging in protected First Amendment activity. This includes prohibiting Defendants from again terminating Plaintiff Sultan's visa or initiating removal proceedings against him solely on the basis of his participation in lawful protests and associations and likewise prohibiting any adverse immigration action against the Plaintiff organization (Students for Justice in Palestine at The Ohio State University) or its members on the basis of their protected speech or political associations.

3. Maintain the Status Quo: Restraining Defendants from taking any steps to remove, deport, or otherwise retaliate against Plaintiff Sultan as a result of the now-rescinded visa status or his political activities, thereby preserving the status quo and ensuring that Plaintiff can continue his studies and advocacy without fear of imminent harm while this case is pending.

4. Further Relief as Just and Proper: Granting such other and further relief as the Court deems just and proper to fully protect Plaintiffs' rights and to effectuate the Court's order.

Plaintiffs respectfully submit that such relief is necessary and appropriate to prevent irreparable harm and to vindicate the fundamental constitutional and statutory rights at stake in this matter. Accordingly, Plaintiffs pray that the Court issue the requested preliminary injunction without delay.

//

//

//

44

//

Dated: Brooklyn, NY

      May 9, 2025

                       Respectfully submitted,

                       */s/ Rafael Urena*
                       Rafael Urena
                       Jana Al-Ahkras
                       *Attorneys for the Respondent*

                       **Urena & Associates, PLLC**
                       42 West St, Floor R
                       Brooklyn, NY 11222
                       Email: ru@urenaesq.com
                       Tel: (888) 817-8599

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send electronic notification of such filing to all attorneys of record.  I

Dated: May 9, 2025

/s/ Rafael Urena
Rafael Urena, Esq.